Daniel B. Bidegaray
BIDEGARAY LAW FIRM, LLC
104 East Main Street, Suite 305
Bozeman, MT 59715
Ph: (406) 522-7744
Fax: (406) 534-7629
Email: Daniel@BidegarayLawFirm.com
*Attorney for Plaintiff*



## MONTANA EIGHTH JUDICIAL DISTRICT COURT, CASCADE COUNTY

| | |
|---|---|
| MICHELLE KING, as the PERSONAL REPRESENTATIVE OF THE ESTATE OF ROBERT GLENN KING,<br><br>Plaintiff,<br><br>v.<br><br>UNITED TEACHER ASSOCIATES INSURANCE COMPANY, CONTINENTAL GENERAL INSURANCE COMPANY, GREAT AMERICAN LIFE INSURANCE COMPANY, CONTINENTAL LTC, INC. fka CONTINENTAL INSURANCE, INC., and DOES I-V,<br><br>Defendants. | ADV-18-0601<br>Cause No. Gregory G. Pinski<br>CV-21-87-GF-BMM<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

Plaintiff, Michelle King ("Michelle") through counsel, states:

1. Michelle is the Personal Representative of the Estate of Robert Glenn King.

2. Defendants are corporate entities involved in the business of insurance within the state of Montana.

3. The true names or capacities, whether individual, corporate, associated, or otherwise, of defendants and does I-V, inclusive, are unknown to plaintiff. Therefore, plaintiff sues defendants and does I-V by using these fictitious names. Plaintiff alleges that each of the

defendants sued as a doe is legally responsible in some manner for the events and happenings referred to herein and will ask leave of this Court to amend this complaint to insert their true names and capacities in place of the fictitious names when and if the same become known to plaintiff.

## BACKGROUND

4. Robert Glenn King ("Robert") was born in 1936.

5. After honorable discharge from the Army, Robert went to college, obtained a Bachelor of Science degree, married his wife Margaret Rose in 1962, started a family, and pursued a career in the insurance industry.

6. Robert worked for Fireman's Fund in Helena Montana as a claim adjuster for years, then he and Margaret owned and operated the American Insurance Center in Helena selling insurance, before devoting the final years of his professional career as risk manager for the Montana Municipal Insurance Authority, again involved in adjusting insurance claims.

7. Margaret passed away on April 16, 1995. In the years following her death, Robert became concerned about getting old, losing the ability to care for himself, and becoming a burden on his children.

8. Robert believed in insurance, and wanted to have financial arrangements in place for his own care if that became necessary.

9. In August 2004, Robert bought long term care insurance through Great American Life Insurance Company (Great American Life). A copy of the policy is attached and incorporated as Exhibit A.

10. Robert timely paid all premiums owing for his long term care coverage from the time of purchase until his death.

## THE INSURANCE COMPANIES

11. Great American Life is a subsidiary of Great American Financial Resources, Inc. (Great American Financial).

12. Effective January 1, 2010, Great American Life entered into an assumption reinsurance agreement with United Teacher Associates Insurance Company (United Teachers Insurance) with respect to certain policies which included Robert's long term care policy.

13. United Teachers Insurance was also a subsidiary of Great American Financial.

14. After this assumption took place, United Teachers Insurance represented to Robert in part:

> **Policyholder: Please be advised that you retain all rights with respect to your policy against Great American Life Insurance Company in the event that United Teacher Associates Insurance Company is unable to fulfill its obligations. In such event, Great American Life Insurance Company remains liable to you notwithstanding the terms of its assumption agreement.**
>
> All of the terms and conditions of the Policy remain unchanged, except that **UNITED TEACHER ASSOCIATES INSURANCE COMPANY** shall be the insurer.

15. On December 24, 2015, HC2 Holdings, Inc. (HC2), acquired two of Great American Financial's subsidiaries: 1) United Teachers Insurance, and 2) Continental General Insurance Company (Continental General).

16. HC2's acquisition of United Teachers Insurance and its block of long term care business included Robert's long term care policy.

17. At or about the time of the purchase of United Teachers Insurance, HC2 created a new insurance unit called Continental Insurance Group, Ltd.

18. The following appears to be the hierarchical ownership of these companies:



19. HC2 Holdings 2, Inc. is a wholly owned subsidiary of HC2 Holdings, Inc.

20. Continental Insurance Group, LTD is a wholly owned subsidiary of HC2 Holdings 2, Inc.

21. Continental LTC, Inc. fka Continental Insurance, Inc. is a wholly owned subsidiary of Continental Insurance Group, LTD.

22. United Teachers Insurance and Continental General are wholly owned subsidiaries of Continental LTC, Inc. fka Continental Insurance, Inc.

23. On December 31, 2016, United Teachers Insurance merged into Continental General, leaving only Continental General as the surviving company.

24. United Teachers Insurance's authority to conduct insurance business was cancelled and it could no longer operate in Montana or elsewhere.

COMPLAINT AND DEMAND FOR JURY TRIAL 4

## AFTER CHANGE IN OWNERSHIP

25.     On January 22, 2016, United Teachers Insurance notified Robert that HC2 Holdings, Inc. had purchased United Teachers Insurance and stated:

> Thank you for your continued business with United Teacher Associates Insurance Company. We are pleased to announce that HC2 Holdings, Inc. (HC2) has completed its acquisition of United Teacher Associates Insurance Company (UTA) and Continental General Insurance Company (CGI) from American Financial Group, Inc. (AFG), the parent company of Great American Insurance Group.
>
> Please know that the acquisition **does not** change or limit any rights you have under your contract. The organization formerly known as **Great American Insurance Group's Long Term Care Division** will now be called **Continental Insurance, Inc.** No administrative changes are scheduled to occur as a result of the acquisition and your Long Term Care contract will continue to be administered by the same office in Austin, Texas.
>
> For more information regarding this acquisition, please visit www.hc2.com to view the press release under the Investor Relations section. We look forward to servicing your insurance needs for many years to come.
>
> /s/ Roger E. Desjardins, Chief Operating Officer, LTC Operations

## ROBERT'S LONG TERM CARE COVERAGE

26.     Robert's long term care policy provides for payment of up to $100 per day for care in a facility received by eligible policyholders.

27.     Robert's long term care insurance policy also includes a provision entitled "Alternate Payment Benefit Rider" which promises to pay $1,000 per month if a policyholder meets the benefit eligibility requirements, but instead of receiving care in a facility, elects to remain at home and receive care from his/her family.

28.     The Alternate Payment Benefit Rider provides in part:

> We will pay benefits when We verify that:
>
>     1.     You are unable to perform, without Substantial Assistance from another person, at least 2 Activities of Daily Living for a period of at least 90 consecutive days due to a loss of functional capacity; or

2. You require Substantial Supervision to protect Yourself from threats to health and safety due to a Severe Cognitive Impairment; and

3. A Licensed Health Care Practitioner has certified, within 12 months, that You meet the Activity of Daily Living or the Severe Cognitive Impairment requirements above, and has developed a written Plan of Care which details the Qualified Long Term Care You need.

29. Substantial assistance is defined in the policy as including either hands-on assistance or standby assistance.

30. The policy lists ADLs as:

1. **Eating. Feeding Yourself.** by getting food into Your body from a receptacle (such as a plate, cup or table) or by a feeding tube or intravenously.

2. **Dressing.** Putting on and taking off all items of clothing and any necessary braces, fasteners or artificial limbs.

3. **Bathing.** Washing yourself by sponge bath; or in either a tub or shower, including the task of getting in or out of the tub or shower.

4. **Toileting.** Getting to and from the toilet, getting on and off the toilet, and performing associated personal hygiene.

5. **Transferring.** Moving into or out of a bed, chair or wheelchair.

6. **Continence.** The ability to maintain control of bowel and bladder function; or, when unable to maintain control of bowel or bladder function, the ability to perform associated personal hygiene, including caring for a catheter or colostomy bag.

### ROBERT'S PHYSICAL DECLINE

31. When Robert purchased this long term care policy at age 68, he stood six feet four inches tall and weighed almost 300 pounds.

32. As Robert aged in the years following, he suffered chronic swelling of his lower legs, his balance and mobility decreased, he lost strength, and he gained weight.

33. By mid-2011, Robert weighed over 330 pounds.

34. By August of 2011, Robert relied on a walker and a wheelchair because of his poor balance and risk of falling.

35. By August 2011, Robert needed assistance with bathing, toileting and getting out of chair.

36. In August of 2011, Robert moved to the home of his daughter, Michelle and her family in Helena, so she could help take care of him.

37. In September 2011, he suffered from a cellulitis condition on his leg which resulted in hospitalization from September 7, 2011, through September 21, 2011, and again from October 28, 2011, through November 4, 2011.

38. In September of 2011, Robert began using compression socks as recommended by his care provider to reduce swelling and improve circulation in his legs.

39. Robert could not put on or remove compression socks without assistance.

40. Pneumonia caused Robert to enter the hospital again from March 16, 2012, through March 18, 2012.

41. By June 2012, Robert's relied on a wheelchair as his primary mode of mobility.

42. On December 4, 2012, Robert underwent a total left knee replacement.

43. On February 11, 2013, Robert called United Teachers Insurance to update his mailing address and to inquire about policy benefit related to the assistance his daughter provided.

44. A company representative told Robert that to qualify for benefits his caregiver could not be a relative.

45. From November of 2013, until March of 2016, Robert was hospitalized three times for various health conditions.

46. On his 80th birthday in March 2016, Robert's medical provider informed him he had pancreatic cancer.

47. Later in March, Robert began hospice care.

48. Robert continued to need substantial assistance with 2 or more ADLs throughout 2016.

49. Robert did not want to leave his family to live his final days in a facility.

50. In March 2016, Michelle quit her job to stay home full time to care for Robert.

## ROBERT CALLS TO MAKE A CLAIM

51. Starting in March 2016, Robert made several calls to the phone number provided by defendants requesting benefits under his long term care policy.

52. Each time Robert was told the policy did not pay benefits if a family member provided the care.

53. In July 2016, Michelle took over communications with defendants.

54. Defendants told Michelle that Robert would qualify for benefits if she became a certified personal care attendant.

55. In reality the alternate payment benefit rider does not exclude benefits when care is provided by family members nor does it require that families be licensed care providers.

56. However, neither Robert nor Michelle understood the legal construction and interplay between the rider and the primary policy coverage, and were misled by Defendants' misrepresentations.

57. Defendants on the other hand, know and understand the legal effect of their own coverage and riders.

58. Michelle agreed to become a certified personal care attendant.

COMPLAINT AND DEMAND FOR JURY TRIAL                                          8

## DEFENDANTS SEND NURSE TO ASSESS ROBERT

59. On August 2, 2016, defendants arranged for an assessment of Robert's physical condition by an independent nurse.

60. The nursing assessment corroborated Robert's need for assistance with 2 or more ADLs as defined in the policy.

61. In September of 2016, Michelle became a certified personal care attendant through A-Plus Healthcare in Helena.

62. Robert received a letter dated October 4, 2016 from Great American Life approving his claim for long term care benefits under the Home and Community Care Benefits provision of the policy.

63. However, a month after receiving Great American's October 4, 2016 letter approving his claim, Defendants still had not made any payment.

64. On November 6, 2016, Robert died.

65. After Robert's death, defendants sent Michelle a letter dated December 6, 2016, along with a check for $3,167.74.

66. The explanation of benefits accompanying United Teachers $3,167.74 check indicated this payment represented benefits owed under the policy's Alternate Payment Benefit Rider from August 2, 2016, the date of the nurse assessment, through November 6, 2016, the date of Robert's death.

67. This letter states, "all claims received in our office have been processed through November 6, 2016. At this time we are moving the claim out of active status and you will not hear from us again unless we hear from you."

68. The policy provides policyholders with the right to appeal claim decisions by requesting reconsideration in writing which must be received by the company within 60 days of the denial.

69. On January 31, 2017, Michelle sent Great American Life medical records documenting Robert's need for substantial assistance with dressing, bathing, toileting and transferring before August 2, 2016.

70. In Michelle's January 31, 2017 letter, she again explained:

> . . . August 2, 2016 was the day my father was assessed by the nurse Great American sent to our house. This was not the first day that my Dad could not do two or more ADL's. He could not do two or more ADL's for a substantial period before August 2, 2016. He was put on Hospice in March of 2016, but as you can see from the attached medical records, he needed assistance with ADL's for several years before March of 2016. I am enclosing medical records which discuss that he needed help with dressing, bathing, toileting, and transferring long before August 2, 2016.
>
> In the months leading to my Dad's death, his interactions with Great American were so frustrating that I dealt with it to help minimize the stress he would experience from these interactions. One of the last times that my Dad and I discussed this policy he asked that I please fight Great American because he felt that the way it was treating him was wrong. He died thinking he had been taken advantage of by Great American and he didn't want others to be cheated. My Dad believed in insurance but this experience made him second guess the industry he worked in for so many years. Please pay all benefits owed under this policy. The benefits should start substantially before August 2, 2016.

71. Following Michelle's appeal of the benefit calculation, Great American sent her a letter dated February 1, 2017, stating in part, "we are acknowledging receipt of your request appealing Mr. Robert King's eligibility date under his Great American Life insurance Long Term Care Policy. The information we received is being reviewed at this time. We will advise you shortly regarding the status of your appeal request."

72. On March 7, 2017, Michelle spoke with Ms. Glasgow, a representative of Great American Life, and explained that Robert's inability to perform 2 or more ADLs started long before nursing assessment on August 2, 2016.

COMPLAINT AND DEMAND FOR JURY TRIAL                                                         10

73. Ms. Glasgow agreed that Robert's physical condition as revealed by the August 2, 2016 nurse assessment, probably did not materialize instantaneously on that very day, and requested additional records including the dates of Robert's hospitalizations.

74. On March 9, 2017, as requested by Ms. Glasgow, Michelle sent a letter to Great American Life with additional medical records reflecting Robert's physical condition that supported his need for substantial assistance with 2 or more ADLs before August 2, 2016, and outlined several dates he was hospitalized.

75. By May 10, 2017, because Michelle had not received a response to her March 9, 2017 letter, she followed up with another letter to Great American Life inquiring about this claim.

76. To date, Michelle has not received a response from any defendant regarding her appeal.

## JOINT LIABILITY AND SIMILAR THEORIES

77. All paragraphs are restated herein.

78. Defendants each participated in providing the insurance or processing the claim described herein and each of them owed duties as set forth by law.

79. Defendants are also jointly and/or vicariously liable for each other's conduct.

80. Based on information and belief, defendants tortiously acted in concert or under a common design causing him harm.

81. Based on information and belief, defendants knowingly provided substantial assistance or encouragement to the other to breach duties owed to plaintiff, causing him harm.

82. Based on information and belief, defendants assumed duties and engaged in acts/or omissions in violation of such duties, causing him harm.

83. Based on information and belief, defendants substantially assisted the other in accomplishing a tortious result and their own conduct, separately considered, constitutes a breach of duty owed to plaintiff causing him harm.

84. Based on information and belief, defendants have entered into an agreement in which each member became the agent, partner or delegee of the other members, and engaged in acts and/or omissions in violation of duties owed to plaintiff causing him harm.

85. Based on information and belief, defendants ratified each other's acts/omissions in breaching duties owed to plaintiff, causing him harm.

### BENEFITS OWED/BREACH OF CONTRACT

86. All paragraphs are restated herein.

87. Defendants owed Robert $1,000 for each month he was unable to perform, without substantial assistance from another person, at least 2 ADLs for a period of at least 90 consecutive days due to loss of functional capacity and as documented by his medical providers.

88. Defendants knew Robert did not first become unable to perform 2 or more ADLs for the first time on August 2, 2016, the day of the nursing assessment.

89. Defendants knew Michelle did not have to be a certified personal care attendant before benefits were owed Robert.

90. To the extent that Robert had not met any technical conditions precedent to coverage, that omission was caused or contributed to by defendants. Such performance was prevented or delayed by the acts of defendants.

91. By misrepresenting that the policy provided no benefits when care is provided by a family member, and by failing to provide claim forms as required by law and the policy,

defendants induced Robert to not address various conditions precedent to coverage such as a written claim submission, a formal plan of care, or any other technical requirements.

92. Robert did not submit a written claim earlier than he did because he was told the policy provided no coverage if care was being provided by a family member.

93. Robert did not specifically arrange for a licensed health care provider to certify his physical condition or create a written plan of care for insurance purposes because representatives of defendants told him the policy provided no coverage if care was being provided by a family member.

94. Defendants also prevented or delayed the performance of conditions precedent by failing to comply with other duties required by law, including: 1) failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies; 2) failing to adopt and implement reasonable standards for the prompt investigation of claims arising under insurance policies; 3) failing to promptly provide a reasonable explanation of the basis in the insurance policy in relation to the facts or applicable law for denial of a claim or for the offer of a compromise settlement.

95. Defendants should be equitably estopped from asserting nonperformance of conditions precedent other than inability to perform 2 or more ADLs without substantial assistance.

96. Defendants owed Robert benefits before August 2, 2016, commencing at the latest a reasonable when defendants first had notice of a potential claim and opportunity to investigate.

97. Defendants have wrongly not paid the benefits owed.

98. Defendants not only breached expressed conditions of the contract, they breached duties implied by the contract and by law.

99. Defendants also breached the contract by not properly responding to plaintiff's appeal or complying with the obligations set forth in the policy.

## VIOLATION OF THE UNFAIR TRADE PRACTICES ACT

100. All paragraphs are restated herein.

101. Defendants must comply with Montana law regarding Robert's insurance claim; this included but is not limited to complying with the Unfair Trade Practices Act.

102. Specifically, an insurance company may not: 1) misrepresent pertinent facts or insurance policy provisions relating to coverages at issue; 2) refuse to pay claims without conducting a reasonable investigation based upon all available information; 3) fail to affirm or deny coverage of claims within a reasonable time after proof of loss statements have been completed; or 4) neglect to attempt in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear.

103. Defendants violated the Montana Unfair Trade Practices Act.

## COMPENSATORY DAMAGES

104. All paragraphs are restated herein.

105. Defendants' acts as alleged herein proximately caused the following harm:

   A. loss of benefits available under the contract in the amount of $1,000 for each month Robert met the eligibility requirements or could have met the eligibility requirements had defendants performed their duties;

   B. interest on the contract amounts owing as provided by law, and interest on contract amounts delayed by reason of defendants acts and omissions;

 C. attorneys' fees;

 D. emotional upset, anxiety, annoyance, frustration, worry, loss of sleep and other emotional harms, and wasted time during a period when Robert had little time left; and

 E. such other damages as shown by the evidence and as appropriate under Montana law.

## PUNITIVE DAMAGES

106. All paragraphs are restated herein.

107. Defendants have acted with actual malice and/or actual fraud as defined by Section 27-1-221, MCA.

108. Defendants' conduct is sufficiently wrong to warrant a fine in the form of punitive damages. Defendants should be fined for their conduct. The trier of fact must determine a fine sufficient to punish defendants and to deter defendants and others from acting similarly.

## DECLARATORY JUDGMENT

109. Plaintiff, under the Montana Declaratory Judgments Act, seeks declaratory judgment in plaintiff's favor that the policy was in full force and effect at the time of Robert's death and that additional long term care benefits are due and owing, plus interest, attorney fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment of and from defendants for all damages allowed by law, including but not limited to benefits owed, interest, costs, attorneys' fees, economic and non-economic damages, punitive damages, and such other and further relief to which may be just and equitable.

DATED this 25th day of October, 2018.

BIDEGARAY LAW FIRM, LLC

_/s/ Daniel B. Bidegaray_
Daniel B. Bidegaray
*Attorney for Plaintiff*

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

DATED this 25th day of October, 2018.

BIDEGARAY LAW FIRM, LLC

_/s/ Daniel B. Bidegaray_
Daniel B. Bidegaray
*Attorney for Plaintiff*