# EXHIBIT C

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF MONTANA
 2                    GREAT FALLS DIVISION

 3   MICHELLE KING, as the        )
     Personal Representative of   )
 4   the Estate of ROBERT GLENN   )
     KING,                        )
 5                                ) No.  4:21-cv-00087-BMM
                    Plaintiff,    )
 6                                )
         vs.                      )
 7                                )
     UNITED TEACHER ASSOCIATES    )
 8   INSURANCE COMPANY,           )
     CONTINENTAL GENERAL          )
 9   INSURANCE COMPANY, GREAT     )
     AMERICAN LIFE INSURANCE      )
10   COMPANY, CONTINENTAL LTC,    )
     INC. fka CONTINENTAL         )
11   INSURANCE, INC., and DOES    )
     I-V,                         )
12                                )
                    Defendants.   )
13   _____)

14

15

16            Taken at 7 West Sixth Avenue
                    Helena, Montana
17        Tuesday, December 10, 2024 - 9:05 a.m.

18

19               D E P O S I T I O N

20                        OF

21                  MICHELLE KING

22

23

24        Reported by Mary R. Sullivan, RMR, CRR
                 Sullivan Court Reporting
25           406.721.2588  scr@montana.com
```

Page 2

```
 1              A P P E A R A N C E S

 2

 3   For the Plaintiff:

 4        Daniel B. Bidegaray, Esq.
          BIDEGARAY LAW FIRM, LLC
 5        104 East Main Street, Suite 305
          Bozeman, Montana 59715
 6        Daniel@BidegarayLawFirm.com

 7        and

 8        Michael Abourezk, Esq.
          (Via Videoconference)
 9        2020 West Omaha Street
          P.O. Box 9460
10        Rapid City, South Dakota 55709
          mike@abourezk.com
11
     For the Defendants:
12
          Sandra K. Jones, Esq.
13        (Via Videoconference)
          Nicole C. Wixted, Esq.
14        (Via Videoconference)
          Jessica L. Gallagher, Esq.
15        (Via Videoconference)
          FAEGRE DRINKER BIDDLE & REATH LLP
16        One Logan Square, Suite 2000
          Philadelphia, Pennsylvania 19103
17        Sandra.Jones@faegredrinker.com
          Nicole.Wixted@faegredrinker.com
18        Jessica.Gallagher@faegredrinker.com

19        and

20        Maxon R. Davis, Esq.
          (Via Videoconference)
21        DAVIS, HATLEY, HAFFEMAN & TIGHE, P.C.
          The Milwaukee Station, Third Floor
22        101 River Drive North
          P.O. Box 2103
23        Great Falls, MT 59403-2103
          Max.Davis@dhhtlaw.com
24
     ALSO PRESENT: John Murphy, Videographer
25
```

Page 3

```
 1                I N D E X

 2   DEPONENT:                           PAGE:

 3   MICHELLE KING

 4        Examination by Ms. Jones.................. 9

 5

 6   EXHIBITS:

 7   Exhibit 1    St. Peter's Hospice Skilled

 8                Nursing Admission Visit.......... 64

 9   Exhibit 2    St. Peter's Hospice Hospice Plan

10                of Care.......................... 69

11   Exhibit 3    CONFIDENTIAL Instructions for

12                Filing a New Long Term Care

13                Claim............................ 80

14   Exhibit 4    CONFIDENTIAL August 2016 benefit

15                eligibility assessment........... 86

16   Exhibit 5    Note Log......................... 95

17   Exhibit 6    CONFIDENTIAL Provider Claim Form. 106

18   Exhibit 7    CONFIDENTIAL October 4, 2016

19                letter from Great American Life

20                Insurance Company to Michelle

21                King Re:  Claim Approval......... 109

22   Exhibit 8    CONFIDENTIAL 11/17/16 Fax from

23                Daniel Leal

24                Re:  REQUEST FOR CLAIM DOCUMENTS

25                FOR ROBERT KING- AI00001227...... 119
```

Page 4

```
 1   INDEX: (Contd.)

 2   EXHIBITS: (Contd.)                     PAGE:

 3   Exhibit 9        August 24, 2023 letter from

 4                    Bidegaray Law................... 150

 5

...

23   Stipulations...................................   5

24   Certificate of Court Reporter................. 153

25   Errata Sheet.................................. 154
```

Page 5

```
 1            S T I P U L A T I O N S

 2

 3      It was stipulated by and between counsel

 4   for the respective parties that the deposition be

 5   taken by Mary R. Sullivan, Freelance Court

 6   Reporter and Notary Public for the State of

 7   Montana, residing in Missoula, Montana.

 8

 9      It was further stipulated and agreed by

10   and between counsel for the respective parties

11   that the deposition be taken in accordance with

12   the Federal Rules of Civil Procedure.

13

14      It was further stipulated and agreed by

15   and between counsel for the respective parties and

16   the deponent that the reading and signing of the

17   deposition would be expressly reserved.

18

19

20

21

22

23

24

25
```

Page 6

1  TUESDAY, DECEMBER 10, 2024
2  **THE VIDEOGRAPHER:** This is the video
3  deposition of Michelle King taken by the defendant
4  in the matter pending before the United States
5  District Court for the District of Montana,
6  Great Falls Division. Cause Number
7  4:21-cv-00087-BMM. Wherein Michelle King as the
8  personal representative of the Estate of Robert
9  Glenn King as plaintiff, and United Teachers [sic]
10  Associates Insurance Company, Continental General
11  Insurance Company, Great American Life Insurance
12  Company, Continental, LTC, Incorporated formerly
13  known as Continental Insurance Incorporated, and
14  Does I through IV -- I through V are defendants.
15  Deposition is being held at the offices
16  of Lesofski Court Reporting, 7 West 6th Avenue,
17  Helena, Montana.
18  Today's date is December 10th, 2024.
19  Time is 9:06.
20  My name is John Murphy, video specialist
21  employed by Mountain Star Productions, Helena,
22  Montana.
23  The reporter's name is Mary Sullivan for
24  Lesofski Court Reporting.
25  Counsel will now introduce themselves,

Page 7

1  and the court reporter will swear in the witness.
2  **MR. BIDEGARAY:** Daniel Bidegaray on
3  behalf of the plaintiff, along with Mike Abourezk.
4  **MS. JONES:** Sandra Jones of Faegre
5  Drinker Biddle & Reath for the defendants
6  Continental General Insurance Company, Continental
7  LTC, Inc. and associates. All of them is
8  Continent -- (Zoom audio disruption) -- I have
9  co-counsel with me -- (Zoom audio disruption) --
10  Jessica L. Gallagher --
11  **THE COURT REPORTER:** We need to -- We
12  need to --
13  **MS. JONES:** -- and --
14  **THE COURT REPORTER:** Excuse me, Counsel.
15  We need to go off the record.
16  **MS. JONES:** Sure.
17  **THE VIDEOGRAPHER:** Time is 9:06. Going
18  off the record.
19  (Recess taken from 9:23 a.m. to
20  9:28 a.m.)
21  **THE VIDEOGRAPHER:** Time is 9:28. Back on
22  the record.
23  **MS. JONES:** Excellent. Okay. So after
24  those technical difficulties, my name is
25  Sandra Jones. I'm a partner at Faegre Drinker

Page 8

1  Biddle & Reath. "Faegre" is spelled F-a-e-g-r-e.
2  I represent the defendants Continental General
3  Insurance Company, Continental LTC, Inc., and
4  United Teacher Associates, Inc., but I'm going to
5  refer to them all as "Continental" throughout this
6  deposition.
7  I'm here with my co-counsel
8  Jessica L. Gallagher and Maxon Davis.
9  **MS. WIXTED:** This is Nicole Wixted also
10  from Faegre Drinker Biddle & Reath, and I
11  represent Great American Life Insurance Company
12  now known as MassMutual Ascend Life Insurance
13  Company.
14  **MR. DAVIS:** And just for the record,
15  Max Davis, and I am co-counsel, as Ms. Jones says,
16  for her clients, and I'm also co-counsel with
17  Ms. Wixted for her client.
18  **MS. JONES:** All right. All right. Thank
19  you, Max.
20  So court reporter, you may swear the
21  witness.
22  Thereupon,
23  MICHELLE KING,
24  a witness of lawful age, having been sworn to tell
25  the truth, the whole truth, and nothing but the

Page 9

1  truth, testified as follows:
2  **EXAMINATION**
3  **BY MS. JONES:**
4  Q. Great. Thanks, Ms. King. Again, my
5  name's Sandy. You can call me "Sandy."
6  A. Okay.
7  Q. I don't know if you have been deposed
8  before.
9  A. No.
10  Q. I guess I should ask you, have you ever
11  been deposed before?
12  A. No.
13  Q. Okay. So I'll give you -- and I'm sure
14  you've talked to your counsel, but I'll give you a
15  couple of basic -- I don't want to call them
16  really rules, per se, but things to remember.
17  So it's difficult in this environment
18  because we're not sitting face to face to be able
19  to -- to stop each other and articulate certain
20  things, so it's important that you let me ask the
21  question of you, which it'll -- it'll flow like an
22  interview, and then you give your answer, and we
23  will try our best not to talk over one another
24  because the court reporter has to record all of
25  this, and so, again, like, it reads like a -- the

Page 10

```
 1   script of a play --
 2  A.  Okay.
 3  Q.  -- where it all -- Right?
 4  A.  Okay.
 5  Q.  Any time that you need a break, you just
 6   let me know or let the folks in the room know, but
 7   you can only ask for a break after you answer a
 8   question, so not while a question's pending, which
 9   I'm sure makes sense to you.
10  A.  Yep.
11  Q.  Also try to answer yes, no instead of yep
12   or -- or shake your head or anything like that
13   because the court reporter has to gather that
14   answer from you.
15  A.  Got it.
16  Q.  If there -- If there's anything that I
17   ask you and you don't understand, just ask me to
18   clarify, I'm happy to do that.
19  A.  Okay.
20  Q.  And again, I'll try and speak as slowly
21   and clearly as possible.
22      So the first question's kind of a silly
23   one, but I always ask it, which is are you under
24   the influence of any drugs, alcohol, or medication
25   that would impair your ability to testify
```

Page 11

```
 1   truthfully or honestly today?
 2  A.  No.
 3  Q.  And who is in the room with you aside
 4   from the court reporter and the videographer.
 5  A.  Daniel Bidegaray?
 6  Q.  And just Daniel?
 7  A.  Yes.
 8  Q.  Okay.  What did you do to prepare for
 9   this deposition.
10      MR. BIDEGARAY:  I'm gonna interject an
11   objection.  The question's overbroad.
12      Anything you did to prepare with me I'm
13   gonna -- gonna instruct you not to answer that.
14   Now, if you did some things on your own separate
15   and aside from me, you can go ahead and answer
16   with that qualification.
17  A.  I just kind of reviewed in my head
18   what -- things that I could never forget of the
19   last, let's see, 13 years.
20      BY MS. JONES:
21  Q.  And did you read any documents to prepare
22   for the deposition?
23      MR. BIDEGARAY:  Same objection.
24      Same instruction.
25  ///
```

Page 12

```
 1      BY MS. JONES:
 2  Q.  Did you read any documents on your own to
 3   prepare for the deposition.
 4  A.  No.
 5  Q.  Did you talk with anyone other than
 6   Mr. Bidegaray about the deposition.
 7  A.  No.
 8  Q.  Where do you currently live?  What's your
 9   address, I should say.
10  A.  4015 Chapparal Drive, Helena, Montana.
11  Q.  And who lives with you at that address.
12  A.  My husband and my children.
13  Q.  How old -- What's your husband's name?
14  A.  Scott Klatt.
15  Q.  And -- Oh, sorry.  Scott, I'm sorry,
16   Klatt?
17  A.  Yes.
18  Q.  And how old are your children.
19  A.  I have a 17-year-old and a 14-year-old.
20  Q.  And let's talk about your education.
21      What's your highest level of education.
22  A.  I have a master's degree in education
23   curriculum and instruction.
24  Q.  And where did you go for that.
25  A.  I did that University of Phoenix online.
```

Page 13

```
 1  Q.  When did you get that degree?
 2  A.  2004 maybe I finished it?
 3  Q.  And where did you go to college.
 4  A.  To Montana State University in Bozeman,
 5   Montana.
 6  Q.  And what was your degree from there.
 7  A.  I have two degrees.  The first time I got
 8   a degree in health promotion and wellness, and
 9   then I decided to go back, and I got a degree in
10   elementary education, certified K through 8.
11  Q.  Okay.  When was the first degree.
12  A.  I graduated in 1995, and I went back to
13   school and graduated with my education degree in,
14   I believe, 1999.
15  Q.  So did you go back to back?  Did you have
16   to go to college for eight years or did you -- was
17   there a break in between.
18  A.  There was a break in between.  I had to
19   do a -- an internship for my health promotion and
20   wellness, and so I did that.  And then I had some
21   fun jobs, and then I needed to go back
22   to school to do teaching 'cause I liked kids.
23  Q.  Got it.  What were -- What were some of
24   those fun jobs.
25  A.  I worked at a daycare center, and that
```

Page 14

1 was where I decided I really loved working with
2 kids, and that's what made me decide to go back to
3 college for education. And it only took two years
4 'cause I had a lot of -- a lot of the classes
5 carried over from my previous degree.
6 Q. What did you do -- What was your first
7 job after college, if you remember.
8 A. Well, it was probably my internship when
9 I was doing health fairs and that kind of stuff,
10 health fairs and taking people's blood pressure
11 and checking eyes and cholesterol and those kind
12 of things.
13 Q. After your internship, what was your --
14 what was your first, I guess, paid job.
15 A. Working at the daycare center.
16 Q. So can you walk me through your
17 employment history going back from now, I guess
18 maybe that's easier, or going forward, whichever's
19 easiest for you, you let me know what you prefer,
20 but I -- I'm trying to get a picture of your
21 employment history from when you graduated with --
22 from college all the way until now and if there
23 were any breaks in between --
24 A. I --
25 Q. -- your next --

Page 15

1 A. Okay. So I worked at the daycare center,
2 and then I went back to college and got a
3 education degree and teaching certificate. I
4 taught for three years, and then I started doing
5 some bookkeeping. And then I had some children.
6 And then I was -- I was still bookkeeping part
7 time. And then I -- my dad came and lived with
8 us, and I helped take care of him, and continued
9 working part time. And then I took some time off
10 to be with my kids and be a mom. And then I went
11 back to bookkeeping, and that's what I --
12 Q. Oh --
13 A. -- currently do.
14 Q. Thank you. So when did your -- when did
15 your dad move in with you?
16 A. In 2011. July, maybe? August?
17 Q. And you said -- So you were bookkeeping
18 part time while your dad lived with you? Is that
19 what you said?
20 A. Yes.
21 Q. And can you tell me a little bit more
22 about the bookkeeping and the time frame in which
23 you did that?
24    So first all -- of all, who did you do
25 the books for.

Page 16

1 A. I worked for an Austin PEO company, and
2 there's just a bunch of different clients, and I
3 do bank recs and accounts payable.
4 Q. What was the name of the Austin company.
5 A. Austin PEO.
6 Q. Oh, Austin PEO was the name of the
7 company.
8 A. Yes.
9 Q. Okay. And what -- what did -- what did
10 part time look like? In other words, how many
11 hours a week did you work? What were your hours
12 like?
13 A. Part time. I don't really remember a
14 hundred percent, but less than 20 hours a week
15 generally, and it was flexible hours because I had
16 my kids and they were involved in different
17 classes, and I was able to take them to different
18 classes and take my dad to appointments and that
19 kind of stuff. So it was generally flexible hours
20 and I could work a little bit remotely from home,
21 I could log in and do bank recs and that kind of
22 stuff.
23 Q. Did you have to go into the office?
24 A. When I was printing checks, yes.
25 Q. And how often would that be?

Page 17

1 A. Maybe a couple of hours a week.
2 Q. And the rest was from home?
3 A. It could be. It wasn't always, but it
4 could have been.
5 Q. And how -- were you paid by the hour or
6 did you earn a salary?
7 A. No, paid by the hour.
8 Q. Approximately how many hours a week did
9 you work? Well, you -- you essentially told me
10 that already, but based on your income or --
11 A. I would --
12 Q. -- salary situation.
13 A. I would --
14 Q. Go ahead.
15 A. -- say 20 hours a week.
16 Q. Okay. Did you ever work in the insurance
17 industry?
18 A. No.
19 Q. When did you stop bookkeeping in -- in
20 terms of timeline. So again, you were -- you were
21 doing that, your dad moves in around 2011 and you
22 were still working. When did you stop.
23 A. March of 2016.
24 Q. So up until March 2016 you were working
25 part time.

Michelle King Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 7 of 56 Michelle King
United Teacher Associates Insurance Company, et al.
December 10, 2024

Page 18

1  A.  Yes.
2  Q.  And you were not working for a school or
3  any other job in addition to bookkeeping?
4  A.  No, I would volunteer, if I could, in my
5  children's classroom.
6  Q.  Okay.  How often was that?
7  A.  Maybe an hour a week?
8  Q.  And when you stopped working in
9  March 2016, when did you go back to work again.
10 A.  September 2021?
11 Q.  And when did your dad pass away?
12 A.  November 6th of 2006.  I mean, '16.
13 Q.  So what did you do from then,
14 November 2016 until September 2021?
15 A.  I was a mom.
16 Q.  Understood.  Me too.
17     And then do you -- you work -- came --
18 went back to work, though, you said in 2021?
19 A.  Yes.
20 Q.  And what did you do in 2021.
21 A.  I went back to the bookkeeping.
22 Q.  And you still do that now?
23 A.  Yes.
24 Q.  Okay.  So you never used your education
25 degree to teach or --

Page 19

1  A.  Not again.
2  Q.  -- anything like that?
3  A.  I taught back in the early 2000s for
4  three years, and then after that, then, no, I did
5  not, other than --
6  Q.  Okay.
7  A.  -- to teach my own children.
8  Q.  Got it.  And are you still a bookkeeper?
9  A.  Yes.
10 Q.  And what company do you work for.
11 A.  Austin PEO.
12 Q.  Okay.  And do you still work part time or
13 are you full time now.
14 A.  Just part time.
15 Q.  Still about 20 hours per week?
16 A.  I would say more like 15 to 20 hours.
17 Q.  And what is your -- what is your income
18 from that job per hour.
19 A.  I think I make 23 or $25 an hour?
20 Q.  And has that increased, I guess, over
21 time?
22 A.  Yes.
23 Q.  What about your spouse?  What does he do
24 for a living.
25 A.  He sells Sheetrock and roofing.

Page 20

1  Q.  What company does he work for.
2  A.  Northwest Drywall.
3  Q.  And how long has he worked there.
4  A.  I'm sorry.  How long has he worked there?
5  Q.  Yes.  Sorry about that.
6  A.  Okay.  Let's see.  He has been there for
7  ten years.
8  Q.  Okay.  And prior to that, do you know
9  what he did?
10 A.  Yes.  He delivered lumber, and he did
11 that for six -- probably eight to ten years?  I'm
12 not sure exactly.
13 Q.  Has your husband ever worked in
14 insurance.
15 A.  No.
16 Q.  Were you ever a noncommercial registered
17 insurance agent, by any chance.
18 A.  No.
19 Q.  Do you hold any licenses or professional
20 certifications.
21 A.  I have a teaching certificate that I keep
22 current.
23 Q.  Okay.  Anything else?
24 A.  Not that I can recall.
25 Q.  Okay.  Do you have any siblings.

Page 21

1  A.  I have two.
2  Q.  And who are they?
3  A.  My brother Mark, and my brother Matt.
4  Q.  And where does Mark live?
5  A.  He lives in Big Timber, Montana.
6  Q.  How far is Big Timber from where you
7  live?
8  A.  A hundred and --
9  Q.  Approximately.
10 A.  Hundred and sixty miles?
11 Q.  Okay.  And what about your brother Matt?
12 Where does he live?
13 A.  He lives in Helena.
14 Q.  And how far is Helena -- Well, Helena is
15 where you live, but how far is the distance from
16 his house to yours if you had to guess.
17 A.  Eight miles?
18 Q.  I don't know if Helena is that tiny.
19 A.  Eight miles?
20 Q.  Eight, you said?
21 A.  Eight.
22 Q.  Eight.  Yes, okay.
23     And what do your brothers do for a
24 living?  What does Mark do?
25 A.  He is a county extension agent.

Page 22

1  Q.  And has your brother Mark ever worked in
2  insurance.
3  A.  No.
4  Q.  What about Matt?  What does he do?
5  A.  He is an engineer for the highway
6  department?
7  Q.  And has he ever worked in insurance.
8  A.  No.
9  Q.  Have any of their spouses or children
10  worked for -- in insurance, either Matt or Mark.
11  A.  No.
12  Q.  But did your dad work in insurance.
13  A.  Yes.
14  Q.  And can we walk through some of your
15  dad's employment history, if you remember,
16  obviously.
17     So when did your dad, if you know, first
18  get licensed as an insurance producer.
19  A.  I really have no idea.
20  Q.  I guess would you believe me if I said
21  around 1980?  Does that sound right to you?
22  A.  Yeah, I guess.  I -- I don't -- I --
23  honestly I -- I don't know.
24  Q.  Do you know what an insurance producer
25  is?

Page 23

1  A.  No, I don't.
2  Q.  Okay.  Do you know -- I guess do you
3  know -- a -- do you know what an insurance
4  salesman is.
5  A.  Yes.
6  Q.  Okay.  Did your dad sell insurance.
7  A.  I believe so.
8  Q.  Did you -- Did he ever work for a company
9  called GAB Insurance?
10  A.  Yes.
11  Q.  And did he own that company or was he
12  just an employee there.
13  A.  I believe an employee.
14  Q.  Do you know what he did there?
15  A.  I do not.
16  Q.  Do you know how long that he -- he worked
17  there?
18  A.  I do not.
19  Q.  Did he work -- ever work at fireman's
20  fund insurance company?
21  A.  Yes.
22  Q.  And do you know what his job was there?
23  A.  I do not because that was about the time
24  I was born.
25  Q.  Okay.  I guess I should ask, when were

Page 24

1  you born?
2  A.  1971.
3  Q.  Okay.  Did your mother also work when you
4  were a child.
5  A.  I believe so.  Some -- Part of the time.
6  Q.  Do you know what she did?
7  A.  Well, she was a registered nurse.
8  Q.  Okay.  And was she anything else besides
9  a registered nurse?
10  A.  I believe she worked in an insurance
11  agency.
12  Q.  When you say "the insurance agency," do
13  you mean the American Insurance Center --
14  A.  Yes.
15  Q.  -- that was in Helena?
16  A.  Yes.
17  Q.  Okay.  Did your parents own that
18  business?
19  A.  Yes.
20  Q.  Did they own it with anybody else?
21  A.  I do not know that.
22  Q.  Can you tell me in your own words what
23  the American Insurance Center is.
24  A.  It was an insurance company?  That's
25  about all I know.

Page 25

1  Q.  Okay.  Do you -- Do you know what kind of
2  insurance company?  Like what line of insurance or
3  what types of insurance it would sell?
4  A.  No, I do not.
5  Q.  And do you know what your dad did at
6  American Insurance Center?
7  A.  I do not.
8  Q.  Do you know what your mom did at American
9  Insurance Center.
10  A.  She answered the phones, as far as I
11  know.
12  Q.  Was she involved in the business in any
13  other way in terms of selling insurance or
14  operating --
15  A.  Not that I know of.
16  Q.  -- (Zoom audio distortion.)
17  A.  I don't know.  I was a young child, so I
18  don't recall.
19     THE COURT REPORTER: Excuse me, Counsel.
20     Ms. King --
21     MR. DAVIS: Yes.
22     THE COURT REPORTER: -- just a reminder,
23  if you could please wait until she's completely
24  finished with her question, so that I can get all
25  of her words down before you answer.

Page 26

1   THE DEPONENT: Yes.
2   THE COURT REPORTER: Thank you so much.
3   I appreciate it.
4   Go ahead, Counsel.
5   MS. JONES: Thanks, Mary, no problem, and
6   again, I'll try to slow down as well.
7   BY MR. DAVIS:
8   Q.  Do you know the different roles that your
9   father held within American Insurance Center?
10  A.  I do not.
11  Q.  Do you know how many employees,
12  approximately, might have worked there?
13  A.  I do not.
14  Q.  Are your brothers older or younger than
15  you.
16  A.  They are older.
17  Q.  Did they ever work at American Insurance
18  Company Center?  I'm sorry, American Insurance
19  Center?
20  A.  I think they may have mowed the lawn, but
21  they did not work inside, to my knowledge.
22  Q.  Did any other family members of yours
23  work at the American Insurance Center?
24  A.  No.
25  Q.  Do you know how much the business earned

Page 27

1   in revenues?
2   A.  No.
3   Q.  Do you know what happened to that
4   business or when it -- when they stopped working
5   there?
6   A.  I do not.
7   Q.  Do you have a ballpark of a -- of a year
8   when it stopped?
9   A.  I don't.
10  Q.  Do you know how -- approximately how long
11  they owned it?
12  A.  I do not.
13  Q.  Could it have been more than ten years?
14  A.  Yes.
15  Q.  Do you know why your parents stopped
16  working there or maybe sold the business?  Do you
17  know -- I should say -- Strike that.
18  Do you know if your parents sold the
19  business?
20  A.  I do not.
21  Q.  Do you know why they stopped working
22  there?
23  A.  No, I do not.
24  Q.  Do you believe that your father would
25  have adjusted insurance claims while he owned

Page 28

1   American Insurance Center?
2   A.  That could be possible, yes.
3   Q.  Do -- You don't know for a fact what he
4   did?
5   A.  I do not, no.
6   Q.  Did your dad ever become -- work for the
7   Montana Municipal Insurance Authority?
8   A.  I believe so.
9   Q.  Do you know when that might have been?
10  Just estimated?
11  A.  Maybe in the late '80s or early '90s.
12  Q.  Do you know how long he worked there?
13  A.  No, I do not.
14  Q.  Do you know what his title was.
15  A.  No, I do not.
16  Q.  Do you know what he did there at all?
17  A.  I want to say he was an adjuster?
18  Q.  Do you know what an adjuster is?
19  A.  No.
20  Q.  Do you know what a claim examiner is?
21  A.  I would believe that that would be a
22  person that examines claims, but I'm not a hundred
23  percent sure.
24  Q.  Do you know what types of insurance
25  your -- your dad handled when he worked at Montana

Page 29

1   Municipal Insurance Authority?
2   A.  No, I do not.
3   Q.  You know, I should have asked this
4   earlier.  Were you ever involved in a -- party
5   in a lawsuit before?
6   A.  Can you please repeat that?
7   Q.  Sure.  I'm sorry, I should have asked
8   earlier, but were you ever a party to a lawsuit
9   before.
10  A.  No.
11  Q.  Okay.  What about your -- your husband.
12  A.  Not to my knowledge.
13  Q.  What about your dad?  Did he ever -- Was
14  he ever involved in another lawsuit while he was
15  living?
16  A.  Not that I can recall.
17  Q.  Do you know what kind of work your dad
18  did after Montana Municipal Insurance Authority?
19  A.  No, I don't.
20  Q.  Did he always work for insurance
21  companies or in the insurance industry, as far as
22  you remember?
23  A.  As far as I remember, yes.
24  Q.  And was that from before you were born up
25  until he retired?

Page 30

1  A. Yes.
2  Q. Do you know when he retired?
3  A. No, I do not.
4  Q. Do you have a -- an estimated year? Were
5  you an adult, were you a child?
6  A. I was probably a young adult.
7  Q. And did he do anything after he retired?
8  A. He worked -- he did some -- I don't know
9  if he was retired then or not, but he would take
10  oil -- parts to oil rigs when he lived in
11  Louisiana just as -- little odd jobs here and
12  there.
13  Q. Okay. So let -- let's -- did he work
14  when he moved in with you in 2011.
15  A. No.
16  Q. What -- Did he have any hobbies or things
17  he liked to do?
18  A. He --
19  Q. Go ahead.
20  A. He liked to build birdhouses and things
21  with his hands.
22  Q. And in addition to birdhouses, did he
23  make any, like, large structures or was it mostly
24  small wood projects.
25  A. Small wood projects.

Page 31

1  Q. Did he have a workshop --
2  A. Yes.
3  Q. -- that he could do that at?
4  Was that part of your house?
5  A. Yes.
6  Q. Does your -- Describe to me how your --
7  your home is. How many bedrooms does it have?
8  A. It has four bedrooms and three --
9  Q. How many square feet is it,
10  approximately?
11  A. 1,200?
12  Q. Do you have a lot of land?
13  A. Five acres?
14  Q. Are there any other structures on the
15  property?
16  A. There is a garage, there's a shop, and
17  there's a chicken coop?
18  Q. When your father lived with you, did he
19  live inside the house, then?
20  A. Yes.
21  Q. Did he have his own room?
22  A. Yes.
23  Q. Is it on one floor or two floors, your
24  house?
25  A. Two levels.

Page 32

1  Q. And so his bedroom was upstairs?
2  A. Yes.
3  Q. And how did he -- how did he get up the
4  stairs? Did he walk up the stairs?
5  A. Sometimes.
6  Q. Do you know who Jack Huckabay is?
7  A. The name is familiar?
8  Q. Have you ever met Jack Huckabay?
9  A. No.
10  Q. When you say the name is familiar, do you
11  know why? Do you have any recollection of
12  what --
13  A. His --
14  Q. -- he might be? No, that's okay. Go
15  ahead.
16  A. He was a friend of my father's, I
17  believe.
18  Q. Did he work with your dad ever in
19  insurance?
20  A. I do not know.
21  Q. Did you know if Jack Huckabay sold your
22  dad the insurance policy that we're here to talk
23  about today?
24  A. I do not know.
25  Q. Did you know your dad was buying the

Page 33

1  insurance policy that we're here to talk about
2  today.
3  A. I did not know.
4  Q. Did he ever talk to you about the
5  insurance policy while he was living.
6  A. He had told me he had bought a long-term
7  care insurance policy, but that was about the
8  extent of my knowledge.
9  Q. Did he ever give you a copy of the policy
10  or otherwise tell you where it was located?
11  A. No.
12  Q. When did you first see the insurance
13  policy.
14  A. After he died.
15  Q. So otherwise had he reviewed -- seen the
16  insurance policy, I should say? Was he the one
17  who had control over the insurance policy may be a
18  better question?
19  A. Yes.
20  Q. And did you trust that he was able to do
21  that on his own? In other words, you didn't feel
22  the need to intervene.
23  A. Correct.
24  THE COURT REPORTER: I'm sorry. You
25  didn't feel the need to?

Page 34

1 　　MS. JONES: I'm sorry. I said intervene.
2 　　THE COURT REPORTER: Okay. I need you to
3 try and slow down just a little bit, Counsel. I'm
4 not catching everything. Thank you. Go ahead.
5 　　MS. JONES: No, not a problem, Mary. I
6 appreciate you letting me know that.
7 　　BY MS. JONES:
8 Q. Do you -- Have you ever heard of
9 Carpenter Insurance Service?
10 **A. No.**
11 Q. What about Transwestern General Agency.
12 **A. No.**
13 Q. Do you have your own long-term care
14 insurance policy?
15 **A. Yes.**
16 Q. And who issues that policy? What
17 insurance company?
18 **A. Knights of Columbus?**
19 Q. And when did you purchase that.
20 **A. Maybe sometime in 2018?**
21 Q. So after your dad had died?
22 **A. Yes.**
23 Q. And have you ever read that policy.
24 **A. No.**
25 Q. Does your husband also have a long-term

Page 35

1 care insurance policy?
2 **A. Yes.**
3 Q. Is it also with Knights of Columbus?
4 **A. Yes.**
5 Q. Who sold you that insurance policy?
6 What -- And did you work with a financial advisor,
7 an insurance broker?
8 **A. I believe he got it through an insurance**
9 **broker.**
10 Q. And when you say "he," you mean your
11 husband?
12 **A. Yes.**
13 Q. And so he got both of those policies.
14 **A. Yes.**
15 Q. So you bought long-term care insurance
16 even after your dad's claim for insurance. Right?
17 **A. Yes.**
18 Q. Do you know what a long-term care
19 insurance policy is intended for?
20 **A. In my own beliefs?**
21 Q. You can answer that however you'd like.
22 Go ahead.
23 **A. In my own beliefs, I just feel that it's**
24 **there to help you if you need help if you get**
25 **disabled, if you need somebody to come take care**

Page 36

1 of you or if you end up in a nursing home, it'll
2 help assist with that.
3 Q. Do you know what the policy that you have
4 will cover?
5 **A. I do not.**
6 Q. Do you believe that all long-term care
7 insurance policies cover the same thing?
8 **A. No.**
9 Q. Do you know that there are different
10 levels of coverage that can be purchased that will
11 pay for different needs or types of care.
12 **A. No.**
13 Q. So again, you say that you first looked
14 at this policy after your dad had died?
15 **A. Yes.**
16 Q. During his lifetime, did your -- or
17 I -- if I already asked this, I apologize, but did
18 your dad ever talk to you about the insurance
19 company or the insurance policy while he was
20 alive.
21 **A. Not necessarily the policy, but we did**
22 **discuss long-term care.**
23 Q. Did he ever talk about the insurance
24 company Continental?
25 **A. No, not -- not specifically.**

Page 37

1 Q. Not until -- What about after you became
2 involved in his claim and -- and were talking to
3 the insurance company yourself. What -- Did you
4 discuss things then?
5 **A. Yes, and I don't -- I didn't really**
6 **realize -- I mean, I didn't put a -- associate a**
7 **name of a company with a policy. I just knew that**
8 **there was a policy.**
9 Q. Okay. So, then, generally, did you talk
10 about the insurance company with your dad.
11 **A. Yes.**
12 Q. Do you know when your dad first contacted
13 the insurance company about the policy.
14 **A. About purchasing a policy?**
15 Q. No. Once he already had the policy, do
16 you know if he ever called the insurance company.
17 **A. Yes.**
18 Q. And when was that?
19 **A. The -- I would believe maybe in 2013?**
20 Q. And do you know the next time he called
21 to talk to the insurance company?
22 **A. Not offhand I do not. I know there was**
23 **other times, but I don't know the exact dates.**
24 Q. What about, like, a -- a general
25 ballpark.

Page 38

1  A. Well, I --
2  Q. Do you know --
3  A. -- know that they're --
4  Q. -- between 2013 -- Oh, no, that's okay.
5     Do you know between 2013 and 2016 if he
6  had called the insurance company?
7  A. I know that he had called again in 2016
8  at some point in time, but I do not know about
9  2014 or '15, I don't have any recollection of a
10 phone call at that time.
11 Q. Did you ever tell your dad or suggest to
12 your dad at any point in time that he should call
13 the insurance company and submit a claim for
14 benefits?
15 A. No.
16 Q. Why is that?
17 A. Because it was his policy, and I know
18 nothing about insurance and how that works.
19 Q. Well, what about help? If your dad
20 needed help and the policy -- you testified
21 earlier you think the -- you know, the policy
22 should pay to help you when you get older. Right?
23 A. Yes.
24 Q. So as your dad got older, you didn't
25 think he should try and call the insurance company

Page 39

1  and file a claim for benefits?
2  A. I didn't know what was covered on that
3  policy.
4  Q. Sure. But even just to call and inquire,
5  you didn't say, "Hey, Dad, maybe you should call
6  and see what's going on about that policy."
7     You didn't say anything like that?
8  A. No.
9  Q. And again, that's because you trusted
10 your dad to handle his own affairs?
11 A. Yes.
12 Q. In addition to the insurance, did your
13 dad handle his own finances up until -- just to
14 draw a line in the sand, let's call it early 2 --
15 2016 or January 2016, did your dad handle his own
16 finances?
17 A. Yes.
18 Q. And although he lived with you, did he
19 pay anything towards -- to you to live there?
20 A. No, he would help with groceries once in
21 a while.
22 Q. Did he -- Did he otherwise have any
23 issues managing his own finances or insurance
24 matters or other personal business matters at that
25 time?

Page 40

1  A. No.
2  Q. In fact, your -- your -- your dad, was he
3  pretty sharp up until his -- his passing mentally?
4  A. Yes.
5  Q. And so when did your dad, I guess, ask
6  you to get involved with the insurance company.
7  A. I don't know that he specifically asked
8  me, but after he would get off the phone crying
9  and be irate, then I said I think I need to step
10 in because I don't like to see people crying and
11 upset, and I needed to see what I could do 'cause
12 he was not a person to cry. Sorry.
13 Q. No, no, no, I wanted to let you finish.
14    Do you know what -- how many times your
15 dad had called the insurance company where he was
16 crying instances?
17 A. Are you asking how many times --
18 Q. Like a number of times you felt like
19 you -- you saw your dad distraught that you -- you
20 wanted to call the insurance company.
21 A. I do not know how many times he had
22 called, but I would come into the room and he
23 would -- yeah, after he was off a conversation,
24 'cause I tried to let him have his privacy, and he
25 would just be crying and upset, and I don't recall

Page 41

1  how many times. Maybe twice? Maybe more? I --
2  I'm sorry, I don't remember.
3  Q. And do you know what insurance company
4  specifically he was -- this was about? Was it
5  just the insurance company? Like, do you know
6  that it was the long-term care insurance
7  company --
8  A. The --
9  Q. -- of being upset?
10 A. The long-term care, yes.
11 Q. And did he have other long-term care
12 insurance?
13 A. No.
14 Q. So tell me a little bit about when your
15 dad was first diagnosed with cancer in 2016. What
16 was his condition like when he was -- or -- or
17 what led to him going to the doctor to explore
18 that?
19 A. Do you want just 2016 or do you want when
20 it first started?
21 Q. Yeah, I think that was a bad question. I
22 think what I'm trying to ask is how did your dad
23 learn that he had cancer. And I -- I should also
24 say I know that this is a hard topic and I
25 don't -- you know, I'm sensitive to these issues.

Page 42

```
 1   Actually my dad also has cancer, and so I don't,
 2   by any means, try to upset you.  I'm just -- you
 3   know, I have to do my job and ask these questions.
 4   A.  Okay.
 5   Q.  So I -- I guess so in your own words, you
 6   know, what kind of led to the diagnosis and when
 7   was that.
 8   A.  'Kay.  And first off, I'm sorry to hear
 9   about your father 'cause I would not wish cancer
10   on anybody.
11   Q.  Thank you.  I know it's a -- yeah, it's
12   horrible.  You and I have a lot in common, though.
13   I have chickens and kids and all that good stuff.
14   So I had to smile a little when you said chicken
15   coop, but go ahead.
16       THE COURT REPORTER:  Counsel, I really
17   need you to try to slow down.
18       MS. JONES:  Yes, ma'am.  Sorry.  That was
19   a little bit of a -- a side comment, anyway, if it
20   didn't make the record.  I'm just saying I think
21   we have a lot in common, the witness and I.
22       BY MS. JONES:
23   Q.  But go ahead, Michelle, if you need me to
24   repeat that question, I'm happy to.
25   A.  In maybe September, October of 2015 my
```

Page 43

```
 1   dad was not eating, he was turning yellow, he was
 2   itchy, he had diarrhea, he would have accidents.
 3   I called the VA and asked if they could get him in
 4   to look at him because the accidents were
 5   terrible, and he was yellow and miserable and
 6   itchy, and they admitted him to the hospital, and
 7   they came up with a diagnosis that he had
 8   diabetes, which I don't understand why he would be
 9   yellow when you have diabetes because I don't know
10   other people that have diabetes that are yellow.
11       Then they did a lot of testing and sent
12   him home, and things continued to get worse, and
13   he continued to have accidents.
14       And finally, I believe it was in February
15   of 2016, the VA made arrangements for him to go to
16   the VA in Salt Lake City for further testing.  And
17   at that time, I believe they did a CAT scan, and
18   they diagnosed him with a pancreatic mass at that
19   time.
20   Q.  And just -- just ballpark, do you know
21   when in 2015, 2016 that was?
22   A.  What is what?
23   Q.  What time of year, what month that was?
24   A.  When he was diagnosed, actually, with
25   cancer?
```

Page 44

```
 1   Q.  Well, all of that, I guess.  Help me
 2   understand, did that take place over the span
 3   of --
 4   A.  That was --
 5   Q.  -- a couple months or a couple weeks or
 6   days?  What was the -- What did that look like?
 7   A.  It started in September of 2015, and then
 8   he was diagnosed with the actual cancer sometime
 9   in February of 2016.
10   Q.  And during that time did he spend
11   overnight in the hospital?
12   A.  Yes.
13   Q.  Do you know when that was?
14   A.  Well, he was admitted, I believe, in
15   November of 2015, and that is where they diagnosed
16   him with diabetes at that time.  And I cannot
17   recall in February if he was actually in the
18   hospital at the VA or if he stayed at the
19   Fisher House next to the hospital there.
20   Q.  And that was February of 2016?
21   A.  Correct.
22   Q.  In November of 2015, do you recall how
23   long he was in the hospital?
24   A.  I want to say a week.
25   Q.  And then in February 2016 do you know how
```

Page 45

```
 1   long he was in the hospital?
 2   A.  If he was in the hospital then, it would
 3   have been maybe two days, three days?
 4   Q.  And, I'm sorry, what's the -- you said
 5   Fisher House?
 6   A.  Yes.
 7   Q.  And can you tell me what that is?
 8   A.  It is a house located near the VA center,
 9   and a -- a -- the person that's taking a veteran
10   to the hospital there can stay there for -- I
11   don't know if it's free or a reduced rate.
12   Q.  That actually raises a good point that I
13   didn't talk about.
14       Your dad was a veteran.  Right?
15   A.  Yes.
16   Q.  When -- What branch of the military was
17   he with?
18   A.  He was in the Army.
19   Q.  Do you know when?  Was it before you were
20   born?
21   A.  Yes.
22   Q.  And so as a result of being in the Army,
23   he get VA, veterans affairs benefits?  Is that
24   right?
25   A.  Yes.
```

Page 46

1  Q.  Or he did, I should say?
2  A.  Yes.
3  Q.  And do you know what those were --
4  A.  No.
5  Q.  -- (Zoom audio distortion?  I'm sorry,
6  that was my fault.
7     THE COURT REPORTER:  I'm sorry.  I --
8  Counsel, I didn't hear.  Did you say "oddly"?
9     MS. JONES:  I said "broadly."
10     THE COURT REPORTER:  Broadly.
11     MS. JONES:  Yeah.  Well, I'm trying to be
12  slow, and by doing that, I think I'm creating
13  pauses and confusing Ms. King, so apologies.
14     BY MS. JONES:
15  Q.  I guess the question is broadly do you
16  know what his VA benefits were or what they
17  covered.
18  A.  Well, I know he was able to go to the VA
19  medical center for -- for medical care, but that's
20  all I know.
21  Q.  Do you know -- You don't know if the VA
22  benefits would have also paid for a home nurse or
23  anything like that?
24  A.  For -- Forever or just at certain times?
25  Q.  I mean, I'm -- I'm not sure what you mean

Page 47

1  by "forever."
2  A.  I don't -- I don't -- I guess I don't
3  understand your question, I'm sorry.  I know that
4  they had a nurse that came out to our house at
5  certain times.
6  Q.  I -- Yeah.  So that's -- that is what I
7  was asking.
8     Did a -- Did a nurse ever come out sent
9  by the VA.
10  A.  Yes, when he was on hospice, there was a
11  nurse that would come out from the VA.
12  Q.  And that was only during hospice?  He
13  didn't have a VA nurse come out any other time
14  prior?
15  A.  Not to my recollection.
16  Q.  And do you know when the hospice started.
17  A.  Sometime in March of 2016.
18  Q.  So what did your dad decide to do with
19  regard to his cancer treatment.
20  A.  Live each day to the fullest.
21  Q.  So your dad decided not to go through
22  with any chemotherapy or radiation, or maybe that
23  wasn't an option, but he didn't do that.  Is that
24  right?
25  A.  Correct.

Page 48

1  Q.  So at that point, then, would they
2  automatically place him on hospice because he
3  chose not to have any sort of treatment for the
4  cancer?  Is that --
5  A.  I --
6  Q.  -- how that worked?
7  A.  I believe so, yes.
8  Q.  And when he first started the hospice
9  care, how would you say he was doing in terms of
10  his health.
11  A.  Terribly.
12  Q.  And -- And again, when did that start?
13  In March of 2016 you had said?
14  A.  What started?  What -- What are you
15  asking what started?  I'm sorry.
16  Q.  I apologize, yeah, the hospice care, the
17  hospice nurse coming out.
18  A.  Yes, that started in March of 2016.
19  Q.  And do you know how many days a week the
20  hospice nurse would come out?  At that time?
21  A.  I -- No, I don't remember.  I don't
22  know -- I -- 'cause at different times there was
23  different -- different numbers at different times,
24  so I don't remember at that time.
25  Q.  Did -- Did they continue coming from

Page 49

1  March 2016 until your dad passed in November of
2  2016?
3  A.  Yes.
4  Q.  Was there a time when they were there
5  every day?
6  A.  Maybe towards the end, but I don't think
7  they came every day 'cause they didn't come on
8  weekends.  So five days a week, maybe, towards the
9  end there?
10  Q.  And do you know what they were doing for
11  him while they were there?  Did you see it?
12  A.  Yes.  They would check his vitals, they
13  would assess his body for marks and wounds and bed
14  sores.
15  Q.  Would they have helped him with other
16  things if he needed it, like going to the bathroom
17  or getting food?
18  A.  No, that -- they would not.
19  Q.  What was the name of the hospice
20  provider.
21  A.  St. Peter's Hospice?
22  Q.  And so even though you said it was the
23  VA, was it paid for by the VA but it was
24  St. Peter's, or is St. Peter's also the VA?  I'm
25  just trying to understand that piece.

Page 50

1  A.  No, the VA, as far as I know, does not
2  have a hospice program, so it was through the
3  community St. Peter's Hospital hospice.
4  Q.  And who paid for the hospice?
5  A.  I don't know if that was Medicare or if
6  that was the VA.  I'm sorry, I don't know.
7  Q.  When did you start handling your dad's
8  financial affairs or paying for things like
9  hospice?
10  A.  I don't recall ever paying anything for
11  hospice.
12  Q.  Did you handle any sort of arrangement
13  for hospice or Medicare?  In other words, did you
14  talk to hospice or Medicare to arrange for payment
15  to ensure that those things were paid for?
16  A.  No, I believe that was all arranged
17  through the VA.
18  Q.  And when your dad -- I guess when hospice
19  first started in March of 2016, did you still
20  trust your dad to handle his financial affairs and
21  the insurance policy?
22  A.  Yes.
23  Q.  Do you know why your dad did not call the
24  insurance company when he was diagnosed with
25  cancer and put on hospice?

Page 51

1  A.  I do not, but I know that he had said
2  when he had talked to them previously that they
3  would not pay a -- a family member, so I don't
4  know why he did not call.
5  Q.  Well, so -- so you just mentioned you
6  didn't really talk to him much about the policy.
7      When did he tell you that it didn't cover
8  a family member?
9  A.  Well, clear back in 2013 he had a
10  wound -- no -- no, that was in 2011.  In 2013 he
11  had called and asked some question, and that --
12  whoever he spoke to said they would not pay a
13  family member for any care.
14  Q.  When did he tell you that?
15  A.  In 2013.
16  Q.  Did -- Did he tell you anything else in
17  2013 about the policy or the insurance?
18  A.  No.
19  Q.  Did you ever question that, what he was
20  told by the insurance company?
21  A.  No.
22  Q.  You didn't say "That sounds odd" or "Can
23  we look into that" or "I want to investigate that
24  further"?
25  A.  No, I was -- No.  I was a mom, I did not.

Page 52

1  Q.  And is -- is that also because you
2  trusted your dad because he knew insurance?
3  A.  Yes.
4  Q.  Would you say that your dad knew how to
5  read an insurance policy and understand one.
6  A.  Yes.
7  Q.  Did you ever have -- have any doubt that
8  your dad didn't understand an insurance policy
9  that he had.
10  A.  No.
11  Q.  Do you think your dad would have
12  purchased an insurance policy that he didn't
13  understand.
14  A.  No.
15  Q.  I'm just gonna take that -- one second,
16  I'm not gonna take a break, but I just want to ask
17  the court reporter, Mary, if I want to share
18  exhibits by sharing my screen, are we set up to do
19  that?
20      THE COURT REPORTER:  I'm not sure.  Can
21  we go off the -- the record, Counsel, and give it
22  a test?
23      MS. JONES:  Absolutely.
24      And Ms. King, if you want to take a short
25  break while we figure that out, feel free.  If

Page 53

1  not, that's also okay.  We've been going for about
2  an hour, so...
3      THE VIDEOGRAPHER:  Time is 10:19.  Going
4  off the record.
5      (Recess taken from 10:19 a.m. to 10:27
6  a.m.)
7      THE VIDEOGRAPHER:  Time is 10:27.  Back
8  on the record.
9      BY MS. JONES:
10  Q.  All right.  We're back on the record
11  after a short break.  Thanks again, Ms. King.  So
12  I am going to share my screen.  Let me know if you
13  can't see this for any reason.
14      Can you see a document on my screen?
15  A.  Yes.
16  Q.  And have you ever seen the complaint in
17  this matter?
18      I can scroll through this slowly, but do
19  you see where it says "COMPLAINT AND DEMAND FOR
20  JURY TRIAL"?
21  A.  Yes.
22  Q.  Do you recall seeing this before?
23  A.  Yes.
24  Q.  Did you sign this?
25  A.  Yes.

Michelle King                                                          Michelle King
United Teacher Associates Insurance Company, et al.                    December 10, 2024
Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 16 of 56

Page 54

1    MR. BIDEGARAY: I object. No, the
2  document speaks for itself. There's no signature
3  of hers on there, and you know that.
4    MS. JONES: I -- I can't hear you, I'm
5  sorry, Dan.
6    MR. BIDEGARAY: The document speaks for
7  itself. You know there's no signature of hers on
8  that document.
9    MS. JONES: I'm not sure about that.
10   MR. BIDEGARAY: Well, look at -- Well,
11 look at it. Show me where the signature is of
12 hers.
13   MS. JONES: You know, you scolded me
14 quite a bit for speaking objections during these
15 depositions. I'm gonna make the same suggestion
16 that you don't do that. Okay. Fair, Dan, I
17 appreciate it. Wasn't trying to catch her in some
18 sort of lie. I myself thought that she might have
19 verified it.
20   BY MS. JONES:
21 Q. Ms. King, do you know where the facts
22 came from for this complaint?
23 A. Medical records?
24 Q. And did you provide the medical records?
25   MR. BIDEGARAY: I'm --

Page 55

1 A. No.
2    MR. BIDEGARAY: I'm gonna object, and I'm
3  gonna instruct you not to answer any questions as
4  to whether any discussions that you had with us
5  and how this complaint was drafted or what your
6  input with -- was with me, I instruct you not to
7  answer any question with regard to any
8  attorney-client communication.
9    MS. JONES: I wasn't asking any
10 attorney-client privilege, I was asking where the
11 information in the complaint came from.
12   MR. BIDEGARAY: And to the extent that
13 any discussion with me was part of how that
14 complaint was drafted, I instruct you not to
15 answer it.
16   MS. JONES: Your objection's understood.
17   BY MS. JONES:
18 Q. Ms. King, where did the information in
19 the complaint come from. Do you know?
20 A. I do not know.
21 Q. Did it come from you?
22   MR. BIDEGARAY: Objection. Same
23 instruction.
24   If you ask it again, I'll terminate the
25 deposition.

Page 56

1    MS. JONES: Dan, this is not a privileged
2  question. And again, the irony here is rich
3  compared to what you asked my witnesses. All I'm
4  asking for -- She is the plaintiff in this action,
5  she -- there's a complaint for -- on her benefit
6  where she is the complainant. I'm simply asking
7  where the information in the complaint came from.
8  That is all I'm asking. I'm not asking privileged
9  information.
10   MR. BIDEGARAY: Same objection.
11   Any discussions you and I had with regard
12 to drafting of the complaint or anything related
13 to this case, I instruct you not to answer it.
14   MS. JONES: I'm gonna move to strike the
15 improper speaking objection of counsel.
16   Are you instructing her not to answer
17 where did the information in the complaint come
18 from.
19   MR. BIDEGARAY: Same -- Same objection I
20 made.
21   MS. JONES: Well, I think, Dan, are you
22 instructing her not -- I think she -- she
23 doesn't -- she needs instruction. Are you telling
24 her not to answer that question.
25   MR. BIDEGARAY: To the extent that

Page 57

1  anything in that complaint is a result of
2  conversations you have had with me, I instruct you
3  not to answer it.
4    If -- If you know how to answer the
5  question without getting into attorney-client
6  communications, feel free to try to answer it.
7  But if you don't, you don't.
8    BY MS. JONES:
9 Q. Okay. I'm sorry about that, Ms. King.
10   Again, was this -- who -- where did the
11 information in the complaint come from.
12   MR. BIDEGARAY: Same objection.
13   MS. JONES: It -- It's the same question,
14 so the objection is understood. I'm just trying
15 to get an answer.
16   BY MS. JONES:
17 Q. You can answer to the best of your
18 ability.
19   MR. BIDEGARAY: Without getting into
20 discussions.
21   BY MS. JONES:
22 Q. Based on counsel's instruction, which he
23 said three times.
24 A. I have no answer.
25 Q. All right. That's fair.

Page 58

1    I'm gonna show you a record, I believe
2  it's this one.  No, give me one moment.  Whoops.
3  Give me one second.
4    Okay.  Ms. King, can you see the document
5  on my screen?
6  **A.  Yes.**
7  Q.  Do you see what it says at the top?
8  **A.  Yes.**
9  Q.  Okay.  And it says "St. Peter's Hospice
10 Skilled Nursing Admission Visit."  Is that right?
11 **A.  Yes.**
12 Q.  And the date here is March 24, 2016.  Is
13 that right?
14 **A.  Yes.**
15 Q.  And the clinician, or I suppose the
16 nurse, was Brenda Tubbs.  Is that right?
17   Do you see that?  It's right here.
18 **A.  Yes.**
19 Q.  And do you know -- Who is Brenda Tubbs?
20   Do you remember her?
21 **A.  I do not.**
22 Q.  Do you recall if she was ever at your
23 home?
24 **A.  I -- No, I do not.**
25 Q.  Okay.  I'm -- I'm scrolling, although you

Page 59

1  can always ask me to stop and read this document.
2  I'm -- I'm gonna do the best I can.  This document
3  is about 13 pages.  I'm not asking you to read the
4  whole thing, but you have that opportunity if you
5  want to just tell me.
6    So do you see here -- it's the same
7  document.  It says "St. Peter's Hospice Skilled
8  Nursing Admission Visit."
9    Do you see that?
10 **A.  Yes.**
11 Q.  And again, excuse me, the date is
12 March 24, 2016?
13 **A.  Yes.**
14 Q.  Do you see where it says "Activities of
15 Daily Living"?
16 **A.  Yes.**
17 Q.  Do you know what "Activities of Daily
18 Living" are?
19 **A.  Yes.**
20 Q.  What are they?  Or what I should -- what
21 is an activity of daily living.
22 **A.  Being able to go to the bathroom by**
23 **yourself?**
24 Q.  Anything else?
25 **A.  You need to be able to transport**

Page 60

1  **yourself, move yourself around, you need to be**
2  **able to eat, you need to be able to bathe**
3  **yourself?**
4  Q.  Where did you learn that information
5  from.
6  **A.  From reading that I've done?**
7  Q.  Do you know what kind of reading or
8  what -- where you read it?
9  **A.  No.**
10 Q.  Do you see here where it says [As Read]:
11 "Activities of Daily Living:  Able to perform ADLs
12 independently"?
13   Did I read that right?
14 **A.  Yes.**
15 Q.  And underneath it it says "Instrumental
16 Activities of Daily Living."
17   Do you know what the -- what
18 "Instrumental Activities of Daily Living" are.
19 **A.  Not right off I do not.**
20 Q.  It does say here "Able to perform all
21 IADL's independently."
22   Do you see that?
23 **A.  Yes.**
24 Q.  Do you see where it says "Neurologic
25 Overview Assessment" entry on 3/24/2016 2016 at

Page 61

1  the top of the page?
2  **A.  Yes.**
3  Q.  It says "Sensation:  Denies experiencing
4  altered sensation."
5    Did I read that correctly?
6  **A.  Yes.**
7  Q.  "Weakness:  No evidence of weakness."
8    Did I read that correctly?
9  **A.  Yes.**
10 Q.  "Headache:  Denies headaches."
11   Did I read that right?
12 **A.  Yes.**
13 Q.  Okay.  And then "Senses."  Says [As
14 Read]:  "No evidence of self -- sense deficits."
15   Did I read that right?
16 **A.  Yes.**
17 Q.  Then right below here it says "Signature
18 for:  Details:Consent for Care/Service/ Tx;
19 Insurance Payer Verification; Medicare Secondary
20 Payer Form; Notice of Election."
21   Do you see that?
22 **A.  Yes.**
23 Q.  And again, based on your recollection,
24 hospice care was paid for by the VA and/or
25 Medicare?

Page 62

1  A.  Yes.
2  Q.  Do you see here where it says
3  "Appearance:  Patient is neat and clean, personal
4  hygiene adequate."
5  A.  Yes.
6  Q.  And "Behavior," it says "No adverse
7  behaviors present."
8     Do you see that?
9  A.  Yes.
10  Q.  And again, if I'm scrolling too quickly,
11  please do let me know.  There's a lot of other
12  information on here.  But I'm trying to get to the
13  bottom.  I just want to, again, continue along.
14     Here it says "Medication Management
15  Overview Assessment."  "Medications:  Able to
16  independently prepare and take all prescribed
17  medications."
18     Do you see that?
19  A.  Yes.
20  Q.  And here it's an "Assess Risk:  Falls."
21     Do you see that?
22  A.  Yes.
23  Q.  It says "Use of ambulatory device."
24     Do you know what kind of ambulatory
25  device that would be referring to?

Page 63

1  A.  A walker, maybe?  Wheelchair?
2  Q.  At this time do you recall, did your dad
3  have a walker?
4  A.  Yes.
5  Q.  Was there a time when he switched to
6  having a wheelchair?
7  A.  On and off throughout many years, yes.
8  Q.  Okay.  Here it says "Risk Profile
9  Description:  Patient risk for falls is mild."
10     Do you see that?
11  A.  Yes.
12  Q.  And then this says it was electronically
13  signed by Brenda Tubbs RN on March 25, 2016.
14     Do you see that?
15  A.  Yes.
16  Q.  And again, do you know who Brenda Tubbs
17  was or do you recall meeting Brenda Tubbs?
18  A.  I do not.
19  Q.  Do you recall someone from the VA or from
20  St. Peter's Hospice coming to your home to review
21  your dad or to interview and assess your dad?
22  A.  I do not recall a nurse.  I recall
23  somebody coming to set up his plan of care, like
24  what to expect, what they could provide.
25  Q.  Okay.  And can you see this document on

Page 64

1  the screen?
2  A.  Yes.
3  Q.  Actually, let me take one step back for
4  the court reporter.
5     MS. JONES: Madam Court Reporter, I will
6  send you the exhibits, but I'd like to mark this
7  exhibit, which is the skilled nursing admission
8  visit as Exhibit 1.
9     THE COURT REPORTER: Thank you.
10     EXHIBIT:
11     (Deposition Exhibit 1 marked for
12  identification.)
13     BY MS. JONES:
14  Q.  Okay.  So can you see this document,
15  Ms. King?
16  A.  Yes.
17  Q.  A different document?
18     It says "St. Peter's Hospice."  Right?
19  A.  Yes.
20  Q.  And it says "Hospice Plan of Care."
21     Do you see that?
22  A.  Yes.
23  Q.  And the date on this -- and I'm -- it's
24  only three pages long, I'm just gonna scroll down
25  so you can see the date.

Page 65

1     The date looks like it's either April 27
2  or April 22, April 26.  There's a couple dates on
3  here.
4     Do you see those dates?
5  A.  Yes.
6  Q.  Would you agree with me that this is from
7  somewhere around -- actually there's another date,
8  it says prepared by Brenda Tubbs on 3/28/2016
9  2016.
10     Would you agree with me that this is from
11  around that time period, March to April of 2016.
12  A.  Yes.
13  Q.  Do you know if your dad had submitted a
14  claim for benefits under the insurance policy
15  we've been talking about at this time.
16  A.  Can you repeat the question, please?
17  Q.  Sure.  At this time, in around March or
18  April of 2016, do you know if your dad submitted a
19  claim for benefits to the long-term care insurance
20  company.
21  A.  I do not know.
22  Q.  So this again says "Interdisciplinary
23  Careplan."
24     Is this the plan of care that you were
25  just referencing in your prior testimony?  And if

Michelle King
Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 19 of 56    Michelle King
United Teacher Associates Insurance Company, et al.                                    December 10, 2024

Page 66

1  you need me to scroll through it, please let me
2  know.
3  A.  Yeah, could you scroll down a little bit,
4  please?
5  Q.  Yes.  And again, tell me if I'm going too
6  slow or too fast.  This is the worst part of
7  the --
8  A.  It's perfect.  Thank you.
9  Q.  -- documents not -- and me not being
10  there.
11      So it's a three-page document, but it
12  looks like the bulk is in two pages, so I'll go
13  back so you can see.
14      And again, let me know if you need me to
15  rescan or rescroll any of this.
16  A.  Can you repeat what your question was
17  previously, please?
18  Q.  Sure.  All I said was is this the hospice
19  plan of care you had referenced in your prior
20  testimony that St. Peter's had sent a nurse or
21  someone to do a plan of care.
22  A.  I am not totally sure.  I know -- recall
23  them just sending somebody out, and, I mean, that
24  was a terrible time for me, I'm sorry, I -- I
25  don't know if this was the exact document at that

Page 67

1  time or not.
2  Q.  Not a worry.
3      Would you agree with me that it said
4  "Hospice Plan of Care" at the top.
5  A.  Yes.
6  Q.  And I want to -- I'm gonna scroll through
7  very slowly, I suppose.  At this time it says
8  "Visit Orders:  Nursing," from March 23rd, 2016
9  through June 21 of 2016 they are ordering one
10  visit every week for 14 weeks to manage symptoms
11  or "symptom management."
12      Do you see that?
13  A.  Yes.
14  Q.  And again, if I'm going too fast, let me
15  know, I want you to be able to -- to see this.
16      You know what I can probably do is
17  minimize it slightly so maybe you can see more on
18  one page.
19      Did that help?  Can you still see it or
20  did I make it too small?
21  A.  I -- I can see it.  Just -- It's a
22  struggle.
23  Q.  I can make it a little bit bigger.  Here
24  we go.  I was just trying to fit more of the
25  document so you don't have to have me scroll.

Page 68

1  A.  That -- That's better.  Thank you.
2      Can you scroll down?
3  Q.  Yep.
4  A.  And if you could scroll a little more,
5  please?
6  Q.  Of course.
7  A.  Oh.
8  Q.  Did I scroll too much?
9  A.  No, that was good.
10  Q.  Okay.
11  A.  Okay.  You can -- Is there more to scroll
12  or was that the second page?  That was it.
13  Q.  That was the second page, yeah.  This is
14  the signature page I had shown you earlier.
15      Okay.  So I'm gonna go back up to where
16  we just read.  It says "Nursing," "Assess:
17  Advance Directive, Cardiac Function,
18  Gastrointestinal Overview Assessment, Heart
19  Sounds, Infection, Integumentary Overview
20  Assessment, Medication Management Overview
21  Assessment, Neurologic Overview Assessment,
22  Nutrition/Hydration Overview Assessment, Pain
23  Overview Assessment, Psychological Overview
24  Assessment, Renal/Urinary Overview Assessment,
25  Respiratory Overview Assessment, Spiritual

Page 69

1  Overview Assessment," and "Vital Signs."
2      Did I read that right?
3  A.  Yes.
4  Q.  Do you see anything about activities of
5  daily living in that nursing section or anywhere
6  else in this plan of care?  And again, I can
7  scroll for as much as you'd like.
8  A.  No.
9  Q.  Okay.  I'm sorry, so you would agree with
10  me, then, that this plan of care does not say
11  anything about ADLs.
12  A.  Not --
13  Q.  Activities of daily living.
14  A.  Not that I have seen, no.
15  Q.  Okay.  And if you need longer, please do
16  let me know.  I'm not -- I don't want to take it
17  away from you.
18  A.  I don't see anything.
19  Q.  Okay.
20      MS. JONES:  So Madam Court Reporter, this
21  March Hospice Plan of Care will be marked as
22  Exhibit 2.
23      THE COURT REPORTER:  Thank you.
24      EXHIBIT:
25      (Deposition Exhibit 2 marked for

Page 70

1 identification.)
2     BY MS. JONES:
3 Q. Okay. So Ms. King, was your dad still
4 fairly active at this time in terms of working
5 outside or going to his workshop.
6 **A. It depended on the day.**
7 Q. Was he able sometimes to work in his wood
8 shop.
9 **A. Occasionally, yes.**
10 Q. Do you remember what he was doing, then,
11 or things he was making in the wood shop?
12 **A. Probably birdhouses.**
13 Q. Did he make a lot of birdhouses?
14 **A. Yes.**
15 Q. Did you help your dad while he was living
16 with you in terms of providing him with care?
17 **A. I'm not sure I understand the question.**
18 Q. Sure. Maybe that was poorly worded.
19     Did you provide your dad with care while
20 he lived with you.
21 **A. I -- I don't know what you mean by "care"**
22 **specifically.**
23 Q. I just -- It's a pretty broad question.
24 Did -- I guess did you care for your dad? Did you
25 help him with things.

Page 71

1 **A. Yes.**
2 Q. Did you ever keep a log or a diary of the
3 care that you provided to your dad?
4 **A. No.**
5 Q. Did you otherwise have any record of care
6 that you provided to your dad?
7 **A. Just in my head.**
8 Q. And did any of your siblings ever provide
9 care to your dad?
10 **A. Yes. When I asked for help, they would**
11 **come assist.**
12 Q. And what kind of assistance would they
13 give? Was it -- I'm sorry. The first question is
14 fine.
15     What kind of assistance did they give?
16 **A. They would help him get up out of a**
17 **chair, they would help him move around when**
18 **I -- my back needed a break.**
19 Q. And when -- when was that? When did that
20 start? Was it during the hospice care period or
21 was it before then.
22 **A. Before then.**
23 Q. Did any of your siblings ever say to your
24 dad, you know, "Hey, you should maybe look into
25 submitting an insurance claim" when they were

Page 72

1 helping him get up out of chairs?
2 **A. Not to my knowledge.**
3 Q. Did you ever talk about the insurance
4 policy with your siblings?
5 **A. No.**
6 Q. Did you ever talk to your siblings about
7 getting your dad a caregiver or a -- a nurse to
8 come in and help him?
9 **A. No.**
10 Q. Why not?
11 **A. Because I was there and I was doing it.**
12 Q. You were also working, though, about
13 20 hours a week. Right?
14 **A. 15 to 20 hours, and I could work at**
15 **different times. I didn't have a set schedule.**
16 Q. Why did you not want a nurse to come in
17 to assist your dad?
18 **A. My dad was a very proud man, and he**
19 **didn't exactly like to have to be taken care of.**
20 **He was not comfortable having a lot of other**
21 **people around.**
22 Q. I understand. When the hospice nurses
23 were coming, though, they were allowed to come in
24 or your dad accepted them assisting him. Is that
25 right?

Page 73

1 **A. Yes.**
2 Q. Did your dad ever pay you to take care of
3 him?
4 **A. No.**
5 Q. Did he ever pay your siblings?
6 **A. No.**
7 Q. Did he ever pay anybody else to take care
8 of him?
9 **A. No.**
10 Q. Did you ever have any sort of -- I think
11 you already answered this, but I just want to be
12 clear -- any sort of formal caregiver come in
13 beyond hospice care?
14 **A. No.**
15 Q. Do you know when your dad first submitted
16 a claim under the insurance policy.
17 **A. I do not.**
18 Q. Do you know a ballpark of the time when
19 he might have started the insurance claim.
20 **A. 2016?**
21 Q. Do you know when in 2016?
22 **A. No.**
23 Q. Did your dad tell you he was calling the
24 insurance company in 2016?
25 **A. No.**

Page 74

1  Q.  So you weren't there when your dad first
2  called the insurance company?
3  A.  I may have been there, but I tried to
4  give him privacy.  I could have been outside the
5  day.  I'm -- I don't know.
6  Q.  Oh, I'm sorry.  I should have said you
7  weren't there in the room with him or on the
8  other -- on the phone with him when he first
9  called.
10  A.  Correct.
11  Q.  Do you recall if your dad said anything
12  to you after he first called.  Did he tell you
13  that a claim had been started with the long-term
14  care insurance company.
15  A.  No.
16  Q.  When did you first learn that a claim had
17  been started with the long-term care insurance
18  company.
19  A.  Can you repeat the question?
20  Q.  Sure.  When did you first learn that
21  there was a claim that your dad had submitted.
22  A.  Maybe August 2016?
23  Q.  And at that time, do you know what had
24  already transpired or had you -- what -- what was
25  your involvement in August of 2016.  Maybe that's

Page 75

1  the better question.
2  A.  I believe I had called somebody for
3  something, I don't recall what I was calling for,
4  but at that time I -- at that time I was upset.
5      And I said, "Well, I will call," but I
6  don't remember what I was calling about.
7  Q.  Did he tell you why he was upset?  Do you
8  remember what he said at -- at that time what
9  might have upset him in August of 2016?
10  A.  No.
11  Q.  But you remember that in August of 2016
12  he was upset.
13  A.  Yes.
14  Q.  Do you know if there was a nurse assessor
15  that was sent by the insurance company in 2016 to
16  your house?
17  A.  Yes.
18  Q.  Were you there and present with that
19  nurse assessor?
20  A.  I believe so.
21  Q.  Did you give that nurse assessor
22  information about your dad?
23  A.  If she asked me a question, I'm sure I
24  did.  I don't -- I don't remember the actual
25  assessment.

Page 76

1  Q.  Is that because it was a long time ago?
2  A.  Yes, and it was a very hard time.
3  Q.  Understood.  Do -- Do you remember if
4  anybody else was there, besides you and your dad,
5  from your family?
6  A.  I don't remember.
7  Q.  I'm gonna -- Give me one second.  I'm
8  gonna share my screen again.
9      I'm sorry, there's some background noise
10  on my end.  Give me one second.  I am trying to
11  pull up a document.
12      Okay.  So have you ever seen -- I just
13  pulled up a document that says "Instructions For
14  Filing a New Long Term Care Claim."
15      Have you ever seen this document before?
16  A.  Can you scroll down, please?
17  Q.  Sure.  Let me know if I'm going too fast.
18  A.  And can you repeat what your question
19  was, please?
20  Q.  Yeah.  I had just asked if you had seen
21  this document before.  Let me know if -- Are you
22  able to answer that, or do you need me to scroll
23  lower?  Let me know.
24  A.  I'm just trying to think back in my
25  memory.

Page 77

1  Q.  No worries.  Take your time.  Just --
2  Again, this is dated July 27, 2016.
3  A.  I don't recall right off, but I'm sure I
4  must have seen it before.
5  Q.  So this says -- it's dated July 27, 2016.
6  Right?
7  A.  Yes.
8  Q.  Is that around the time your dad had
9  called the insurance company to start a claim?
10  A.  I -- I don't know.
11  Q.  And here it says [As Read]: "The claim
12  packet is being sent to you because you or your
13  representative contacted our office on July 25,
14  2016 about filing a claim under your Long Term
15  Care insurance policy."
16      Do you see that?
17  A.  Yes.
18  Q.  Would you believe that to be accurate?
19  A.  Yes.
20  Q.  And would you agree that this is a form
21  instructing or providing instructions, I should
22  say, on how to complete the claim?
23  A.  Yes.
24  Q.  And do you see here where I'm gonna
25  highlight just a moment -- whoops -- just a

Page 78

1  minute, not do that.  Oh, goodness.  Okay, well,
2  I'm not gonna highlight it because for whatever
3  reason that didn't work.
4      But here it says "You are requesting Home
5  Health Care benefits."
6      Do you see that?
7  A.  Yes.
8  Q.  Do you know what "Home Health Care
9  benefits" are?
10  A.  I don't know in the legal terms.  I know
11  what I think in my head.
12  Q.  That's fine.  Answer to the best of your
13  ability.
14  A.  Benefits that -- that allow you to stay
15  at home.
16  Q.  What about the health care piece?  Is
17  that to receive care at home?
18  A.  Yes.
19  Q.  And do you see that it says there was
20  a -- there's a 60-day elimination period and a
21  maximum daily benefit of $100 for home health
22  care.
23      Do you see that in the next sentence?
24  A.  Yes.
25  Q.  And it says "no benefits are payable

Page 79

1  during the Elimination Period, if applicable."
2      Do you see that?
3  A.  Yes.
4  Q.  And it says "Covered services will result
5  in a credit toward meeting the Elimination Period.
6  We will require copies of itemized billing during
7  the Elimination Period phase."
8      Do you see that?
9  A.  Yes.
10  Q.  Do you believe that your dad understood
11  what this meant?
12  A.  I was not in my dad's head, so I don't
13  know.
14  Q.  Do you believe that if your dad didn't
15  understand this he would have called the insurance
16  company to ask about it.
17  A.  It would depend on the day if -- how he
18  was feeling.
19  Q.  But you had testified that you trusted
20  your dad to handle his insurance affairs.  Is that
21  right?
22  A.  Yes.
23  Q.  Okay.
24      MS. JONES:  Madam Claims Examiner [sic]
25  I'm going to mark the instructions for filing a

Page 80

1  new long-term care claim as number -- Exhibit 3.
2      EXHIBIT:
3      (Deposition Exhibit 3 marked for
4  identification.)
5      BY MS. JONES:
6  Q.  And I'm gonna move on to the next
7  document.
8      Whoops.  It's not supposed to be that
9  one.
10      Okay.  Do you see this document?
11  A.  Yes.
12  Q.  I'll scroll fairly slowly, but the
13  question I'm gonna ask, so that you have it, is
14  have you seen this document before.  It's 20
15  pages, so if you don't recognize it, that's fine,
16  or I can keep scrolling.  Just let me know.
17  A.  Well, I see my signature on it, so I must
18  have seen it.
19  Q.  Okay.  And I'll -- I'll go through it
20  slowly so I'm not gonna trip you up on anything.
21      So here it says it's an assessment review
22  summary, and that the request was dated July 26,
23  twenty-seven -- 2016, which that was a day after
24  that letter said your dad submitted his claim.
25  Right?

Page 81

1  A.  Yes.
2  Q.  And the date of this assessment was about
3  six days later on August 2nd, 2016?
4      Do you see that?
5  A.  Yes.
6  Q.  And it looks like the person who
7  completed this was named -- actually, I apologize.
8  Teresa Johnson?
9      Do you see that?
10  A.  Yes.
11  Q.  Do you remember Ms. Johnson at all coming
12  to the home?
13  A.  I don't remember that name.  I know there
14  was a lot of people throughout the years.  I don't
15  recall that name.
16  Q.  But do you recall someone from the
17  insurance -- or sent by the insurance company to
18  come talk to you about your dad?
19  A.  Yes.
20  Q.  And the authorization, pursuant to HIPAA
21  or health -- information pursuant to health
22  insurance portability and accountability act of
23  1996 was signed by you.  Is that right?  That's
24  your signature?
25  A.  Yes.

Page 82

1 Q.  And here it states that you are the power
2 of attorney, right here, and guardian.
3    Do you see that?
4 A.  Yes.
5 Q.  And again, it says your dad
6 went -- worked in insurance and he went to
7 college.  I didn't -- I'm not sure I asked, where
8 did your dad go to college.
9    MR. BIDEGARAY: Objection.  Form.
10    BY MS. JONES:
11 Q.  You can answer.  Where did your dad go to
12 college.
13 A.  Black Hills State, I believe?
14 Q.  Do you know what degree he had?
15 A.  I believe he had a teaching certificate?
16 Q.  Did he have a bachelor's degree, a
17 bachelor's of arts, bachelor's of science?  Do you
18 know?
19 A.  I don't know.
20 Q.  'Kay.  And then it here it says, again,
21 that he had Medicare Part A and Medicare Part B
22 and veteran's benefits.
23    Do you see that?  I highlighted them.
24 A.  Yes.
25 Q.  Is that accurate?

Page 83

1 A.  Yes.
2 Q.  And primary physician there's -- it looks
3 like there's four blocks for physicians, and the
4 only one listed is James Meyer.  Is that right?
5 A.  That's the only one listed, yes.
6 Q.  Do you know at that time what doctors
7 your dad was seeing?
8 A.  Is this in, like -- we didn't see any
9 doctors in 2016.  Once he was diagnosed with
10 cancer, he canceled everything.
11 Q.  Starting in March of 2016.
12 A.  Yes.
13 Q.  Is that right?  Okay.  And so beyond
14 Dr. Meyer, there were no other doctors your dad
15 was seeing at this time.  Right?
16 A.  Correct.
17 Q.  And then it says "Has Insured been
18 hospitalized," and it says yes, "Salt Lake City."
19 That's the one hospitalization you had mentioned
20 earlier.  Right?
21 A.  Yes.
22 Q.  The one before that isn't mentioned,
23 though.  Is it the one -- the 2015 admission for
24 diabetes diagnosis?  November 2015 you had -- you
25 had said.  That was not on here.  Is that right?

Page 84

1 A.  Yes.
2 Q.  Then here it says "Does the Insured
3 currently have care in place?"  "Yes" is checked,
4 and then it says the provider is St. Peter's
5 Hospice.  And I highlighted it.  It says providing
6 personal care and ADL's three times a week
7 starting March 24th, 2016.
8    Do you see that?
9 A.  Yes.
10 Q.  Where did this information come from, if
11 you recall.  Would it have come from you?
12 A.  No.
13 Q.  Do you know where it would have come from
14 otherwise?
15 A.  No.
16 Q.  Here it says "Driving:  Is the Insured
17 currently driving?"  And it said no.  And then "If
18 no, when did the Insured stop driving," and it
19 says September of 2015.
20    Do you see that?
21 A.  Yes.
22 Q.  Is that accurate?
23 A.  Yes.
24 Q.  Do you know where this information would
25 have come from?

Page 85

1 A.  No.
2 Q.  Do you know if you told the nurse
3 assessor that?
4 A.  It would have been my dad or myself
5 probably.
6 Q.  Okay.  So here it says that your dad was
7 able to use the phone, able to recognize danger
8 and safety hazards.
9    Do you see that?
10 A.  Yes.
11 Q.  Do you agree with that --
12 A.  Yes.
13 Q.  -- at that time?
14 A.  Yes.
15 Q.  August 2016?  Okay.
16    And that he had zero cognitive deficits.
17    Do you see that?
18 A.  Yes.
19 Q.  And do you agree with that?
20 A.  Yes.
21 Q.  Okay.  So here it says "Daughter
22 reports" -- and I guess is "Daughter" you?
23 A.  Yes.
24 Q.  -- "insured sleeps most of the time."
25    Do you see that?

Page 86

1  A.  Yes.
2  Q.  Okay.  And it says "answers taken from
3  are daughter's response."
4     Do you see that?
5  A.  Yes.
6  Q.  "Insured very hard of hearing."
7     Do you see that?
8  A.  Yes.
9  Q.  Do you agree that you probably provided
10  most of the answers for this?
11  A.  Yes.
12  Q.  Okay.
13     MS. JONES:  Madam Court Reporter, I'm
14  gonna mark this as Exhibit 4.  This is the benefit
15  eligibility assessment from August 2016.
16     EXHIBIT:
17     (Deposition Exhibit 4 marked for
18  identification.)
19     BY MS. JONES:
20  Q.  Okay.  What is Exhibit 4 [sic]?
21  A.  HealthCare?  Home care?
22  Q.  Did you ever work for A-Plus home care
23  [sic]?
24  A.  I did.
25  Q.  When was that.

Page 87

1  A.  In September 2016.
2  Q.  And how did you come to find A-Plus home
3  care [sic]?  In other words, how did you learn
4  about it.
5  A.  Through some -- many of the various
6  people that were coming in and out of our house.
7  I do not recall exactly who had told me about it.
8  Q.  And when did you first reach out to
9  A-Plus home care [sic]?
10  A.  July?  August 2016?
11  Q.  And that was after your dad submitted a
12  claim for benefits under the policy.  Right?
13  A.  Yes.
14  Q.  Why did you contact A-Plus home
15  HealthCare?
16  A.  Because somebody that we had talked to, I
17  don't recall who, had said that I should get
18  certified to be a caregiver.
19  Q.  Do you think you needed to be certified
20  to be a caregiver?
21  A.  Are you asking me if I think it was good
22  to be a certified caregiver or was it required.
23  Q.  I -- I guess both.  Right?  I guess why
24  did you think you needed to become a certified
25  caregiver?  Because someone told you to or was it

Page 88

1  because you wanted to?  I mean, I'm trying to
2  learn why you did that.
3  A.  Somebody told me I needed to do -- to do
4  it.
5  Q.  Do you believe you were unable to take
6  care of your dad without it?
7  A.  No.
8  Q.  So this is gonna sound ridiculous, but
9  you just did it because someone told you to?
10  A.  Yes.
11  Q.  And you don't know who told you to do
12  that.
13  A.  I believe it was somebody through the VA.
14  Q.  And do you recall why they said you
15  should do that?
16  A.  Because they said I could be -- get some
17  money for taking care of my father through the VA.
18  Q.  And where would that money come from?
19  A.  Well, I got paid by A-Plus.  I don't know
20  who paid them.
21  Q.  You don't know who paid A-Plus?
22  A.  I don't know if it was a Medicare or a VA
23  thing.
24  Q.  But did A-Plus get paid?  Do you know
25  that?

Page 89

1  A.  No, I don't know.
2  Q.  But they paid you?
3  A.  Yes.
4  Q.  How much did they pay you?
5  A.  Like $10 -- 10.50 an hour, maybe?
6  Q.  And where did -- how did you record your
7  time?
8  A.  On a time sheet.
9  Q.  And where did you submit the time sheet?
10  A.  In a box outside their office?
11  Q.  Where's their office.
12  A.  It was on 11th Avenue in Helena?
13  Q.  Who was your supervisor there?
14  A.  Either Lynn or Tanya.  I don't know which
15  one was in charge of me.
16  Q.  So when you did it, was it to get paid by
17  the VA, was it to get paid under the insurance
18  policy?
19  A.  No.
20  Q.  Did you expect to get paid under the
21  insurance policy?
22  A.  No.
23  Q.  Did you need to take a course to get
24  hired at A-Plus?
25  A.  Yes.

Page 90

1  Q.  And what was that?
2  A.  Home -- I -- A caregiver course?  I don't
3  remember the title of it.
4  Q.  Did you get a certification from that?
5  A.  Yes.
6  Q.  Do you -- Did the certification expire,
7  was it good for life?  What's -- Tell me a little
8  bit about that certification.
9  A.  I'm sure it expired 'cause you were
10  required to take so many classes to keep it
11  current, I know that.
12  Q.  And did you do that?
13  A.  No, I only took the certification
14  classes.
15  Q.  So once you were certified, you didn't
16  continue education to -- or -- or anything else.
17  A.  No.
18  Q.  And did you have any patients besides
19  your dad.
20  A.  Not while my dad was alive, no.
21  Q.  Did you ever have any patients other than
22  your dad.
23  A.  Yes.
24  Q.  And who was that?
25  A.  Oh, I have no idea of their names.

Page 91

1  Q.  But you continued to work -- When -- I --
2  I guess I should say after your dad died, you
3  continued to work for A-Plus?
4  A.  Very infrequently, yes.
5  Q.  When you say "very infrequently," can you
6  elaborate that for me?
7  A.  They would call me once in a while and
8  ask me if I could go assist somebody.
9  Q.  And when you say "assist," what would you
10  do?
11  A.  I would either take people to an
12  appointment or I would give them a shower and
13  dress them.
14  Q.  And approximately how many times did you
15  do that.
16  A.  Do you mean like how many -- like
17  month-wise or how many a day or what.  I'm not
18  sure I understand.
19  Q.  Yeah.  I mean, before, you gave me your
20  employment history, you didn't mention this.  I'm
21  just trying to figure out when it -- how long you
22  did this for.
23  A.  It was very short.  I only did it while I
24  was taking care of my dad, and he died in
25  November.  I had a few people I helped in

Page 92

1  December, and I believe I had a couple of people
2  in January of 2017 that I helped, and then that
3  was my limit.
4  Q.  Okay.  So why -- So why, then, did you
5  stop --
6  A.  Because --
7  Q.  -- working there.
8  A.  Sorry.
9  Q.  No, go ahead.
10  A.  It was very hard.  It reminded me of my
11  dad.  And to see some of these people that had
12  such poor conditions that they were living in was
13  heart wrenching.
14  Q.  And so, I guess, did you quit working for
15  the company?  Is that the best way to describe
16  it -- what happened?
17  A.  Yes.
18  Q.  And that was in January of 2017?
19  A.  I don't remember if I had actually
20  submitted my -- my doneness in January or February
21  of 2017.
22  Q.  And you said you got paid 10.50 an hour.
23  Do you recall, I guess, starting in
24  September 2016 and then walking me through each
25  month, do you know how much you earned per month

Page 93

1  from A-Plus, if you can recall?
2  A.  I think I was approved for, like,
3  20 hours a week.  So however long that was until
4  my dad died I did that for the 20 hours.  And then
5  after that it was maybe two or three hours
6  possibly a week or every other week.  I didn't
7  have a regular schedule.  It was just on an
8  as-needed -- they called me just, like, "Hey, can
9  you go give somebody a shower today?"
10  And, you know, I would either have to say
11  yes or no.
12  Q.  Got it.  And you did that -- at the same
13  time, you were also a bookkeeper.
14  A.  No --
15  Q.  Or not.
16  A.  Not at that time, no.
17  Q.  Okay.  Okay.  Sorry.  I was a little bit
18  confused.  Okay.
19  Before we leave that topic, in terms of
20  employment, are there any other small jobs or ways
21  that you've earned income whether it be, you know,
22  I don't know, selling things or -- or is there any
23  other earning of income or jobs that you've held
24  besides what you've already told me about.
25  A.  Not that I can recall, no.

Page 94

1  Q.  Okay.  So again, I believe I might have
2  already asked this, but I don't remember.
3       Did you -- You were being paid by A-Plus.
4  Right?
5  A.  Yes.
6  Q.  Did you ever charge your dad out of
7  pocket to take care of him.
8  A.  No.
9  Q.  Okay.  And so you never created invoices
10 or any sort of, I guess, record beyond
11 your -- your timesheets that you submitted to
12 A-Plus.  No invoices or anything like that, I
13 guess I should say.
14 A.  No invoices.
15 Q.  Did you or your dad incur any expenses
16 related to any care that was ever provided to him
17 at all.  By you, by St. Peter's or -- any other
18 caregiver.
19 A.  No.
20 Q.  When you started working for A-Plus in
21 September, did your dad tell Continental, the
22 insurance company, that A-Plus was providing him
23 with care.
24 A.  I don't believe so, no.
25 Q.  Did your dad tell the insurance company

Page 95

1  at that time that you were providing him with
2  care.
3  A.  Yes.
4  Q.  Okay.  Give me one second.  I'm just
5  gonna share my screen.
6       Okay.  Can you see this document?  It's
7  one -- It's one page long, but I know there's a
8  lot of print on it, so I will scroll slowly.  Tell
9  me if I'm going too fast.
10      Have you seen this document before?
11 A.  No.
12 Q.  At the top of the document, it says "Note
13 Log."  Whoops, that's not gonna work.
14      Do you see that?
15 A.  Yes.
16 Q.  Okay.  So I'm gonna go back to this
17 exhibit at some point.
18      MS. JONES: But Madam Court Reporter, the
19 note log is gonna be marked as Exhibit 5.
20      EXHIBIT:
21      (Deposition Exhibit 5 marked for
22 identification.)
23      BY MS. JONES:
24 Q.  One moment.  I'm sorry.  Okay.
25      Ms. King, can you see the document on the

Page 96

1  screen?
2  A.  Yes.
3  Q.  And it is one page, but I will scroll
4  slowly.
5       Have you seen that document before?
6  A.  Yes.
7  Q.  And at the top it says September 6, 2016.
8       Do you see that?
9  A.  Yes.
10 Q.  Whoops.  And it says "2nd REQUEST."
11      Do you see that?
12 A.  Yes.
13 Q.  And it says "Dear Mr. King, We are taking
14 this opportunity to advise you of the status of
15 the above claim.  We have received a portion of
16 the Claim Form packet.  However additional
17 information is needed in order to complete the
18 processing of the claim.  We are still in need of
19 the following information from these providers:"
20      And then it says "HIPAA form," "Personal
21 Representative Form," so forth, and then it says
22 "Provider Claim Form and the following from the
23 licensed home health care agency you select:  RN
24 Assessment," Plan of Care and/or Service Plan, and
25 Current agency license.  This information is vital

Page 97

1  to our claim evaluation."
2       Do you see that?
3  A.  Can you scroll down, please?
4  Q.  Oh, of course.
5  A.  Thank you.
6       Yes, I see that.
7  Q.  And did I read that correctly?
8  A.  Yes.
9  Q.  Were you helping your dad with the
10 insurance claim at this time in September 6, 2016?
11 A.  Yes.
12 Q.  And so were you aware that at this time
13 the claim had not been fully submitted, there was
14 still missing information?
15 A.  Can you repeat your question, please?
16 Q.  Sure.  Yeah.  Were you aware that at this
17 time based on this letter there was still
18 additional information that the insurance company
19 needed to complete the processing of the claim.
20 A.  Yes.
21 Q.  Would you agree that at that time you had
22 not provided any of that documentation; that this
23 is a correct statement.
24 A.  We had passed this stuff off to all the
25 other nurses and that.  I -- We did not file

Page 98

1 anything. I mean, we didn't give any forms
2 ourselves to any doctors or anything. We had
3 given them to the nurses to pass on.
4 Q. When you say "the nurses," who are you
5 referring to?
6 A. Either the hospice nurse or the VA nurse.
7 Q. And this says specifically, though, from
8 the licensed home health care agency you select.
9 Do you see that?
10 A. Yes.
11 Q. Would that have been A-Plus home
12 HealthCare?
13 A. I guess that would be the healthcare
14 agency that was selected.
15 Q. Well, who selected it?
16 A. The VA, I believe.
17 Q. The VA selected home -- A-Plus or you
18 did?
19 A. Well, there was only -- there's not many
20 places around, so that was one of the only places
21 that was available.
22 Q. But you started working at A-Plus.
23 Right? There wasn't a different home health care
24 agency, just so that we're clear.
25 MR. BIDEGARAY: Objection. Form.

Page 99

1 BY MS. JONES:
2 Q. You can answer, if you understand.
3 A. No answer.
4 Q. Was there another licensed home health
5 care agency other than A-Plus providing care to
6 your dad.
7 A. No.
8 Q. When you saw this, as you testified you
9 did, did you call the insurance company to ask
10 what they meant or what they were asking for?
11 A. I don't recall.
12 Q. But you were -- were you seeking
13 reimbursement for the care you were being -- you
14 were providing from the policy, from the insurance
15 policy?
16 A. Was I personally seeking it?
17 Q. Yes.
18 A. Is that what you're asking? No, I was
19 not.
20 Q. So what benefit did you think you were
21 going to get under the policy if you were not
22 seeking reimbursement for the home health care.
23 A. I'm not sure I understand what you're
24 asking.
25 Q. Yeah. So you just said you weren't

Page 100

1 seeking reimbursement under the policy for the
2 care you were providing.
3 So what did you think the policy was
4 going to provide?
5 A. I believed it was paying my dad a hundred
6 dollars a day or whatever the amount was for his
7 policy. I don't know.
8 Q. Yeah. Do you know what the hundred
9 dollars a day would be for?
10 A. No.
11 Q. So I just want to go back briefly to
12 something I had already marked as an exhibit.
13 Give me one second.
14 Okay. So we had already looked at this
15 claim -- "Instructions For Filing a New Long Term
16 Care Claim." Right?
17 A. Yes.
18 Q. And here it tells you you were requesting
19 home health care benefits, and the benefit is a
20 maximum benefit of a hundred dollars per home
21 health care.
22 Do you see that?
23 A. Yes.
24 Q. What was the home health care that your
25 dad was receiving that he should have gotten a

Page 101

1 hundred dollars for.
2 A. Well, he had hospice in there, and he had
3 VA people coming in. That's all --
4 Q. But that was being paid for by Medicare.
5 Right?
6 A. To the best of my knowledge, yes.
7 Q. 'Kay. I'm gonna show you a different
8 document. This is one page.
9 Have you ever seen this before? I'll
10 scroll down. I guess I should say -- You know
11 what, quick question for you. What's Northwest
12 Drywall?
13 A. That's the company where my husband
14 works.
15 Q. So would your husband have faxed this or
16 sent this, it looks like?
17 A. Yes.
18 Q. And this says "PROVIDER CLAIM FORM" at
19 the top. Right?
20 A. Yes.
21 Q. And it says "This form is to be completed
22 by a Home" -- "Home Care Agency, Hospice Provider,
23 Adult Day Care," and so forth.
24 Did I read that correctly?
25 A. Yes.

Page 102

1 Q.   And it says "All information on this form
2 is vital to your patient's long term care
3 insurance claim."
4     Do you see that?
5 A.   Yes.
6 Q.   And do you see here it was your dad's
7 name, Robert King, and then it says "Provider
8 Name: A-Plus Health Care."
9     Do you see that?
10 A.   Yes.
11 Q.   And it says the services began
12 September 13, 2016.
13     Do you see that?
14 A.   Yes.
15 Q.   And it also says "Admitted for VA
16 Services."
17     Do you see that?
18 A.   Yes.
19 Q.   Do you see your name anywhere on here.
20 A.   Can you scroll down, please?
21 Q.   Sure.
22 A.   No, I do not see my name on there.
23 Q.   Does this form say that you are providing
24 care from A-Plus HealthCare.
25 A.   No.

Page 103

1 Q.   Who is Tanya Douglas LPM?  Well, strike
2 that.
3     Is this firm -- Is this sign -- It says
4 "Form completed by:  Tanya Douglas LPN," and it's
5 signed by Tanya Douglas, LPN.
6     Do you see that?
7 A.   Yes.
8 Q.   And it says she's the program manager.
9 Right?
10 A.   Yes.
11 Q.   And this was submitted on September 26,
12 2016.  Right?
13 A.   Yes.
14 Q.   So about 20 days after the letter that we
15 just looked at -- and I'll go back to that for one
16 second -- that has a date of September 6, 2016
17 telling you they still needed that in provider
18 claim form.  Right?
19 A.   Yes.
20 Q.   And who is Tanya Douglas?
21 A.   She was somebody that worked at
22 A-Plus HealthCare.  I don't know her exact
23 position other than it says her title was program
24 manager.
25 Q.   Did you interact with her?

Page 104

1 A.   Yes.
2 Q.   Did you ask her to complete this form?
3 A.   I do not recall.
4 Q.   This has some different handwriting on
5 it.  I know you're not a handwriting expert, but
6 do you know whose handwriting this part is?
7 A.   That would be --
8 Q.   Is that your dad's handwriting?
9 A.   Yes.
10 Q.   And then what about this kind of bubbly
11 script that I have highlighted.  "A-Plus Health
12 Care," is that completed by you?
13 A.   No.
14 Q.   But it was your husband's work where this
15 came from.  Right?  It came from Northwest
16 Drywall.
17 A.   Yes.
18 Q.   Did you pick up this form from A-Plus
19 after they completed it?
20 A.   I do not recall.
21 Q.   When you started working for A-Plus, did
22 you tell the insurance company that you were
23 working for them.
24 A.   I don't -- I don't recall.  I'm sorry.
25 Q.   That's okay.  And at this time was your

Page 105

1 dad still -- and -- and we're in September now
2 just to give you -- the end of September -- was
3 your dad still handling the insurance claim by
4 himself or was it you who were working with him --
5 A.   I --
6 Q.   -- or working with the insurance company.
7 A.   I -- I was.
8 Q.   And so at this time, you didn't think to
9 tell the insurance company that you were providing
10 the care, you just told him it was
11 A-Plus HealthCare.  Right?
12     MR. BIDEGARAY: Objection.  Form.  And it
13 misstates what she just testified to.
14     MS. JONES: I'm sorry, Dan, I didn't -- I
15 honestly didn't hear you.
16     MR. BIDEGARAY: I said objection, form,
17 and it misstates what she just testified to.
18     BY MS. JONES:
19 Q.   Okay.  Then tell me what you testified
20 to.  Or correct your testimony, I should say.
21 I'm -- I'm basically saying, on here it just says
22 A-Plus HealthCare.  It does not say Michelle King.
23 Is that right?
24 A.   Yes.
25 Q.   Did you tell the insurance company in

Page 106

```
 1   September 2016 that you were providing care to
 2   your dad.
 3 A. I honestly do not remember.
 4 Q. 'Kay.  So I'm gonna mark the provider
 5   claim form as Exhibit 6.
 6     EXHIBIT:
 7     (Deposition Exhibit 6 marked for
 8   identification.)
 9     BY MS. JONES:
10 Q. And I'm gonna go to the next document.
11   So this is dated October 4th, 2016.
12     Do you see that?
13 A. Yes.
14 Q. And this is a four-page document.  I'm
15   going to scroll slowly so that you can see it.
16     You tell me when to stop or how to
17   scroll.
18 A. Can you slow down, please?
19 Q. Of course.
20 A. Thank you.
21 Q. Yeah.  Yeah, how about you tell me when
22   to scroll.  I know there's kind of a lot here.
23 A. You were doing good.
24 Q. Okay.  I'm sorry.  It's not a memory
25   test, I'm not gonna ask you any of this without
```

Page 107

```
 1   looking at it again.  I'm -- I'm, again, gonna ask
 2   you the same question I've been asking, which is
 3   just have you seen this before.  But we'll go
 4   through each piece.
 5     MR. BIDEGARAY: And Sandy, we've been
 6   going for a little over an hour.  If you can find
 7   a spot that's a good spot to take a break, let us
 8   know.
 9     MS. JONES: I'm fine if you want to take
10   a break now.  Does that work?
11     MR. BIDEGARAY: It -- It's up to you.
12   It's your -- you're going.  I -- I just -- Since
13   you were scrolling --
14     MS. JONES: Well, I actually just looked
15   at the clock.  I can't -- I can't believe it's
16   been that long.  Yeah, let's take a break.
17     BY MS. JONES:
18 Q. We'll come back to this document, and
19   I'll let you read it 'cause, you know, there's no
20   question pending.
21     MS. JONES: So it's 2 o'clock my time.  I
22   want to be mindful.  So Dan just to give you an
23   idea, I probably have, like a -- I don't know,
24   maybe another hour and change to go, depending on
25   reading of the documents and such.
```

Page 108

```
 1     Does Ms. King or you need a break for
 2   lunch or you tell me how long you need.  If this
 3   is the right time or you want to --
 4     MR. BIDEGARAY: I don't.  Let me check
 5   with the court reporter.  I don't, and I don't
 6   think Ms. King does, but the court reporter may.
 7     THE COURT REPORTER: I don't need a break
 8   for lunch.  Thank you.
 9     MR. BIDEGARAY: Okay.  Yeah, no.  We can
10   keep -- if you want -- have an hour left, that --
11   that -- let's just take a break, finish up, then
12   that would be wonderful.
13     MS. JONES: Well, not an half an hour.  I
14   might have, like --
15     MR. BIDEGARAY: Yep.
16     MS. JONES: -- an hour --
17     MR. BIDEGARAY: I said --
18     MS. JONES: -- left.
19     MR. BIDEGARAY: -- hour, I said hour.  If
20   you have an hour left --
21     MS. JONES: Okay, okay.
22     MR. BIDEGARAY: --  that'd be great.
23     MS. JONES: Okay.  So do you want to take
24   about 10, 15 minutes?  We'll come back 2:00 p.m.
25   my time?  Well, that's almost 20 minutes, I guess.
```

Page 109

```
 1     MR. BIDEGARAY: 10 minutes.
 2     MS. JONES: Let's just take 10 or 15
 3   minutes, and we'll come back at -- I guess what
 4   time is it where you guys are?  11:50 something?
 5   Does that work?
 6     MR. BIDEGARAY: Yes.  10 minutes is fine.
 7     MS. JONES: Okay.  Great.
 8     THE VIDEOGRAPHER: Time is 11:42.  Going
 9   off the record.
10     (Recess taken from 11:42 a.m. to
11   11:54 a.m.)
12     THE VIDEOGRAPHER: Time is 11:54.  Back
13   on the record.
14     BY MS. JONES:
15 Q. All right.  Ms. King, we're back on the
16   record again after a short break.  And right
17   before the break I had put up an exhibit that I'm
18   gonna mark as Exhibit 7, and I'm gonna put that
19   back up.
20     EXHIBIT:
21     (Deposition Exhibit 7 marked for
22   identification.)
23     BY MS. JONES:
24 Q. Can you see that?  This is where -- right
25   I stopped scrolling, but I'm happy to stop
```

Page 110

1    scrolling if you need.
2  **A. I can see that.**
3  Q. Okay. And I'll represent that
4    highlighting is mine, it's not in the original
5    document, but you can disregard it for now.
6      Let me know when you I go back to the
7    top.
8  **A. You can go back to the top.**
9  Q. Okay. Okay. So again, this is dated
10   October 4, 2016.
11     Do you see that?
12 **A. Yes.**
13 Q. And based on what we just scrolled
14   through, have you seen this letter before.
15 **A. Yes.**
16 Q. And this letter's addressed to you,
17   actually. Right?
18 **A. Yes.**
19 Q. And here it says -- the Re line says
20   "Claim Approval."
21     Do you see that?
22 **A. Yes.**
23 Q. And here it says "Mr. King is eligible
24   for Home and Community Care Benefits (Home Health
25   Care) beginning August 2, 2016 - the date of the

Page 111

1    on-site benefit evaluation and the date Mr. King
2    was certified Chronically Ill. Benefits are
3    subject to the conditions and limitations of the
4    Policy."
5      Do you see that?
6  **A. Yes.**
7  Q. When you saw "Home and Community Care
8    Benefits," did you ask the insurance company what
9    that means or why they determined that was the
10   benefit he was eligible for?
11 **A. Not that I can remember. I don't**
12 **remember asking.**
13 Q. And here it describes home and community
14   care benefits, and it says "Once the Elimination
15   Period," which is up here, [As Read]: "has been
16   met, we can begin paying benefits for eligible
17   care. We will pay benefits when Mr. King receives
18   Home and Community care or Hospice services.
19   Eligible care is Qualified Long Term Care from a
20   Home Health" -- "Home Health Care Provider" --
21   apologies -- "an Independent Caregiver, or an
22   Adult Day Care center."
23     Do you see that?
24 **A. Yes.**
25 Q. So down here in that same letter, which

Page 112

1    is only about four pages, it says "Effect of
2    Medicare." "Please note under SECTION 3:
3    EXCLUSIONS of the policy where WHEN THIS POLICY
4    WILL NOT PROVIDE BENEFITS are outlined." Then it
5    says what the policy states.
6      Did you look at the policy at this time
7    when you received this letter?
8  **A. Not that I recall, no.**
9  Q. Did you talk to your dad about the policy
10   when you got this letter?
11 **A. I don't remember.**
12 Q. Do you see how it says [As Read]: "This
13   Policy will not pay benefits for any care services
14   that are:... Reimbursable under Title XVIII" --
15   which is 28 -- [As Read]: "of the Social Security
16   Act (Medicare) or would be so reimbursable but for
17   the application of a deductible or co-insurance,
18   or Reimbursable under any federal, or state health
19   care plan or law, except Medi-Cal or Medicaid."
20     Do you see that?
21 **A. Yes.**
22 Q. And do you agree that that's what the
23   policy says?
24     **MR. BIDEGARAY:** Objection. Form. And
25   she's already answered that.

Page 113

1      **MS. JONES:** Okay. Fine.
2      **BY MS. JONES:**
3  Q. Do you agree that I read that correctly.
4  **A. Yes.**
5  Q. Then it says "Proof of Loss - Invoicing."
6      **[As Read]:** "In order to meet the Elimination
7    Period and to pay benefits, we require itemized
8    invoicing for eligible care provided to Mr. King.
9    The claim file indicates that Mr. King is
10   receiving services from St. Peter's Hospice and
11   A-Plus Health Care. We will need itemized
12   invoicing for the services provided to Mr. King in
13   addition to the agencies state issued home health
14   care agency license and a W-9 with the agencies
15   federal tax information number.
16     The next section of this letter will
17   explain how to submit invoicing for Home Health
18   Care through LTCFastPay."
19     Do you see that?
20 **A. Yes.**
21 Q. Did you ever provide itemized invoicing
22   to the insurance company.
23 **A. I don't remember.**
24 Q. And here it says, again, "Mr. King is
25   receiving services from St. Peter's Hospice and

Page 114

1  A-Plus Health Care."
2     That's correct. Right?
3  A.  Yes.
4  Q.  He wasn't receiving services from anyone
5  else. Right?
6  A.  Well, the VA would send a nurse out
7  occasionally. I don't know if that was part of
8  that or not.
9  Q.  But again, you didn't pay out of pocket
10  for that --
11  A.  No.
12  Q.  -- or incur an expense? Right? It was
13  paid for by the VA.
14  A.  Correct.
15  Q.  So were there any invoices submitted for
16  home health care through LTCFastPay.
17  A.  I don't remember LC -- LTCFastPay.
18  Q.  Then here the letter says "Next Steps for
19  You." "Submit an address change if needed.
20  Enroll with LTCFast Pay for Home Health Care."
21  Send in the provider claim form from St. Peter's
22  Hospice along with those documents listed, and
23  "The following from A-Plus Health Care."
24     And then at the bottom do you see it says
25  "Itemized invoicing and daily notes for each date

Page 115

1  of service."
2  A.  Yes.
3  Q.  Did you provide those to the insurance
4  company. Itemized invoicing and daily notes for
5  each date of service.
6  A.  I honestly don't remember.
7  Q.  Do you know if someone else would have
8  submitted those or --
9  A.  No.
10  Q.  -- would it have been you?
11  A.  I don't know if A-Plus had done that or
12  not.
13  Q.  Okay. Let me see if I can share my
14  screen again.
15     Go up to the top. This is a two-page
16  document, and I'll keep scrolling. Tell me when
17  to stop or scroll up, I should say. I think the
18  bulk is here.
19     Have you seen this document before?
20  A.  Not with the writing on it, no.
21  Q.  Okay. Did you see it without the writing
22  on it from November 17, 2016?
23  A.  Not that I remember.
24  Q.  Okay. Actually it was made out to
25  A-Plus HealthCare. Right? It was directed to

Page 116

1  A-Plus HealthCare?
2  A.  Correct.
3  Q.  And it's signed by Dan Leal.
4     Do you remember Dan Leal at all?
5  A.  No, I remember I believe I talked to a
6  man on the phone at one time, but I don't
7  remember -- I don't recall a name. I'm sorry.
8  Q.  That's all right. And so here it
9  says -- it says Robert King, insured, then it says
10  "Re: Requested Documentation." Right?
11  A.  Correct.
12  Q.  It says "Dear Business Office Manager,"
13  meaning A-Plus HealthCare business office manager,
14  "This is" -- oh, it probably should say "a
15  request." [As Read]: "This is request for
16  documentation regarding our insured
17  Mr. Robert King's Long Term Care claim. For
18  continued proof" -- I'm sorry, "For proof of
19  continued eligibility, we are requesting the
20  following documents: INITIAL RN ASSESSMENT, PLAN
21  OF CARE/SERVICE PLAN, ITEMIZED INVOICING AND DAILY
22  NOTES FOR EACH DATE OF SERVICE," and "CURRENT
23  AGENCY STATE LICENSE."
24     Do you see that?
25  A.  Yes.

Page 117

1  Q.  Would you agree that as of November 17,
2  2016 they had not received any -- Continental,
3  actually, the -- the insurance company, had not
4  received itemized invoicing and daily notes for
5  each date of service from A-Plus?
6  A.  What is your question again? I'm sorry.
7  Q.  Sure. Does it -- Would you agree with me
8  that based on this letter the insurance company
9  was still looking for itemized invoicing and daily
10  notes for each date of service.
11  A.  That's how I would read it, yes.
12  Q.  Do you know if you had submitted an
13  itemized invoicing or daily notes for each date of
14  service --
15  A.  I had --
16  Q.  -- November 17, 2016?
17     THE COURT REPORTER: I -- I'm so sorry,
18  Counsel. Prior to or -- Your audio cut out.
19     MS. JONES: Yeah. Sorry.
20     BY MS. JONES:
21  Q.  At or prior to November 17, 2016, had you
22  submitted itemized invoicing and daily notes for
23  each date of service.
24  A.  Submitted to who?
25  Q.  To the insurance company.

Page 118

1  A.  I don't recall submitting my timesheets
2  that had my documentation to the insurance
3  company.  I know I turned them in to A-Plus, and
4  that's all I can recall.
5  Q.  Okay.  Do you see the handwriting on
6  here?
7  A.  Yes.
8  Q.  And it says it was signed by Tanya
9  Douglas, Program Manager.
10  Do you see that?
11  A.  Yes.
12  Q.  And here it says on the same day, she
13  wrote or at least it says, "The requested
14  documentation was not done, as company denied
15  claimant's daughter to be caregiver."
16  Do you see that?
17  A.  Yes.
18  Q.  So do you believe -- Based on this, would
19  you agree that there was no documentation done
20  from A-Plus.
21  A.  Yes.
22  Q.  I'm gonna go back to --
23  MS. JONES: I'm sorry, I'm -- did I
24  already mark -- I don't think I marked that.  I'm
25  gonna mark that document as Exhibit 8.

Page 119

1  EXHIBIT:
2  (Deposition Exhibit 8 marked for
3  identification.)
4  BY MS. JONES:
5  Q.  Okay.  I'm gonna go back to the exhibit
6  marked Number 7, which asked for those next steps.
7  Was anything in this letter confusing to
8  you when you received it.
9  A.  Can you scroll down, please?
10  Q.  Of course.
11  A.  That LTCFastPay was confusing to me.
12  Q.  Did you try to enroll with it?
13  A.  Boy, I don't remember.  I do remember
14  that it was -- somebody had said something about
15  having to call when I got to my job and call when
16  I left my job.
17  And I said, "Well, that's really hard
18  because I don't ever get here and I don't ever
19  leave, I'm just here 24/7."
20  But I don't -- I don't recall -- I just
21  remember LTCFastPay was above my head.
22  Q.  Did you call the insurance company to
23  tell them that --
24  A.  I -- I don't remember --
25  Q.  -- in October?

Page 120

1  A.  Sorry.
2  THE COURT REPORTER: I -- I didn't get
3  the last part of your question, Counsel.
4  MS. JONES: Sure.
5  BY MS. JONES:
6  Q.  I said in October of 2016 did you call
7  the insurance company to tell them you were
8  confused about LTCFastPay.
9  A.  I don't know when I had called, and I
10  don't know who I called, but I remember talking to
11  somebody about LTCFastPay.
12  Q.  And had you told anybody at that time
13  that you were providing care.
14  A.  Yes.
15  Q.  And when was that.
16  A.  I don't know.
17  Q.  'Kay.  Let me go back to this document
18  which we had seen earlier.  Again, it has a --
19  it's Exhibit 5, but it has quite a lot of
20  documentation on it, but I -- I'll represent to
21  you, and I'll confirm in a minute, that it's
22  backwards in terms of the timeline.  It starts in
23  July all the way down to 2016 -- July 2016 and
24  then it -- it goes the opposite direction and ends
25  March 7, 2017.

Page 121

1  Do you see that?
2  A.  Yes.
3  Q.  Okay.  So when I'm starting at the
4  bottom, it's actually opposite.
5  So October 4, which was the date of that
6  letter.  Right?
7  A.  Yes.
8  Q.  I'm sorry.  Here it says "NEW CLAIM SETUP
9  COMPLETED.  REFERRED to EXAMINER -(DLEAL)."
10  Do you see that, or D-L-E-A-L.
11  A.  Yes.
12  Q.  And then above there it says October 11,
13  2016 at 11:48:59 [As Read]: "MICHELLE KING (POA)
14  CALLED ABOUT INFO STILL NEEDED - REFER TO page 4
15  OF APPROVAL LETTER.  LIST ITEMS PENDING FROM THE
16  PROVIDER AS OF ELIGIBLE DATE OF AUGUST 2016.  SHE
17  WILL TRY FOLLOW UP AGAIN."
18  Do you see that?
19  A.  Yes.
20  Q.  Do you remember that phone call?
21  A.  No, I do not.
22  Q.  And then here on October 25th, 2016, it
23  says [As Read]: "SARA WITH A PLUS HOME HEALTHCARE
24  SAID WILL START CARE FOR SERVICE.  ASKED FOR OUR
25  FAX NUMBER.  GAVE HER NEW FAX.  SARA WILL FOLLOW

1 UP."
2     Do you see that with -- and then it's cut
3 off.  The -- the reason it's cut off, I have
4 another version of this.  It's -- And Dan notes
5 it -- it was a live HTML document, so it's --
6 it's scanned.
7     But essentially do you see that?
8 A.  Yes.
9     MR. BIDEGARAY: With regard to that page,
10 Sandy, I -- I did send an email with it so that it
11 shows everything, and I asked --
12     MS. JONES: I actually think I have that
13 one, Dan, if you want --if you'd give me one
14 second, I'll --
15     MR. BIDEGARAY: But there was objections
16 and this and that, but -- but what I sent you, you
17 can double-check me, and I'm happy to let you just
18 substitute it out.  I --
19     MS. JONES: Yeah.  And I'm -- I could
20 have been -- I don't think there were --
21     THE COURT REPORTER: Sandy -- Sandy --
22     MS. JONES: We know where --
23     THE COURT REPORTER: Sandy, I'm so sorry,
24 Mr. Bidegaray is still speaking.  If you could
25 just hold on a minute and let him finish, please?

1 Thank you.
2     MR. BIDEGARAY: So I'm happy to let you
3 substitute that page out.  I do think it's
4 accurate.  I don't know why the continued
5 objection's on it.  I'm just trying to get an
6 accurate record.
7     MS. JONES: I understand.  I don't think
8 there was intended to be actual objections to it.
9 To be totally candid, I think -- yeah, I -- I
10 think we're on the same page.  We want the full
11 record included.
12     I think the trickiness, of course, was
13 that it was a HTML scrollable document, which I do
14 have the HTML version that we did produce, and so
15 I will pull that one up and I will substitute it
16 for Exhibit 5, if you agree.
17     MR. BIDEGARAY: No, I don't want the HTML
18 substituted.  What I said is substitute that page.
19 The rest of the pages you guys sent were right.
20 That page cut off information, so we redid it so
21 that it -- it showed what actually was on that
22 page, and for some reason you guys didn't want to
23 substitute that particular page.  If you'd go back
24 and look at my email and look at that page, I
25 think you'll see that if we just substitute the

1 cutoff page that you were just trying to use?
2     MS. JONES: Mm-hmm.
3     MR. BIDEGARAY: Does -- Does that make
4 sense?
5     MS. JONES: It does, and I -- I agree
6 that that's fine.  I think there might have been a
7 misunderstanding there.  We didn't intend to do
8 that.  I think what the issue actually was -- not
9 to talk about that here, per se -- but was that
10 the Bates number was different so we just wanted a
11 record that it wasn't a new document.  But
12 I -- I'm -- I'm completely with you.
13     I am gonna show her, however, the HTML
14 version because I know it's not cut off, and I
15 can't find the other one right now, but it's -- if
16 you created your document with the HTML, I think
17 it's the same thing.
18     BY MS. JONES:
19 Q.  But Ms. King, here's that same document,
20 but you can scroll so you can see, again, the
21 whole thing.  It goes from July 26, 2016 backwards
22 to March 7, 2017 if I scroll, but the side is not
23 cut off, which is what Dan and I were talking
24 about.  For some reason when we PDF'd it, the side
25 got cut off and we didn't realize it until Dan

1 brought it to our attention.
2 A.  Okay.
3 Q.  So where I said before Sara will follow
4 up with the family is what was left there on
5 October 25th, 2016.
6     Do you recall talking with a Sara at
7 A-Plus home HealthCare about the claim ever?
8 A.  No, I don't remember a Sarah at all.
9 Q.  Okay.  The next call note on that file
10 which is from -- it says "KBYRD," and then it says
11 October 25, 2016 at 14:50:52 which is, like,
12     2:50 p.m., it says "Sarah With A Plus Care Called
13 and wanted to know the Information they need to
14 send in to Us."  Excuse me.  [As Read]: "I let her
15 know that I would fax the information.  She stated
16 during the call the daughter (Michelle) will be
17 providing the care for the Insured.  I placed her
18 on hold to verify if the daughter would be
19 eligible to provide care.  After reviewing the
20 policy it states 'A Home Health Care Provider
21 cannot be a member of your Immediate Family or
22 anyone living with You.'  I informed Sarah that
23 the daughter could not provide care for the
24 Insured per the policy provisions.  I let her know
25 that I would have the EX," examiner, "reach to the

Page 126

1  daughter and explain the policy provision to her.
2  She understood.  She then provided me the fax
3  number to submit the request 406-421" --
4  "422-1062."
5     Do you see that?
6  A.  Yes.
7  Q.  And I -- I'm not -- you know, these
8  depositions can be repetitive, but I'm gonna ask
9  again, you didn't talk with A-Plus about that call
10  or did you talk to -- with A-Plus about that call?
11  A.  No, not that I remember.
12  Q.  Did anyone from A-Plus ever talk to you
13  about the policy or any provision that would
14  not -- that a home health care provider cannot be
15  a member of your immediate family or anyone living
16  with you?
17  A.  No.
18  Q.  So the next day you see it says "DLEAL -
19  10/26/26."  That's Dan Leal.
20     Again, you -- you testified that you
21  remember speaking to a man.  You don't remember
22  who that was?
23  A.  Correct.
24  Q.  It says that he spoke to you and asked if
25  you had any questions or concerns with hiring a

Page 127

1  caregiver.  [As Read]: "SHE STATED THAT SHE IS THE
2  CAREGIVER FOR HER FATHER, AND SHE IS WORKING FOR A
3  PLUS.  SHE STATED THAT SHE HAS BEEN WORKING WITH
4  THE AGENCY FOR A COUPLE OF MONTHS.  SHE STATES SHE
5  IS CERTIFIED AS A CAREGIVER AND SHE SHARES THE
6  SAME HOME AS THE INSURED.  I ADVISE" -- or
7  "ADVISED HER THAT THE POLICY EXCLUDES ANY
8  IMMEDIATE FAMILY MEMBER FROM BEING CERTIFIED AS AN
9  INDEPENDENT CAREGIVER.  ADVISED HER I WILL
10  RESEARCH THE ISSUE AND CALL HER IN A DAY OR TWO."
11     Do you see that?
12  A.  Yes.
13  Q.  Do you remember that phone call where you
14  were told that the policy excludes an immediate
15  family member from being certified as an
16  independent caregiver?
17  A.  Boy, I don't remember at that time.
18  I'm -- I don't.
19  Q.  Did you -- Do you remember looking at the
20  policy at this time in October of 2016?  October
21  26, 2016?
22  A.  No, I never looked at the policy.  I was
23  concentrating on living -- or enjoying the last
24  days with my father.
25  Q.  I understand.

Page 128

1     But when you were told you weren't going
2  to be paid or that the policy excludes this, you
3  didn't think to look at the policy and figure out
4  whether the company was right or wrong?
5  A.  Nope, that was the last thing on my mind.
6  Q.  But you were trying to get the claim
7  approved.  Right?  You were trying to help your
8  dad get the claim approved that he had submitted.
9  A.  Yes, I was trying.
10  Q.  Okay.  And do you see -- Well, let
11  me -- let me -- I'm gonna close -- stop for a
12  second, I'm gonna go back.  So this was the
13  document we already looked at, Exhibit 7, which
14  was that claim approval letter.
15     Do you see that?  We had already looked
16  at this one where it said "Mr. King is eligible
17  for the Home and Care" -- "Home and Community Care
18  Benefit."
19     Do you see that?
20  A.  Yes.
21  Q.  This was October 4, 2016.  Right?
22  A.  Yes.
23  Q.  Wasn't your dad alive at this time?
24  A.  Yes.
25  Q.  Did you ever tell your dad -- tell the

Page 129

1  insurance company that your dad died thinking he
2  didn't have his claim approved?
3  A.  Did I tell them that?
4  Q.  Yes.  Did you tell them that.
5  A.  On the phone?
6  Q.  At any point in -- I -- I don't know.
7  In -- In the phone, in writing.  I'm asking you.
8  A.  I probably told them somehow.
9  Q.  Would that have been true?  I mean, did
10  you tell your dad the claim was approved in
11  October of 2016?
12  A.  Well, we thought it was approved.
13  Q.  Right, but you didn't submit any invoices
14  to get paid, did you?
15  A.  Not that I remember.
16  Q.  Did you know that the policy for the home
17  and community care benefit had an exclusion for a
18  family caregiver?
19  A.  No.
20  Q.  So did you try to get employed by A-Plus
21  to get paid under the policy?
22  A.  I don't know if I was getting paid under
23  the policy.  I just knew I was getting paid by
24  somebody, and that would have been through the VA.
25  Q.  Right.  So do you think the policy should

---

Page 130

```
 1  have also paid you for providing that care if you
 2  were already getting paid by the VA or Medicare?
 3  A.  Well, I didn't think it was paying me, it
 4  was supposed to be paying for my father.
 5  Q.  Right.  But what do you think the policy
 6  is supposed -- if you -- if you didn't look at the
 7  policy, how would you know what the policy's
 8  supposed to pay for?
 9  A.  I didn't know what.  If it's a home care
10  policy, you would think that it would pay for home
11  care.
12  Q.  But this claim letter was pretty clear --
13  or the letter was pretty clear that it said that
14  invoices were required because don't you think --
15  well, let's -- let's talk about that, actually.
16  Right?
17     So here it says [As Read]: "For Home and
18  Community Care, we will pay benefits as follows:
19  For Home and Community Care or Hospice Services
20  received during the first thirty consecutive
21  calendar days after satisfaction of the
22  Elimination Period, for care received during a
23  day, we will pay the lesser of:  Two times the
24  Maximum Home and Community Care Benefit, or The
25  amount of money remaining in the Maximum Lifetime
```

Page 131

```
 1  Benefit, or The total of:"  and then it lists
 2  expenses incurred.
 3     Did you think -- And then -- And then
 4  down here we read before that -- well, Number 1,
 5  the policy won't be -- won't pay benefits for
 6  services reimbursable under Medicare.  But second
 7  of all, that you need to -- [As Read]: "we require
 8  itemized invoices provided to Mr. King" to pay.
 9  It says and "to" -- "to meet the Elimination
10  Period and to pay benefits, we require itemized
11  invoicing for eligible care provided to Mr. King."
12     Do you see that?
13  A.  Yes.
14  Q.  So does it -- wouldn't you agree with me
15  that the company told you that they required
16  itemized invoicing to pay the -- any benefit to
17  Mr. King?
18  A.  Sorry.
19  Q.  And you already told me you didn't
20  provide that.  Right?
21  A.  I did not, no.
22  Q.  Right.  And we looked at a document that
23  said that it wasn't provided by A-Plus.  Right?
24  A.  Yes.
25  Q.  Did you ever tell A-Plus that they needed
```

Page 132

```
 1  to send invoices?
 2  A.  I believe there was conversation of that
 3  or they had talked to insurance, they would have
 4  seen that it was required.
 5  Q.  Well, right, but those benefits were paid
 6  by Medicare.  Right?  Or the VA?  You were paid by
 7  Medicare or the VA.  Right?
 8  A.  Right.
 9  Q.  A-Plus was?  Right.  So the policy won't
10  pay benefits for any care services that are paid
11  by Medicare or the VA.  Right?
12  A.  Yes.
13  Q.  I'm gonna go back to that -- Well,
14  actually, here, we're gonna -- we're gonna face
15  the cutoff again.  Give me one second.
16     Okay.  Here's that HTML document so we
17  can see the full thing.
18     So it says on November 29th, DLEAL called
19  and left you a voice message needing to discuss
20  alternate payment rider benefit since no care in
21  place per, and then it lists the document number.
22     Do you see that?
23  A.  No, I -- can you scroll up, please?
24  Q.  Of course.  I'm sorry.  I'm looking at
25  where it says here.  I just kind of highlighted it
```

Page 133

```
 1  in blue for a second.
 2     Do you see that?
 3  A.  I -- I don't see that on my screen.
 4  Q.  Maybe you won't be able to see the
 5  highlighting.
 6     Do you see where it says November 29th,
 7  2016 is the date I'm looking at?  13:42?
 8  A.  Mine only goes up through November 17th.
 9  Q.  Okay.  So maybe -- Can you see it now?
10  A.  No.  It's not moving at all on my end.
11  Q.  Maybe it froze.  Is it moving now?  I'm
12  kind of scrolling just quickly?
13  A.  No.
14  Q.  Are things moving?
15  A.  Nothing's moving.
16  Q.  Okay.  I'm gonna stop the share for one
17  second and try again.
18  A.  Sorry.
19  Q.  Must have frozen.  No, that's okay, thank
20  you for telling me.
21     Okay.  Can you -- Is it moving now?
22  A.  Yes.  It's moving.
23  Q.  Okay.  That must have been what happened.
24     Okay.  So I'm looking at where it
25  says -- do you see the blue November 29, 2016?
```

Page 134

1 A. Yes.
2 Q. Okay. Do you know what "ALTERNATE
3 PAYMENT RIDER BENEFIT" is?
4 A. No, I do not.
5 Q. Did you ever look at the -- had you
6 looked at the policy at this point in time,
7 November 29, 2016?
8 A. Probably not, 'cause I was very
9 exhausted.
10 Q. I understand. This is after your dad had
11 passed away, though. Right?
12 A. Correct.
13 Q. Okay. And then it looks like a couple
14 days later on December 6, 2016, Mr. Leal notes [As
15 Read]: "I SPOKE" -- Can you see that? [As Read]:
16 "SPOKE TO MICHELLE KING(POWER OF ATTORNEY)"?
17 A. Yes.
18 Q. Okay. [As Read]: "ADVISED THAT I
19 RECEIVED A NOTE FROM THE HOME HEALTH CARE AGENCY
20 THAT NO CARE WAS PROVIDED. SHE STATED THAT THERE
21 WAS CARE HOWEVER. I EXPLAINED THAT SINCE MR KING
22 DIED SO SUDDENLY THERE'S ANOTHER BENEFIT OPTION
23 TITLED ALTERNATE PAYMENT BENEFIT THAT DOES NOT
24 TAKE THE ELIMINATION PERIOD INTO EFFECT. I
25 EXPLAINED THAT IT PAYS ON A PRORATED BASIS AND

Page 135

1 WILL NOT PAY FOR ANY DAYS MR. KING WAS
2 HOSPITALIZED OVERNIGHT. SHE CONFIRMED THAT HE WAS
3 NOT HOSPITALIZED, ADVISED THAT I WILL PAY PART OF
4 AUGUST, SEPTEMBER, OCTOBER, AND NOVEMBER 1 THROUGH
5 6. ADVISE THAT I WILL PROCESS TODAY AND GO OUT IN
6 TOMORROW'S MAIL. SHE THANKED ME."
7 Do you see that?
8 A. Yes.
9 Q. At that point did you understand what the
10 alternate benefit was that the -- the company had
11 offered to pay to you?
12 A. No.
13 Q. Did you ask the company what the
14 difference was?
15 A. No.
16 Q. Were you paid anything by the company?
17 A. By the insurance company?
18 Q. Yes.
19 A. Yes. There was a check that came.
20 Q. Okay. And what -- do you remember what
21 the check was for?
22 A. It was for the dates August, September,
23 and October, and the few days in November
24 prorated.
25 Q. Okay. And when you received that, did

Page 136

1 you understand that it was paid under the
2 alternate benefit payment rider?
3 A. I really did not, no, I didn't.
4 Q. Did you ask the insurance company to
5 explain the difference between the alternate
6 benefit payment rider and the home health care
7 benefit you had applied for? Or I should say your
8 dad applied for?
9 A. No.
10 Q. What does the word "alternate" mean to
11 you?
12 A. Another option.
13 Q. Do you know what the alternate benefit
14 payment rider would pay per month?
15 A. Do I now know?
16 Q. Yeah.
17 A. Is that what you're asking?
18 Q. Yeah. Yes.
19 A. I believe it was a thousand dollars a
20 month.
21 Q. And do you know what the daily benefit
22 amount under the policy was for home health care
23 benefits?
24 A. Well, I remember seeing a hundred
25 dollars. Was that -- I don't know if that was for

Page 137

1 that.
2 Q. It was.
3 A. Okay.
4 Q. If you agree with me.
5 A. Yes.
6 Q. So just simple math, would you agree that
7 a hundred dollars per day for 30 days per month
8 would have been $3,000 per month.
9 Would you agree with that?
10 A. Yes.
11 Q. So do you agree that under the home
12 health care benefit, Mr. King could have received
13 $3,000 a month.
14 A. Can you ask that question again? I'm
15 sorry.
16 Q. Sure. So do you understand, then, that
17 under the home health care benefit, with the
18 hundred-dollar-a-day daily benefit amount for
19 30 days a month, he could have received $3,000 a
20 month in benefits.
21 MR. BIDEGARAY: Objection. Form.
22 Foundation.
23 Go ahead. You can answer, if you can.
24 A. I'm sorry, I'm not understanding the
25 question that you're asking.

Page 138

1      BY MR. BIDEGARAY:
2  Q.  Sure.  Let me take a step back.
3      So the home health care benefit under the
4  policy, would you agree that it would pay a
5  hundred dollars per day.
6  A.  Yes.
7  Q.  So for an entire month, which using an
8  average of about 30 days, would be about $3,000 a
9  month.  Right?
10  A.  Yes.
11  Q.  Okay.  And that's about $2,000 more than
12  the alternate benefit payment rider which only
13  pays a thousand dollars a month.  Right?
14  A.  Yes.
15  Q.  So would you agree that the company was
16  trying to pay the home health care benefit to you
17  because it would pay more.
18      MR. BIDEGARAY: Objection.  Form.
19  Foundation.
20      MS. JONES: Okay.  I'll rephrase my
21  question.
22      MR. BIDEGARAY: And -- And speculation.
23      ///
24      ///
25      ///

Page 139

1      MS. JONES: Well, no, I asked her if she
2  would -- Okay, well, regardless, I -- I said I'll
3  rephrase.
4      BY MS. JONES:
5  Q.  Would you agree that 3,000 is more than
6  1,000.
7  A.  Yes.
8  Q.  Okay.  After you received the $3,000,
9  approximately, from the company, what did you do
10  next?
11  A.  I'm not following the question.
12  Q.  Well, what did you do after you got the
13  $3,000 from the insurance company.  What -- What
14  did you do next?
15  A.  I probably went to sleep.
16  Q.  Fair point.  Were you dissatisfied with
17  the $3,000?
18  A.  A little bit, yes.
19  Q.  What do you think the policy should have
20  paid to you?
21  A.  Whatever was due to my father for the
22  condition that he was in for the period of time
23  that he was in that condition.
24  Q.  And would you agree with me that no
25  invoices were provided to the company for them to

Page 140

1  reimburse.
2  A.  I'm sorry, I'm a little bit confused on
3  the questioning and the time frame.
4  Q.  Sure.  What -- I guess my question should
5  be what other benefits do you think the policy
6  should have paid to you or your father.
7  A.  Well, a thousand dollars a month
8  for -- it didn't just start in August that he was
9  very ill.
10  Q.  What do you think the trigger of the
11  policy is?  In other words, what do you think the
12  benefit eligibility requirement is under the
13  policy?
14      MR. BIDEGARAY: Objection.  Foundation.
15      BY MS. JONES:
16  Q.  You can answer.
17  A.  I have no answer.
18  Q.  Do you know what the policy requires of
19  someone -- in other words, you said when -- when
20  you're sick, right, or when your dad -- I don't
21  want to twist your words.  You said your dad was
22  sick sooner.
23      What do you think the trigger for the
24  policy is?  What do you think the requirement for
25  benefit eligibility is?

Page 141

1      MR. BIDEGARAY: Objection.  Form.
2  Foundation.
3      BY MS. JONES:
4  Q.  You can answer.
5  A.  I have no answer.
6  Q.  Was there a time, if you recall, that the
7  insurance company asked for additional hospital
8  records from you?
9  A.  Can you restate that?  I'm sorry.
10  Q.  Sure.  Was there a time when the
11  insurance company asked you for additional
12  hospital records for your dad?
13  A.  Yes.
14  Q.  Do you know why that was?
15  A.  Well, I believe it was because I had
16  talked to somebody, and they said that he should
17  have received benefits back into -- to 2015, and
18  they asked when he was hospitalized between 2015,
19  I believe, onto 2016.
20  Q.  Who was the person that you talked to
21  that said 2015?
22  A.  It was a lady, I believe, but I don't
23  recall the name.
24  Q.  It was a lady from the insurance company?
25  A.  Yes.

Page 142

1 Q. And so did you provide hospital records?
2 A. I don't know if I -- Can you clarify on
3 hospital records?
4 Q. I don't know how. Records from a
5 hospital?
6 A. Are you -- Are you meaning the dates that
7 he was hospitalized or actual records from the
8 hospital.
9 Q. Let's -- Both.
10 A. Okay. 'Cause I'm -- I think I had
11 written out the dates that he was hospitalized,
12 and then I did provide medical records, but I
13 don't know if that was at the time he was in the
14 hospital. Must have been.
15 Q. Did you -- Did you -- When you got those
16 records, did you get them directly from the
17 hospital?
18 A. Yes.
19 Q. Did you take any out or did you just give
20 them what you had.
21 A. I don't believe I gave them everything I
22 had. I believe I gave them the dates that they
23 were asking specifically when he was hospitalized.
24 Q. Okay. Did they come back to you and ask
25 for more information, if you recall?

Page 143

1 A. No, I don't believe they did.
2 Q. So here it says [As Read]: "DGLASGOW -
3 3/7/2017."
4    Do you remember someone named
5 Darian Glasgow?
6    Do you remember that name?
7 A. Vaguely, yes.
8 Q. Okay. And it says [As Read]: "Spoke with
9 Michelle King and advised what information was
10 needed to review the claim retroactively: We need
11 medical records from VA for the period of 2014,
12 August, through August 2016, so we can CIC insured."
13 "CIC" meaning Chronic Illness Certification. "RN
14 has reviewed the 11/2015 medical records and will
15 CIC insured retroactively to 11/2015 however we
16 need to know where the insured was during that
17 time in order to pay the -- the benefit." MCB
18 benefit is what it says, but it means the
19 monthly -- monthly cash benefit. "Records
20 indicate he was in the hospital in November 2015,
21 but we need to know where he was all year.
22 Michelle will be sending letter attesting to
23 insured's location. Michelle King understood and
24 will follow up with VA."
25    Do you see that?

Page 144

1 A. Yes.
2 Q. Do you recall providing additional
3 records or a letter attesting to the insured's
4 location?
5 A. I believe I sent the hospital records.
6 Q. Well, you did send them first. Did you
7 send them again. Right? 'Cause here it says
8 records indicate he was in the hospital.
9    Did you send the rest of the information.
10 Did you send the letter attesting to insured's
11 location.
12 A. Yes. I believe I did.
13 Q. Okay. And do you know when you did that?
14 A. It would have been in March sometime. I
15 don't know the exact date.
16 Q. Do you have a copy of that letter?
17 A. I have no idea.
18 Q. Do you remember what that letter said?
19 A. It said where he was hospitalized and
20 where he was for the year.
21 Q. And did you send additional medical
22 records at all --
23 A. I believe --
24 Q. I'm sorry. To Continental?
25 A. I believe I did.

Page 145

1 Q. Okay. Do you recall when that might have
2 been?
3 A. March sometime.
4 Q. And again, did you send them everything
5 or just pieces of information.
6 A. I don't remember.
7 Q. And why did you think you were -- your
8 dad was entitled to retroactive benefits under the
9 policy?
10    MR. BIDEGARAY: Objection. Asked and
11 answered. She's answered that multiple times.
12    MS. JONES: I don't think she's answered
13 that specific question.
14    MR. BIDEGARAY: She -- She specifically
15 answered that question. She said he did
16 not -- his disability didn't start on August 2nd,
17 the day he sent the nurse there. She's answered
18 that.
19    MS. JONES: Well, okay. If that's her
20 answer, that's fine.
21    BY MS. JONES:
22 Q. Is that right, Ms. King? Is that what
23 Mr. -- what Mr. Bidegaray just testified to, even
24 though he's not supposed to? Is that your
25 recollection?

Page 146

1  A.  Yes.
2  Q.  Okay.
3    MS. JONES: I'm -- I'm also gonna object
4  to Mr. Bidegaray's testimony during my deposition.
5    BY MS. JONES:
6  Q.  Did anybody at Continental -- Continental
7  or I should say the insurance company, as we've
8  been calling it, were they ever rude to you or
9  obnoxious to you at any time?
10  A.  No, not that I recall.
11  Q.  When did you first consult counsel.  I'm
12  not asking you for what they -- what you said to
13  counsel or anything like that, but when did you
14  first decide to file a lawsuit in this case.
15  A.  After I had submitted all the paperwork I
16  thought necessary, and then I never heard back
17  anything after March of 2017.  So sometime --
18  Q.  Did you call the insurance -- Oh, I'm so
19  sorry.  Go ahead and finish.  I didn't mean to
20  interrupt.
21  A.  It would have had to have been sometime
22  in 2017.
23  Q.  Did you call the insurance company and
24  ask what was happening?  Why you had not heard
25  from them?

Page 147

1  A.  I believe I had sent letters.
2  Q.  Do you have copies of those letters?
3  A.  I believe I do.  Possibly.
4  Q.  Did you give those letters to your lawyer
5  already?  I'm not asking for private
6  communication.  I'm just saying I haven't seen
7  any.  So have you given those letters to your
8  lawyer?
9  A.  I don't know.
10  Q.  Okay.  I'm gonna ask for those so when
11  you go home, you can look for them.
12    What is it that you're asking the
13  insurance company for here in this lawsuit?
14    MR. BIDEGARAY: And -- And I'm gonna
15  object to the extent -- I'm gonna allow you to
16  answer, but I got to put an objection on the
17  record.  To the extent that your lawyers are gonna
18  help and make the request to the jury in this
19  case, and it will be --
20    MS. JONES: Hey, Dan, I'm not asking
21  about a legal -- it's not a legal question.  She's
22  the plaintiff.
23    BY MS. JONES:
24  Q.  What is it that you're asking for from
25  the insurance company.

Page 148

1    MR. BIDEGARAY: So let me finish my
2  answer [sic], please, do not interrupt me.
3    MS. JONES: Oh, no, speaking objections
4  like this are improper, Dan.
5    MR. BIDEGARAY: No.
6    MS. JONES: You know that as you --
7    MR. BIDEGARAY: It's not --
8    MS. JONES: -- chastised me about it
9  repeatedly, and so I request that you stop doing
10  it now.  Your objection's duly noted.  I'm not
11  asking privileged information.
12    I'm just asking as the plaintiff in this
13  case, which is the case that Ms. King filed as the
14  plaintiff, what is it that she's asking for from
15  the insurance company.
16    MR. BIDEGARAY: Again --
17    MS. JONES: It's an easy question.
18    MR. BIDEGARAY: -- I'm gonna make my
19  objection, and the objection is to the extent that
20  attorney-client privilege or work product or
21  anything of that nature is being inquired of you,
22  of course we're gonna help you with all those
23  requests.
24    To the extent that you know how we're
25  gonna go about trying this case and what we're

Page 149

1  gonna ask for and the legal ramifications, if you
2  know anything about that without giving legal
3  conclusions 'cause you don't have the foundation
4  to do that, answer the best you can.
5    MR. DAVIS: That's an improper objection.
6  It should be a one-word objection, for Christ's
7  sake.
8    MS. JONES: Thank you, Max.  I was just
9  about to say that.
10    Let the record reflect that that's a --
11  we object to that objection.  It's ridiculous.
12  This is a very straightforward question.
13    BY MS. JONES:
14  Q.  Ms. King, can you answer, please?
15  A.  I have no answer.
16  Q.  And Ms. King, do you know that your
17  lawyer sent me a letter last year that said he'd
18  dismiss your case if he got claim files of other
19  insureds?
20    Did you know that?
21  A.  Can you explain further, please?
22  Q.  Sure.  Did you know that your lawyer,
23  Mr. Bidegaray, sent me a letter that said he'd
24  dismiss your case, meaning get rid of it, if I
25  gave him claim files from other insureds, other

Page 150

1   people who have contracts with my insurance
2   company client.
3       Did you know that?
4       MR. BIDEGARAY: First, objection. That
5   misstates the record.
6       MS. JONES: Okay.
7       MR. BIDEGARAY: Second --
8       MS. JONES: One-word objection is -- is
9   fine.
10      BY MS. JONES:
11  Q.  Go ahead.
12      MR. BIDEGARAY: Second, to the extent --
13      MS. JONES: Okay, I'll show -- I'll show
14  the letter, then. That's fine. Give me a moment.
15      BY MS. JONES:
16  Q.  Okay. I'm sharing my screen, and I'm
17  gonna mark this as an exhibit.
18      MS. JONES: I believe we're at Exhibit 9.
19  Madam Court Reporter, but if not, this is just the
20  next exhibit in line.
21      THE COURT REPORTER: That's correct,
22  Counsel.
23      EXHIBIT:
24      ///
25      ///

Page 151

1       (Deposition Exhibit 9 marked for
2   identification.)
3       BY MS. JONES:
4   Q.  And this letter is dated August 24th,
5   2023.
6       Have -- Have you seen this letter
7   before --
8   A.  No.
9   Q.  -- Ms. King? Here it says "This letter
10  is Michelle King's" -- That's you. Right?
11  A.  Yes.
12  Q.  -- "offer to dismiss this case and walk
13  away with nothing, including no payment for the
14  benefits now owed to her or her father's estate."
15      Do you see that?
16  A.  Yes.
17  Q.  Did you know your lawyer sent that?
18  A.  Yes.
19  Q.  Did you say that he could dismiss the
20  case and you would walk away with nothing?
21      Do you agree with that?
22  A.  Yes.
23  Q.  Okay. If you would give me -- I'm gonna
24  take about a five-minute break just so I can go
25  through my notes, and then we'll come back on the

Page 152

1   record after that break.
2       THE VIDEOGRAPHER: Okay. Time is 12:45.
3   Going off the record.
4       (Recess taken from 12:45 p.m. to
5   12:59 p.m.)
6       THE VIDEOGRAPHER: Time is 12:59. Back
7   on the record.
8       BY MS. JONES:
9   Q.  All right. All right. Thanks, Ms. King.
10  We're back on the record after a short break.
11      I don't have any further questions, so I
12  wanted to say thank you to you. I don't know if
13  your counsel has other questions.
14      MR. BIDEGARAY: No questions.
15      THE VIDEOGRAPHER: Okay. This is the end
16  of this deposition. The time is 12:59. Going off
17  the record.
18      (Deposition concluded at 12:59 p.m.
19  Deponent excused; signature reserved.)
20
21
22
23
24
25

Page 153

1            C E R T I F I C A T E
2   STATE  OF  MONTANA )
                       ;  ss.
3   County of Missoula )
4       I, Mary Sullivan, RMR, CRR, Freelance Court
5   Reporter and Notary Public for the State of Montana,
6   residing in Missoula, Montana, do hereby certify:
7       That I was duly authorized to and did
8   report the deposition after having duly sworn
9   Michelle King; that the reading and signing of the
10  deposition by the deponent have been expressly
11  reserved; that the foregoing pages of this testimony
12  constitute a true and accurate transcription of my
13  stenotype notes of the testimony of said deponent.
14      I further certify that I am not an attorney
15  nor counsel of any of the parties; nor a relative
16  or employee of any attorney or counsel connected
17  with the action, nor financially interested in the
18  action.
19      IN WITNESS WHEREOF, I have hereunto set
20  my hand on December 19, 2024.
21
22
23      _____
        Mary Sullivan, RPR, RMR, CRR
24      Freelance Court Reporter
        Notary Public, State of Montana
25      Residing in Missoula, Montana
        My Commission expires:  04/06/2026

Page 154

```
 1        ERRATA SHEET FOR THE DEPOSITION OF:
                    MICHELLE KING
 2              December 10, 2024
                 Michelle King
 3                    vs.
      United Teacher Associates Insurance Company, et
 4                    al.
             No. 4:21-cv-00087-BMM
 5
   PAGE  LINE  CORRECTION
 6    ____ ____ _____
 7    ____ ____ _____
 8    ____ ____ _____
 9    ____ ____ _____
10    ____ ____ _____
11    ____ ____ _____
12    ____ ____ _____
13    ____ ____ _____
14  ( )  I have no corrections
          I hereby certify that this is a true and
15  correct copy of my testimony, together with any
    changes I have made on this and any subsequent
16  pages attached hereto.
17        Dated on this _____ day of _____,
18  _____.
                        _____
19                          Michelle King
20
21
22
23
24
25
```

**$**

**$10 (1)**
89:5
**$100 (1)**
78:21
**$2,000 (1)**
138:11
**$25 (1)**
19:19
**$3,000 (7)**
137:8,13,19;138:8;
139:8,13,17

**/**

**/// (6)**
11:25;138:23,24,25;
150:24,25

**[**

**[As (19)**
60:10;61:13;77:11;
111:15;112:12,15;
113:6;116:15;121:13,
23;125:14;127:1;
130:17;131:7;134:14,
15,18;143:2,8
**[sic] (7)**
6:9;79:24;86:20,23;
87:3,9;148:2

**A**

**ability (3)**
10:25;57:18;78:13
**able (7)**
9:18;16:17;33:20;
46:18;59:22,25;60:2,2,
11,20;62:15;67:15;
70:7;76:22;85:7,7;
133:4
**Abourezk (1)**
7:3
**above (3)**
96:15;119:21;121:12
**Absolutely (1)**
52:23
**accepted (1)**
72:24
**accidents (3)**
43:2,4,13
**accordance (1)**
5:11
**accountability (1)**
81:22
**accounts (1)**
16:3
**accurate (5)**
77:18;82:25;84:22;
123:4,6

**acres (1)**
31:13
**act (2)**
81:22;112:16
**action (1)**
56:4
**active (1)**
70:4
**Activities (7)**
59:14,17;60:11,16,
18;69:4,13
**activity (1)**
59:21
**actual (4)**
44:8;75:24;123:8;
142:7
**Actually (18)**
42:1;43:24;44:17;
45:12;64:3;65:7;81:7;
92:19;107:14;110:17;
115:24;117:3;121:4;
122:12;123:21;124:8;
130:15;132:14
**addition (4)**
18:3;30:22;39:12;
113:13
**additional (6)**
96:16;97:18;141:7,
11;144:2,21
**address (3)**
12:9,11;114:19
**addressed (1)**
110:16
**adequate (1)**
62:4
**adjusted (1)**
27:25
**adjuster (2)**
28:17,18
**ADLs (2)**
60:11;69:11
**ADL's (1)**
84:6
**Admission (4)**
58:10;59:8;64:7;
83:23
**admitted (3)**
43:6;44:14;102:15
**adult (4)**
30:5,6;101:23;
111:22
**Advance (1)**
68:17
**adverse (1)**
62:6
**advise (3)**
96:14;127:6;135:5
**ADVISED (5)**
127:7,9;134:18;
135:3;143:9
**advisor (1)**
35:6
**affairs (5)**

39:10;45:23;50:8,20;
79:20
**Again (49)**
9:4,25;10:20;17:20;
18:9;19:1;26:6;36:13;
38:7;39:9;48:12;53:11;
55:24;56:2;57:10;
59:11;61:23;62:10,13;
63:16;65:22;66:5,14;
67:14;69:6;76:8;77:2;
82:5,20;94:1;107:1,1;
109:16;110:9;113:24;
114:9;115:14;117:6;
120:18;121:17;124:20;
126:9,20;132:15;
133:17;137:14;144:7;
145:4;148:16
**age (1)**
8:24
**agencies (2)**
113:13,14
**agency (14)**
24:11,12;34:11;
96:23,25;98:8,14,24;
99:5;101:22;113:14;
116:23;127:4;134:19
**agent (2)**
20:17;21:25
**ago (1)**
76:1
**agree (26)**
65:6,10;67:3;69:9;
77:20;85:11,19;86:9;
97:21;112:22;113:3;
117:1,7;118:19;
123:16;124:5;131:14;
137:4,6,9,11;138:4,15;
139:5,24;151:21
**agreed (2)**
5:9,14
**ahead (13)**
11:15;17:14;26:4;
30:19;32:15;34:4;
35:22;42:15,23;92:9;
137:23;146:19;150:11
**alcohol (1)**
10:24
**alive (3)**
36:20;90:20;128:23
**allow (2)**
78:14;147:15
**allowed (1)**
72:23
**almost (1)**
108:25
**along (3)**
7:3;62:13;114:22
**altered (1)**
61:4
**alternate (9)**
132:20;134:2,23;
135:10;136:2,5,10,13;
138:12

**although (2)**
39:18;58:25
**always (4)**
10:23;17:3;29:20;
59:1
**ambulatory (2)**
62:23,24
**American (11)**
6:11;8:11;24:13,23;
25:6,8;26:9,17,18,23;
28:1
**amount (4)**
100:6;130:25;
136:22;137:18
**and/or (2)**
61:24;96:24
**answered (8)**
25:10;73:11;112:25;
145:11,11,12,15,17
**A-Plus (45)**
86:20,22;87:2,9,14;
88:19,21,24;89:24;
91:3;93:1;94:3,12,20,
22;98:11,17,22;99:5;
102:8,24;103:22;
104:11,18,21;105:11,
22;113:11;114:1,23;
115:11,25;116:1,13;
117:5;118:3,20;125:7;
126:9,10,12;129:20;
131:23,25;132:9
**apologies (2)**
46:13;111:21
**apologize (3)**
36:17;48:16;81:7
**Appearance (1)**
62:3
**applicable (1)**
79:1
**application (1)**
112:17
**applied (2)**
136:7,8
**appointment (1)**
91:12
**appointments (1)**
16:18
**appreciate (3)**
26:3;34:6;54:17
**Approval (3)**
110:20;121:15;
128:14
**approved (6)**
93:2;128:7,8;129:2,
10,12
**Approximately (7)**
17:8;21:9;26:12;
27:10;31:10;91:14;
139:9
**April (5)**
65:1,2,2,11,18
**Army (2)**
45:18,22

**around (60)**
17:21;22:21;60:1;
65:7,11,17;71:17;
72:21;77:8;98:20
**arrange (1)**
50:14
**arranged (1)**
50:16
**arrangement (1)**
50:12
**arrangements (1)**
43:15
**articulate (1)**
9:19
**arts (1)**
82:17
**Ascend (1)**
8:12
**aside (2)**
11:3,15
**as-needed (1)**
93:8
**assess (4)**
49:13;62:20;63:21;
68:16
**Assessment (18)**
60:25;62:15;68:18,
20,21,21,22,23,24,
25;69:1;75:25;80:21;
81:2;86:15;96:24;
116:20
**assessor (4)**
75:14,19,21;85:3
**assist (5)**
36:2;71:11;72:17;
91:8,9
**assistance (2)**
71:12,15
**assisting (1)**
72:24
**associate (1)**
37:6
**Associates (3)**
6:10;7:7;8:4
**attention (1)**
125:1
**attesting (3)**
143:22;144:3,10
**attorney (2)**
82:2;134:16
**attorney-client (4)**
55:8,10;57:5;148:20
**audio (5)**
7:8,9;25:16;46:5;
117:18
**August (18)**
15:16;74:22,25;75:9,
11;81:3;85:15;86:15;
87:10;110:25;121:16;
135:4,22;140:8;
143:12,12;145:16;
151:4
**Austin (5)**

16:1,4,5,6;19:11
**Authority (3)**
28:7;29:1,18
**authorization (1)**
81:20
**automatically (1)**
48:2
**available (1)**
98:21
**Avenue (2)**
6:16;89:12
**average (2)**
138:8
**aware (2)**
97:12,16
**away (5)**
18:11;69:17;134:11;
151:13,20

**B**

**bachelor's (3)**
82:16,17,17
**Back (46)**
7:21;13:9,12,15,15,
21;14:2,17;15:2,11;
18:9,18,21;19:3;51:9;
53:7,10;64:3;66:13;
68:15;71:18;76:24;
95:16;100:11;103:15;
107:18;108:24;109:3,
12,15,19;110:6,8;
118:22;119:5;120:17;
123:23;128:12;132:13;
138:2;141:17;142:24;
146:16;151:25;152:6,
10
**background (1)**
76:9
**backwards (2)**
120:22;124:21
**bad (1)**
41:21
**ballpark (4)**
27:7;37:25;43:20;
73:18
**bank (2)**
16:3,21
**based (7)**
17:10;57:22;61:23;
97:17;110:13;117:8;
118:18
**basic (1)**
9:15
**basically (1)**
105:21
**BASIS (1)**
134:25
**Bates (1)**
124:10
**bathe (1)**
60:2
**bathroom (2)**

49:16;59:22
**became (1)**
37:1
**become (2)**
28:6;87:24
**bed (1)**
49:13
**bedroom (1)**
32:1
**bedrooms (2)**
31:7,8
**began (1)**
102:11
**begin (1)**
111:16
**beginning (1)**
110:25
**behalf (1)**
7:3
**Behavior (1)**
62:6
**behaviors (1)**
62:7
**beliefs (2)**
35:20,23
**below (1)**
61:17
**benefit (34)**
56:5;78:21;86:14;
99:20;100:19,20;
111:1,10;128:18;
129:17;130:24;131:1,
16;132:20;134:3,22,
23;135:10;136:2,6,7,
13,21;137:12,17,18;
138:3,12,16;140:12,25;
143:17,18,19
**benefits (34)**
38:14;39:1;45:23;
46:16,22;65:14,19;
78:5,9,14,25;82:22;
87:12;100:19;110:24;
111:2,8,14,16,17;
112:4,13;113:7;
130:18;131:5,10;
132:5,10;136:23;
137:20;140:5;141:17;
145:8;151:14
**besides (4)**
24:8;76:4;90:18;
93:24
**best (7)**
9:23;57:17;59:2;
78:12;92:15;101:6;
149:4
**better (3)**
33:18;68:1;75:1
**beyond (3)**
73:13;83:13;94:10
**Biddle (3)**
7:5;8:1,10
**Bidegaray (59)**
7:2,2;11:5,10,23;

12:6;54:1,6,10,25;55:2,
12,22;56:10,19,25;
57:12,19;82:9;98:25;
105:12,16;107:5,11;
108:4,9,15,17,19,22;
109:1,6;112:24;122:9,
15,24;123:2,17;124:3;
137:21;138:1,18,22;
140:14;141:1;145:10,
14,23;147:14;148:1,5,
7,16,18;149:23;150:4,
7,12;152:14
**Bidegaray's (1)**
146:4
**Big (2)**
21:5,6
**bigger (1)**
67:23
**billing (1)**
79:6
**birdhouses (4)**
30:20,22;70:12,13
**bit (12)**
15:21;16:20;34:3;
41:14;42:19;54:14;
66:3;67:23;90:8;93:17;
139:18;140:2
**Black (1)**
82:13
**blocks (1)**
83:3
**blood (1)**
14:10
**blue (2)**
133:1,25
**body (1)**
49:13
**bookkeeper (2)**
19:8;93:13
**bookkeeping (8)**
15:5,6,11,17,22;
17:19;18:3,21
**books (1)**
15:25
**born (4)**
23:24;24:1;29:24;
45:20
**both (3)**
35:13;87:23;142:9
**bottom (3)**
62:13;114:24;121:4
**bought (2)**
33:6;35:15
**box (1)**
89:10
**Boy (2)**
119:13;127:17
**Bozeman (1)**
13:4
**branch (1)**
45:16
**break (19)**
10:5,7;13:17,18;

52:16,25;53:11;71:18;
107:7,10,16;108:1,7,
11;109:16,17;151:24;
152:1,10
**breaks (1)**
14:23
**Brenda (6)**
58:16,19;63:13,16,
17;65:8
**briefly (1)**
100:11
**broad (1)**
70:23
**broadly (3)**
46:9,10,15
**broker (2)**
35:7,9
**brother (4)**
21:3,3,11;22:1
**brothers (2)**
21:23;26:14
**brought (1)**
125:1
**bubbly (1)**
104:10
**build (1)**
30:20
**bulk (2)**
66:12;115:18
**bunch (1)**
16:2
**business (9)**
24:18;25:12;26:25;
27:4,16,19;39:24;
116:12,13
**buying (1)**
32:25

**C**

**calendar (1)**
130:21
**call (27)**
9:5,15;38:10,12,25;
39:4,5,14;40:20;50:23;
51:4;75:5;91:7;99:9;
119:15,15,22;120:6;
121:20;125:9,16;
126:9,10;127:10,13;
146:18,23
**called (21)**
23:9;37:16,20;38:6,
7;40:15,22;43:3;51:11;
74:2,9,12;75:2;77:9;
79:15;93:8;120:9,10;
121:14;125:12;132:18
**calling (4)**
73:23;75:3,6;146:8
**came (11)**
15:7;18:17;43:7;
47:4;49:7;54:22;55:11;
56:7;104:15,15;135:19
**can (87)**

9:5;10:7;11:15;
14:16;15:21;20:24;
22:14;24:22;25:24;
29:6,16;35:21;36:10;
45:7,10;51:22;52:20;
53:14,18;57:17;58:4;
59:1,2;63:25;64:14,25;
65:16;66:13,16;67:16,
17,19,21,23;68:2,11;
69:6;74:19;76:16,18;
80:16;82:11;91:5;93:1,
8,25;95:6,25;97:3,15;
99:2;102:20;106:15,
18;107:6;108:9;
109:24;110:2,5,8;
111:11,16;115:13;
118:4;119:9;122:17;
124:20,20;126:8;
132:17,23;133:9,21;
134:15;137:14,23,23;
140:16;141:4,9;142:2;
143:12;147:11;149:4,
14,21;151:24
**canceled (1)**
83:10
**cancer (10)**
41:15,23;42:1,9;
43:25;44:8;47:19;48:4;
50:25;83:10
**candid (1)**
123:9
**Cardiac (1)**
68:17
**care (136)**
15:8;33:7;34:13;
35:1,15,18,25;36:6,11,
22;41:6,10,11;46:19;
48:9,16;51:13;61:24;
63:23;64:20;65:19,24;
66:19,21;67:4;69:6,10,
21;70:16,19,22;71:3,
71:3,5,9,20;72:19;73:2,
7,13;74:14,17;76:14;
77:15;78:5,8,16,17,22;
80:1;84:3,6;86:20,21,
22;87:3,9;88:6,17;
91:24;94:7,16,23;95:2;
96:23,24;98:8,23;99:5,
5,13,22;100:2,16,19,
21,24;101:22,23;102:2,
8,24;104:12;105:10;
106:1;110:24,25;
111:7,14,17,18,19,19,
20,22;112:13,19;113:8,
11,14,18;114:1,16,20,
23;116:17;120:13;
121:24;125:12,17,19,
20,23;126:14;128:17,
17;129:17;130:1,9,11,
18,19,22,24;131:11;
132:10,20;134:19,20,
21;136:6,22;137:12,
17;138:3,16

**CARE/SERVICE (1)**
116:21
**Care/Service/ (1)**
61:18
**caregiver (16)**
72:7;73:12;87:18,20,
22,25;90:2;94:18;
111:21;118:15;127:1,
2,5,9,16;129:18
**Careplan (1)**
65:23
**Carpenter (1)**
34:9
**carried (1)**
14:5
**case (10)**
56:13;146:14;
147:19;148:13,13,25;
149:18,24;151:12,20
**cash (1)**
143:19
**CAT (1)**
43:17
**catch (1)**
54:17
**catching (1)**
34:4
**Cause (14)**
6:6;13:22;14:4;
40:11,24;42:9;48:22;
49:7;90:9;107:19;
134:8;142:10;144:7;
149:3
**center (15)**
13:25;14:15;15:1;
24:13,23;25:6,9;26:9,
18,19,23;28:1;45:8;
46:19;111:22
**certain (3)**
9:19;46:24;47:5
**certificate (3)**
15:3;20:21;82:15
**certification (5)**
90:4,6,8,13;143:13
**certifications (1)**
20:20
**certified (10)**
13:10;87:18,19,22,
24;90:15;111:2;127:5,
8,15
**chair (1)**
71:17
**chairs (1)**
72:1
**chance (1)**
20:17
**change (2)**
107:24;114:19
**Chapparal (1)**
12:10
**charge (2)**
89:15;94:6
**chastised (1)**

148:8
**check (4)**
49:12;108:4;135:19,
21
**checked (1)**
84:3
**checking (1)**
14:11
**checks (1)**
16:24
**chemotherapy (1)**
47:22
**chicken (2)**
31:17;42:14
**chickens (1)**
42:13
**child (3)**
24:4;25:17;30:5
**children (5)**
12:12,18;15:5;19:7;
22:9
**children's (1)**
18:5
**cholesterol (1)**
14:11
**chose (1)**
48:3
**Christ's (1)**
149:6
**Chronic (1)**
143:13
**Chronically (1)**
111:2
**CIC (3)**
143:12,13,15
**City (2)**
43:16;83:18
**Civil (1)**
5:12
**claim (51)**
28:20;35:16;37:2;
38:13;39:1;65:14,19;
71:25;73:16,19;74:13,
16,21;76:14;77:9,11,
14,22;80:1,24;87:12;
96:15,16,18,22;97:1,
10,13,19;100:15,16;
101:18;102:3;103:18;
105:3;106:5;110:20;
113:9;114:21;116:17;
121:8;125:7;128:6,8,
14;129:2,10;130:12;
143:10;149:18,25
**claimant's (1)**
118:15
**claims (3)**
27:25;28:22;79:24
**clarify (2)**
10:18;142:2
**classes (5)**
14:4;16:17,18;90:10,
14
**classroom (1)**

18:5
**clean (1)**
62:3
**clear (5)**
51:9;73:12;98:24;
130:12,13
**clearly (1)**
10:21
**client (2)**
8:17;150:2
**clients (2)**
8:16;16:2
**clinician (1)**
58:15
**clock (1)**
107:15
**close (1)**
128:11
**co-counsel (4)**
7:9;8:7,15,16
**cognitive (1)**
85:16
**co-insurance (1)**
112:17
**college (9)**
13:3,16;14:3,7,22;
15:2;82:7,8,12
**Columbus (2)**
34:18;35:3
**comfortable (1)**
72:20
**coming (8)**
48:17,25;63:20,23;
72:23;81:11;87:6;
101:3
**comment (1)**
42:19
**common (2)**
42:12,21
**communication (2)**
55:8;147:6
**communications (1)**
57:6
**community (10)**
50:3;110:24;111:7,
13,18;128:17;129:17;
130:18,19,24
**companies (1)**
29:21
**Company (88)**
6:10,11,12;7:6;8:3,
11,13;16:1,4,7;19:10;
20:1;23:8,11,20;24:24;
25:2;26:18;34:17;
36:19,24;37:3,7,10,13,
16,21;38:6,13,25;40:6,
15,20;41:3,5,7;50:24;
51:20;65:20;73:24;
74:2,14,18;75:15;77:9;
79:16;81:17;92:15;
94:22,25;97:18;99:9;
101:13;104:22;105:6,
9,25;111:8;113:22;

115:4;117:3,8,25;
118:3,14;119:22;
120:7;128:4;129:1;
131:15;135:10,13,16,
17;136:4;138:15;
139:9,13,25;141:7,11,
24;146:7,23;147:13,
25;148:15;150:2
**compared (1)**
56:3
**complainant (1)**
56:6
**complaint (13)**
53:16,19;54:22;55:5,
11,14,19;56:5,7,12,17;
57:1,11
**complete (4)**
77:22;96:17;97:19;
104:2
**completed (6)**
81:7;101:21;103:4;
104:12,19;121:9
**completely (2)**
25:23;124:12
**concentrating (1)**
127:23
**concerns (1)**
126:25
**concluded (1)**
152:18
**conclusions (1)**
149:3
**condition (3)**
41:16;139:22,23
**conditions (2)**
92:12;111:3
**confirm (1)**
120:21
**CONFIRMED (1)**
135:2
**confused (3)**
93:18;120:8;140:2
**confusing (3)**
46:13;119:7,11
**consecutive (1)**
130:20
**consult (1)**
146:11
**contact (1)**
87:14
**contacted (2)**
37:12;77:13
**Continent (1)**
7:8
**Continental (14)**
6:10,12,13;7:6,6;8:2,
3,5;36:24;94:21;117:2;
144:24;146:6,6
**continue (3)**
48:25;62:13;90:16
**continued (8)**
15:8;43:12,13;91:1,
3;116:18,19;123:4

**contracts (1)**
150:1
**control (1)**
33:17
**conversation (2)**
40:23;132:2
**conversations (1)**
57:2
**coop (2)**
31:17;42:15
**copies (1)**
79:6;147:2
**copy (2)**
33:9;144:16
**correctly (5)**
61:5,8;97:7;101:24;
113:3
**counsel (19)**
5:3,10,15;6:25;7:14;
9:14;25:19;26:4;34:3;
42:16;46:8;52:21;
56:15;117:18;120:3;
146:11,13;150:22;
152:13
**counsel's (1)**
57:22
**county (1)**
21:25
**couple (8)**
9:15;17:1;44:5,5;
65:2;92:1;127:4;
134:13
**course (9)**
68:6;89:23;90:2;
97:4;106:19;119:10;
123:12;132:24;148:22
**Court (37)**
5:5;6:5,16,24;7:1,11,
14;8:20;9:24;10:13;
11:4;25:19,22;26:2;
33:24;34:2;42:16;46:7,
10;52:17,20;64:4,5,9;
69:20,23;86:13;95:18;
108:5,6,7;117:17;
120:2;122:21,23;
150:19,21
**cover (3)**
36:4,7;51:7
**coverage (1)**
36:10
**covered (3)**
39:2;46:17;79:4
**created (2)**
94:9;124:16
**creating (1)**
46:12
**credit (1)**
79:5
**cry (1)**
40:12
**crying (4)**
40:8,10,16,25
**current (4)**

Michelle King    Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 45 of 56   Michelle King

United Teacher Associates Insurance Company, et al.                                                 December 10, 2024

20:22;90:11;96:25;
116:22
**currently (4)**
12:8;15:13;84:3,17
**curriculum (1)**
12:23
**cut (7)**
117:18;122:2,3;
123:20;124:14,23,25
**cutoff (2)**
124:1;132:15

**D**

**dad (119)**
15:7,15,18;16:18;
17:21;18:11;22:12,17;
23:6;25:5;28:6,25;
29:13,17;32:18,22,25;
34:21;36:14,18;37:10,
12;38:11,12,19,24;
39:5,10,13,15;40:2,5,
15,19;41:15,22;42:1;
43:1;45:14;47:18,21;
49:1;50:18,20,23;52:2,
4,8,11;63:2,21,21;
65:13,18;70:3,15,19,
24;71:3,6,9,24;72:7,17,
18,24;73:2,15,23;74:1,
11,21;75:22;76:4;77:8;
79:10,14,20;80:24;
81:18;82:5,8,11;83:7,
14;85:4,6;87:11;88:6;
90:19,20,22;91:2,24;
92:11;93:4;94:6,15,21,
25;97:9;99:6;100:5,25;
105:1,3;106:2;112:9;
128:8,23,25;129:1,10;
134:10;136:8;140:20,
21;141:12;145:8
**dad's (6)**
22:15;35:16;50:7;
79:12;102:6;104:8
**Daily (18)**
59:15,17,21;60:11,
16,18;69:5,13;78:21;
114:25;115:4;116:21;
117:4,9,13,22;136:21;
137:18
**Dan (15)**
54:5,16;56:1,21;
105:14;107:22;116:3,
4;122:4,13;124:23,25;
126:19;147:20;148:4
**danger (1)**
85:7
**Daniel (3)**
7:2;11:5,6
**Darian (1)**
143:5
**date (22)**
6:18;58:12;59:11;
64:23,25;65:1,7;81:2;

103:16;110:25;111:1;
114:25;115:5;116:22;
117:5,10,13,23;121:5,
16;133:7;144:15
**dated (6)**
77:2,5;80:22;106:11;
110:9;151:4
**dates (7)**
37:23;65:2,4;135:22;
142:6,11,22
**Daughter (7)**
85:21,22;118:15;
125:16,18,23;126:1
**daughter's (1)**
86:3
**Davis (6)**
8:8,14,15;25:21;
26:7;149:5
**day (19)**
47:20;49:5,7;70:6;
74:5;79:17;80:23;
91:17;100:6,9;101:23;
111:22;118:12;126:18;
127:10;130:23;137:7;
138:5;145:17
**daycare (1)**
13:25;14:15;15:1
**days (15)**
44:6;45:3,3;48:19;
49:8;81:3;103:14;
127:24;130:21;134:14;
135:1,23;137:7,19;
138:8
**Dear (2)**
96:13;116:12
**DECEMBER (4)**
6:1,18;92:1;134:14
**decide (3)**
14:2;47:18;146:14
**decided (4)**
13:9,21;14:1;47:21
**deductible (1)**
112:17
**defendant (1)**
6:3
**defendants (3)**
6:14;7:5;8:2
**deficits (2)**
61:14;85:16
**degree (12)**
12:22;13:1,6,8,9,11,
13;14:5;15:3;18:25;
82:14,16
**degrees (1)**
13:7
**delivered (1)**
20:10
**DEMAND (1)**
53:19
**denied (1)**
118:14
**Denies (2)**
61:3,10

**department (1)**
22:6
**depend (1)**
79:17
**depended (1)**
70:6
**depending (1)**
107:24
**deponent (3)**
5:16;26:1;152:19
**deposed (2)**
9:7,11
**deposition (23)**
5:4,11,17;6:3,15;8:6;
11:9,22;12:3,6;55:25;
64:11;69:25;80:3;
86:17;95:21;106:7;
109:21;119:2;146:4;
151:1;152:16,18
**depositions (2)**
5:15;126:8
**Describe (2)**
31:6;92:15
**describes (1)**
111:13
**Description (1)**
63:9
**DetailsConsent (1)**
61:18
**determined (1)**
111:9
**device (2)**
62:23,25
**DGLASGOW (1)**
143:2
**diabetes (5)**
43:8,9,10;44:16;
83:24
**diagnosed (7)**
41:15;43:18,24;44:8,
15;50:24;83:9
**diagnosis (3)**
42:6;43:7;83:24
**diarrhea (1)**
43:2
**diary (1)**
71:2
**died (8)**
33:14;34:21;36:14;
91:2,24;93:4;129:1;
134:22
**difference (2)**
135:14;136:5
**different (16)**
16:2,16,17;26:8;
36:9,11;48:22,23,23,
23;64:17;72:15;98:23;
101:7;104:4;124:10
**difficult (1)**
9:17
**difficulties (1)**
7:24
**directed (1)**

115:25
**direction (1)**
120:24
**Directive (1)**
68:17
**directly (1)**
142:16
**disability (1)**
145:16
**disabled (1)**
35:25
**discuss (3)**
36:22;37:4;132:19
**discussion (1)**
55:13
**discussions (3)**
55:4;56:11;57:20
**dismiss (4)**
149:18,24;151:12,19
**disregard (1)**
110:5
**disruption (2)**
7:8,9
**dissatisfied (1)**
139:16
**distance (1)**
21:15
**distortion (2)**
25:16;46:5
**distraught (1)**
40:19
**District (2)**
6:5,5
**Division (1)**
6:6
**DLEAL (3)**
121:9;126:18;132:18
**D-L-E-A-L (1)**
121:10
**doctor (1)**
41:17
**doctors (4)**
83:6,9,14;98:2
**document (44)**
53:14;54:2,6,8;58:4;
59:1,2,7;63:25;64:14,
17;66:11,25;67:25;
76:11,13,15,21;80:7,
10,14;95:6,10,12,25;
96:5;101:8;106:10,14;
107:18;110:5;115:16,
19;118:25;120:17;
122:5;123:13;124:11,
16,19;128:13;131:22;
132:16,21
**documentation (1)**
97:22;116:10,16;
118:2,14,19;120:20
**documents (6)**
11:21;12:2;66:9;
107:25;114:22;116:20
**dollars (10)**
100:6,9,20;101:1;

115:25
**Dr (1)**
83:14
**drafted (2)**
55:5,14
**drafting (1)**
56:12
**draw (1)**
39:14
**dress (1)**
91:13
**Drinker (3)**
7:5,25;8:10
**Drive (1)**
12:10
**Driving (3)**
84:16,17,18
**drugs (1)**
10:24
**Drywall (3)**
20:2;101:12;104:16
**due (1)**
139:21
**duly (1)**
148:10
**During (12)**
36:16;44:10;47:12;
54:14;71:20;79:1,6;
125:16;130:20,22;
143:16;146:4

**E**

**earlier (6)**
29:4,8;38:21;68:14;
83:20;120:18
**early (3)**
19:3;28:11;39:14
**earn (1)**
17:6
**earned (1)**
26:25;92:25;93:21
**earning (1)**
93:23
**easier (1)**

**136:19,25;137:7;
138:5,13;140:7
done (3)**
60:6;115:11;118:14,
19
**doneness (1)**
92:20
**double-check (1)**
122:17
**doubt (1)**
52:7
**Douglas (5)**
103:1,4,5,20;118:9
**down (16)**
25:25;26:6;34:3;
42:17;64:24;66:3;68:2;
76:16;97:3;101:10;
102:20;106:18;111:25;
119:9;120:23;131:4

Michelle King    Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 46 of 56   Michelle King

United Teacher Associates Insurance Company, et al.         December 10, 2024

14:18
easiest (1)
14:19
easy (1)
148:17
eat (1)
60:2
eating (1)
43:1
education (9)
12:20,21,22;13:10,
13;14:3;15:3;18:24;
90:16
Effect (2)
112:1;134:24
eight (7)
13:16;20:11;21:17,
19,20,21,22
either (6)
22:10;65:1;89:14;
91:11;93:10;98:6
elaborate (1)
91:6
Election (1)
61:20
electronically (1)
63:12
elementary (1)
13:10
eligibility (4)
86:15;116:19;
140:12,25
eligible (9)
110:23;111:10,16,
19;113:8;121:16;
125:19;128:16;131:11
elimination (9)
78:20;79:1,5,7;
111:14;113:6;130:22;
131:9;134:24
else (11)
20:23;24:8,20;51:16;
59:24;69:6;73:7;76:4;
90:16;114:5;115:7
email (2)
122:10;123:24
employed (2)
6:21;129:20
employee (2)
23:12,13
employees (1)
26:11
employment (5)
14:17,21;22:15;
91:20;93:20
end (7)
36:1;49:6,9;76:10;
105:2;133:10;152:15
ends (1)
120:24
engineer (1)
22:5
enjoying (1)

127:23
Enroll (2)
114:20;119:12
ensure (1)
50:15
entire (1)
138:7
entitled (1)
145:8
entry (1)
60:25
environment (1)
9:17
essentially (2)
17:9;122:7
Estate (2)
6:8;151:14
estimated (2)
28:10;30:4
evaluation (2)
97:1;111:1
even (4)
35:16;39:4;49:22;
145:23
evidence (2)
61:7,14
EX (1)
125:25
exact (4)
37:23;66:25;103:22;
144:15
exactly (3)
20:12;72:19;87:7
EXAMINATION (1)
9:2
examiner (4)
28:20;79:24;121:9;
125:25
examines (1)
28:22
Excellent (1)
7:23
except (1)
112:19
EXCLUDES (3)
127:7,14;128:2
exclusion (1)
129:17
EXCLUSIONS (1)
112:3
Excuse (4)
7:14;25:19;59:11;
125:14
excused (1)
152:19
exhausted (1)
134:9
exhibit (37)
64:7,8,10,11;69:22,
24,25;80:1,2,3;86:14,
16,17;95:17,19,20,21;
100:12;106:5,6,7;
109:17,18,20,21;

118:25;119:1,2,5;
120:19;123:16;128:13;
150:17,18,20,23;151:1
exhibits (2)
52:18;64:6
expect (2)
63:24;89:20
expense (1)
114:12
expenses (2)
94:15;131:2
experiencing (1)
61:3
expert (1)
104:5
expire (1)
90:6
expired (1)
90:9
explain (4)
113:17;126:1;136:5;
149:21
EXPLAINED (2)
134:21,25
explore (1)
41:17
expressly (1)
5:17
extension (1)
21:25
extent (8)
33:8;55:12;56:25;
147:15,17;148:19,24;
150:12
eyes (1)
14:11

**F**

face (3)
9:18,18;132:14
fact (2)
28:3;40:2
facts (1)
54:21
Faegre (4)
7:4,25;8:1,10
F-a-e-g-r-e (1)
8:1
Fair (3)
54:16;57:25;139:16
fairly (2)
70:4;80:12
fairs (3)
14:9,10
Falls (10)
6:6;62:20;63:9
familiar (2)
32:7,10
family (11)
26:22;51:3,8,13;
76:5;125:4,21;126:15;
127:8,15;129:18

far (7)
21:6,14,15;25:10;
29:21,23;50:1
fast (4)
66:6;67:14;76:17;
95:9
father (10)
26:9;27:24;31:18;
42:9;88:17;127:2,24;
130:4;139:21;140:6
father's (2)
32:16;151:14
fault (1)
46:6
FAX (4)
121:25,25;125:15;
126:2
faxed (1)
101:15
February (6)
43:14;44:9,17,20,25;
92:20
Federal (1)
5:12;112:18;113:15
feel (5)
33:21,25;35:23;
52:25;57:6
feeling (1)
79:18
feet (1)
31:9
felt (1)
40:18
few (2)
91:25;135:23
figure (3)
52:25;91:21;128:3
file (5)
39:1;97:25;113:9;
125:9;146:14
filed (1)
148:13
files (2)
149:18,25
Filing (4)
76:14;77:14;79:25;
100:15
finally (1)
43:14
finances (3)
39:13,16,23
financial (3)
35:6;50:8,20
find (3)
87:2;107:6;124:15
fine (10)
71:14;78:12;80:15;
107:9;109:6;113:1;
124:6;145:20;150:9,14
finish (5)
40:13;108:11;
122:25;146:19;148:1
finished (2)

13:2;25:24
fireman's (1)
23:19
firm (1)
103:3
first (28)
10:22;13:7,11;14:6,
14;15:24;22:17;33:12;
36:13;37:12;41:15,20;
42:8;48:8;50:19;71:13;
73:15;74:1,8,12,16,20;
87:8;130:20;144:6;
146:11,14;150:4
Fisher (2)
44:19;45:5
fit (1)
67:24
Five (2)
31:13;49:8
five-minute (1)
151:24
flexible (2)
16:15,19
floor (1)
31:23
floors (1)
31:23
flow (1)
9:21
folks (1)
10:6
FOLLOW (4)
121:17,25;125:3;
143:24
following (5)
96:19,22;114:23;
116:20;139:11
follows (2)
9:1;130:18
food (1)
49:17
Forever (2)
46:24;47:1
forget (1)
11:18
Form (24)
61:20;77:20;82:9;
96:16,20,21,22;98:25;
101:18,21;102:1,23;
103:4,18;104:2,18;
105:12,16;106:5;
112:24;114:21;137:21;
138:18;141:1
formal (1)
73:12
formerly (1)
6:12
forms (1)
98:1
forth (2)
96:21;101:23
forward (1)
14:18

**Foundation (5)**
137:22;138:19;
140:14;141:2;149:3
**four (3)**
31:8;83:3;112:1
**four-page (1)**
106:14
**frame (2)**
15:22;140:3
**free (3)**
45:11;52:25;57:6
**Freelance (1)**
5:5
**friend (1)**
32:16
**froze (1)**
133:11
**frozen (1)**
133:19
**full (3)**
19:13;123:10;132:17
**fullest (1)**
47:20
**fully (1)**
97:13
**fun (2)**
13:21,24
**Function (1)**
68:17
**fund (1)**
23:20
**further (6)**
5:9,14;43:16;51:24;
149:21;152:11

**G**

**GAB (1)**
23:9
**Gallagher (2)**
7:10;8:8
**garage (1)**
31:16
**Gastrointestinal (1)**
68:18
**gather (1)**
10:13
**gave (5)**
91:19;121:25;
142:21,22;149:25
**General (5)**
6:10;7:6;8:2;34:11;
37:24
**generally (3)**
16:15,19;37:9
**given (2)**
98:3;147:7
**giving (1)**
149:2
**Glasgow (1)**
143:5
**Glenn (1)**
6:9

**goes (3)**
120:24;124:21;133:8
**gonna (56)**
11:10,13,13;52:15,
16;54:15;55:2,3;56:14;
58:1;59:2;64:24;67:6;
68:15;76:7,8;77:24;
78:2;80:6,13,20;86:14;
88:8;95:5,13,16,19;
101:7;106:4,10,25;
107:1;109:18,18;
118:22,25;119:5;
124:13;126:8;128:11,
12;132:13,14,14;
133:16;146:3;147:10,
14,15,17;148:18,22,25;
149:1;150:17;151:23
**good (7)**
42:13;45:12;68:9;
87:21;90:7;106:23;
107:7
**goodness (1)**
78:1
**graduated (3)**
13:12,13;14:21
**Great (6)**
6:6,11;8:11;9:4;
108:22;109:7
**groceries (1)**
39:20
**guardian (1)**
82:2
**guess (29)**
9:10;14:14,17;19:20;
21:16;22:20,22;23:2,
25;40:5;42:5;44:1;
46:15;47:2;50:18;
70:24;85:22;87:23,23;
91:2;92:14,23;94:10,
13;98:13;101:10;
108:25;109:3;140:4
**guys (3)**
109:4;123:19,22

**H**

**half (1)**
108:13
**handle (6)**
39:10,13,15;50:12,
20;79:20
**handled (1)**
28:25
**handling (2)**
50:7;105:3
**hands (1)**
30:21
**handwriting (5)**
104:4,5,6,8;118:5
**happened (3)**
27:3;92:16;133:23
**happening (1)**
146:24

**happy (5)**
10:18;42:24;109:25;
122:17;123:2
**hard (5)**
41:24;76:2;86:6;
92:10;119:17
**hazards (1)**
85:8
**head (6)**
10:12;11:17;71:7;
78:11;79:12;119:21
**Headache (1)**
61:10
**headaches (1)**
61:10
**health (41)**
13:8,19;14:9,10;
48:10;78:5,8,16,21;
81:21,21;96:23;98:8,
23;99:4,22;100:19,21,
24;102:8;104:11;
110:24;111:20,20;
112:18;113:11,13,17;
114:1,16,20,23;125:20;
126:14;134:19;136:6,
22;137:12,17;138:3,16
**HealthCare (13)**
86:21;87:15;98:12,
13;102:24;103:22;
105:11,22;115:25;
116:1,13;121:23;125:7
**hear (4)**
42:8;46:8;54:4;
105:15
**heard (3)**
34:8;146:16,24
**hearing (1)**
86:6
**Heart (2)**
68:18;92:13
**held (3)**
6:15;26:9;93:23
**Helena (9)**
6:17,21;12:10;21:13,
14,14,18;24:15;89:12
**help (18)**
35:24,24;36:2;38:19,
20,22;39:20;44:1;
67:19;70:15,25;71:10,
16,17;72:8;128:7;
147:18;148:22
**helped (4)**
15:8;49:15;91:25;
92:2
**helping (2)**
72:1;97:9
**here's (2)**
124:19;132:16
**Hey (4)**
39:5;71:24;93:8;
147:20
**highest (1)**
12:21

**highlight (2)**
77:25;78:2
**highlighted (4)**
82:23;84:5;104:11;
132:25
**highlighting (2)**
110:4;133:5
**highway (1)**
22:5
**Hills (1)**
82:13
**himself (1)**
105:4
**HIPAA (2)**
81:20;96:20
**hired (1)**
89:24
**hiring (1)**
126:25
**history (4)**
14:17,21;22:15;
91:20
**hobbies (1)**
30:16
**hold (3)**
20:19;122:25;125:18
**home (65)**
16:20;17:2;31:7;
36:1;43:12;46:22;
58:23;63:20;78:4,8,15,
17,21;81:12;86:20,21,
22;87:2,9,14;90:2;
96:23;98:8,11,17,23;
99:4,22;100:19,20,24;
101:22,22;110:24,24;
111:7,13,18,20,20;
113:13,17;114:16,20;
121:23;125:7,20;
126:14;127:6;128:17,
17;129:16;130:9,10,17,
19,24;134:19;136:6,
22;137:11,17;138:3,
16;147:11
**honestly (5)**
11:1;22:23;105:15;
106:3;115:6
**horrible (1)**
42:12
**hospice (40)**
47:10,12,16;48:2,8,
16,17,20;49:19,21;
50:2,3,4,9,11,13,14,18,
25;58:9;59:7;61:24;
63:20;64:18,20;66:18;
67:4;69:21;71:20;
72:22;73:13;84:5;98:6;
101:2,22;111:18;
113:10,25;114:22;
130:19
**hospital (20)**
43:6;44:11,18,19,23;
45:1,2,10;50:3;141:7,
12;142:1,3,5,8,14,17;

143:20;144:5,8
**hospitalization (1)**
83:19
**hospitalized (8)**
83:18;135:2,3;
141:18;142:7,11,23;
144:19
**hour (16)**
17:5,7;18:7;19:18,
19;53:2;89:5;92:22;
107:6,24;108:10,13,16,
19,19,20
**hours (5)**
16:11,11,14,15,19;
17:1,8,15;19:15,16;
72:13,14;93:3,4,5
**house (10)**
21:16;31:4,19,24;
44:19;45:5,8;47:4;
75:16;87:6
**HTML (7)**
122:5;123:13,14,17;
124:13,16;132:16
**Huckabay (3)**
32:6,8,21
**hundred (11)**
16:14;21:8,10;28:22;
100:5,8,20;101:1;
136:24;137:7;138:5
**hundred-dollar-a-day (1)**
137:18
**husband (7)**
12:12;20:13;29:11;
34:25;35:11;101:13,15
**husband's (2)**
12:13;104:14
**hygiene (1)**
62:4

**I**

**IADL's (1)**
60:21
**idea (4)**
22:19;90:25;107:23;
144:17
**identification (9)**
64:12;70:1;80:4;
86:18;95:22;106:8;
109:22;119:3;151:2
**Ill (2)**
111:2;140:9
**Illness (1)**
143:13
**Immediate (4)**
125:21;126:15;
127:8,14
**impair (1)**
10:25
**important (1)**
9:20
**improper (3)**
56:15;148:4;149:5

Inc (3)
  7:7;8:3,4
included (1)
  123:11
including (1)
  151:13
income (4)
  17:10;19:17;93:21,
  23
Incorporated (2)
  6:12,13
increased (1)
  19:20
incur (2)
  94:15;114:12
incurred (1)
  131:2
Independent (3)
  111:21;127:9,16
independently (3)
  60:12,21;62:16
indicate (2)
  143:20;144:8
indicates (1)
  113:9
industry (2)
  17:17;29:21
Infection (1)
  68:19
influence (1)
  10:24
INFO (1)
  121:14
information (27)
  55:11,18;56:7,9,17;
  57:11;60:4;62:12;
  75:22;81:21;84:10,24;
  96:17,19,25;97:14,18;
  102:1;113:15;123:20;
  125:13,15;142:25;
  143:9;144:9;145:5;
  148:11
informed (1)
  125:22
infrequently (2)
  91:4,5
INITIAL (1)
  116:20
input (1)
  55:6
inquire (1)
  39:4
inquired (1)
  148:21
inside (2)
  26:21;31:19
instances (1)
  40:16
instead (1)
  10:11
instruct (6)
  11:13;55:3,6,14;
  56:13;57:2

instructing (1)
  56:16,22;77:21
instruction (5)
  11:24;12:23;55:23;
  56:23;57:22
Instructions (4)
  76:13;77:21;79:25;
  100:15
Instrumental (2)
  60:15,18
Insurance (150)
  6:10,11,11,13;7:6;
  8:3,11,12;17:16;20:14,
  17;22:2,7,10,12,18,24;
  23:3,6,9,20;24:10,12,
  13,23,24;25:2,2,3,6,9,
  13;26:9,17,18,23;
  27:25;28:1,7,24;29:1,
  18,20,21;32:19,22;
  33:1,5,7,12,16,17;34:9,
  14,17;35:1,5,7,8,15,16,
  19;36:7,18,19,23;37:3,
  10,13,16,21;38:6,13,
  18,25;39:12,23;40:6,
  15,20;41:3,5,6,12;
  50:21,24;51:17,20;
  52:2,5,8,12;61:19;
  65:14,19;71:25;72:3;
  73:16,19,24;74:2,14,
  17;75:15;77:9,15;
  79:15,20;81:17,17,22;
  82:6;89:17,21;94:22,
  25;97:10,18;99:9,14;
  102:3;104:22;105:3,6,
  9,25;111:8;113:22;
  115:3;117:3,8,25;
  118:2;119:22;120:7;
  129:1;132:3;135:17;
  136:4;139:13;141:7,
  11,24;146:7,18,23;
  147:13,25;148:15;
  150:1
Insured (14)
  83:17;84:2,16,18;
  85:24;86:6;116:9,16;
  125:17,24;127:6;
  143:12,15,16
insureds (2)
  149:19,25
insured's (3)
  143:23;144:3,10
Integumentary (1)
  68:19
intend (1)
  124:7
intended (2)
  35:19;123:8
interact (1)
  103:25
Interdisciplinary (1)
  65:22
interject (1)
  11:10

internship (3)
  13:19;14:8,13
interrupt (2)
  146:20;148:2
intervene (2)
  33:22;34:1
interview (2)
  9:22;63:21
into (8)
  16:23;40:22;51:23;
  57:5,19;71:24;134:24;
  141:17
introduce (1)
  6:25
investigate (1)
  51:23
invoices (9)
  94:9,12,14;114:15;
  129:13;130:14;131:8;
  132:1;139:25
Invoicing (14)
  113:5,8,12,17,21;
  114:25;115:4;116:21;
  117:4,9,13,22;131:11,
  16
involved (6)
  16:16;25:12;29:4,14;
  37:2;40:6
involvement (1)
  74:25
irate (1)
  40:9
irony (1)
  56:2
issue (2)
  124:8;127:10
issued (1)
  113:13
issues (3)
  34:16;39:23;41:25
itchy (2)
  43:2,6
itemized (14)
  79:6;113:7,11,21;
  114:25;115:4;116:21;
  117:4,9,13,22;131:8,
  10,16
ITEMS (1)
  121:15
IV (1)
  6:14

**J**

Jack (3)
  32:6,8,21
James (1)
  83:4
January (4)
  39:15;92:2,18,20
Jessica (2)
  7:10;8:8
job (8)

14:7,14;18:3;19:18;
  23:22;42:3;119:15,16
jobs (3)
  13:21,24;30:11;
  93:20,23
John (1)
  6:20
Johnson (2)
  81:8,11
JONES (105)
  7:4,4,13,16,23,25;
  8:15,18;9:3;11:20;
  12:1;26:5;34:1,5,7;
  42:18,22;46:9,11,14;
  52:23;53:9;54:4,9,13,
  20;55:9,16,17;56:1,14,
  21;57:8,13,16,21;64:5,
  13;69:20;70:2;79:24;
  80:5;82:10;86:13,19;
  95:18,23;99:1;105:14,
  18;106:9;107:9,14,17,
  21;108:13,16,18,21,23;
  109:2,7,14,23;113:1,2;
  117:19,20;118:23;
  119:4;120:4,5;122:12,
  19,22;123:7;124:2,5,
  18;138:20;139:1,4;
  140:15;141:3;145:12,
  19,21;146:3,5;147:20,
  23;148:3,6,8,17;149:8,
  13;150:6,8,10,13,15,
  18;151:3;152:8
July (9)
  15:16;77:2,5,13;
  80:22;87:10;120:23,
  23;124:21
June (1)
  67:9
JURY (2)
  53:20;147:18

**K**

Kay (5)
  42:8;82:20;101:7;
  106:4;120:17
KBYRD (1)
  125:10
keep (6)
  20:21;71:2;80:16;
  90:10;108:10;115:16
kids (5)
  13:22;14:2;15:10;
  16:16;42:13
kind (17)
  10:22;11:17;14:9,11;
  16:19,21;25:1;29:17;
  42:6;60:7;62:24;71:12,
  15;104:10;106:22;
  132:25;133:12
King (47)
  6:3,7,9;8:23;9:4;
  25:20;46:13;52:24;

53:11;54:21;55:18;
  57:9;58:4;64:15;70:3;
  95:25;96:13;102:7;
  105:22;108:1,6;
  109:15;110:23;111:1,
  17;113:8,9,12,24;
  116:9;121:13;124:19;
  128:16;131:8,11,17;
  134:21;135:1;137:12;
  143:9,23;145:22;
  148:13;149:14,16;
  151:9;152:9
KINGPOWER (1)
  134:16
King's (2)
  116:17;151:10
Klatt (2)
  12:14,16
knew (4)
  37:7;52:2,4;129:23
Knights (2)
  34:18;35:3
knowledge (5)
  26:21;29:12;33:8;
  72:2;101:6
known (2)
  6:13;8:12

**L**

lady (2)
  141:22,24
Lake (2)
  43:16;83:18
land (1)
  31:12
large (1)
  30:23
last (5)
  11:19;120:3;127:23;
  128:5;149:17
late (1)
  28:11
later (2)
  81:3;134:14
law (1)
  112:19
lawful (1)
  8:24
lawn (1)
  26:20
lawsuit (5)
  29:5,8,14;146:14;
  147:13
lawyer (5)
  147:4,8;149:17,22;
  151:17
lawyers (1)
  147:17
LC (1)
  114:17
Leal (4)
  116:3,4;126:19;

134:14

**learn (6)**
41:23;60:4;74:16,20;
87:3;88:2

**least (1)**
118:13

**leave (2)**
93:19;119:19

**led (2)**
41:17;42:6

**left (6)**
108:10,18,20;
119:16;125:4;132:19

**legal (5)**
78:10;147:21,21;
149:1,2

**Lesofski (2)**
6:16,24

**less (1)**
16:14

**lesser (1)**
130:23

**letter (27)**
80:24;97:17;103:14;
110:14;111:25;112:7,
10;113:16;114:18;
117:8;119:7;121:6,15;
128:14;130:12,13;
143:22;144:3,10,16,18;
149:17,23;150:14;
151:4,6,9

**letters (4)**
147:1,2,4,7

**letter's (1)**
110:16

**letting (1)**
34:6

**level (1)**
12:21

**levels (2)**
31:25;36:10

**license (3)**
96:25;113:14;116:23

**licensed (4)**
22:18;96:23;98:8;
99:4

**licenses (1)**
20:19

**lie (1)**
54:18

**Life (4)**
6:11;8:11,12;90:7

**lifetime (2)**
36:16;130:25

**liked (3)**
13:22;30:17,20

**limit (1)**
92:3

**limitations (1)**
111:3

**line (4)**
25:2;39:14;110:19;
150:20

**LIST (1)**
121:15

**listed (3)**
83:4,5;114:22

**lists (2)**
131:1;132:21

**little (15)**
15:21;16:20;30:11;
34:3;41:14;42:14,19;
66:3;67:23;68:4;90:7;
93:17;107:6;139:18;
140:2

**live (9)**
12:8;21:4,7,12,15;
31:19;39:19;47:20;
122:5

**lived (6)**
15:7,18;30:10;31:18;
39:18;70:20

**lives (3)**
12:11;21:5,13

**living (17)**
19:24;21:24;29:15;
33:5;59:15,18,21;
60:11,16,18;69:5,13;
70:15;92:12;125:22;
126:15;127:23

**located (2)**
33:10;45:8

**location (3)**
143:23;144:4,11

**log (4)**
16:21;71:2;95:13,19

**long (20)**
20:3,4;23:16;27:10;
28:12;44:23;45:1;
64:24;76:1,14;77:14;
91:21;93:3;95:7;
100:15;102:2;107:16;
108:2;111:19;116:17

**longer (1)**
69:15

**long-term (14)**
33:6;34:13,25;35:15,
18;36:6,22;41:6,10,11;
65:19;74:13,17;80:1

**look (14)**
16:10;43:4;44:6;
51:23;54:10,11;71:24;
112:6;123:24,24;
128:3;130:6;134:5;
147:11

**looked (9)**
36:13;100:14;
103:15;107:14;127:22;
128:13,15;131:22;
134:6

**looking (6)**
107:1;117:9;127:19;
132:24;133:7,24

**looks (6)**
65:1;66:12;81:6;
83:2;101:16;134:13

**Loss (1)**
113:5

**lot (13)**
14:4,4;31:12;42:12,
21;43:11;62:11;70:13;
72:20;81:14;95:8;
106:22;120:19

**Louisiana (1)**
30:11

**loved (1)**
14:1

**lower (1)**
76:23

**LPM (1)**
103:1

**LPN (2)**
103:4,5

**LTC (3)**
6:12;7:7;8:3

**LTCFast (1)**
114:20

**LTCFastPay (7)**
113:18;114:16,17;
119:11,21;120:8,11

**lumber (1)**
20:10

**lunch (2)**
108:2,8

**Lynn (1)**
89:14

**M**

**ma'am (1)**
42:18

**Madam (6)**
64:5;69:20;79:24;
86:13;95:18;150:19

**MAIL (1)**
135:6

**makes (1)**
10:9

**making (1)**
70:11

**man (3)**
72:18;116:6;126:21

**manage (1)**
67:10

**Management (3)**
62:14;67:11;68:20

**manager (5)**
103:8,24;116:12,13;
118:9

**managing (1)**
39:23

**many (17)**
16:10;17:8;26:11;
31:7,9;40:14,17,21;
41:1;48:19;63:7;87:5;
90:10;91:14,16,17;
98:19

**March (22)**
17:23,24;18:9;47:17;

48:13,18;49:1;50:19;
58:12;59:12;63:13;
65:11,17;67:8;69:21;
83:11;84:7;120:25;
124:22;144:14;145:3;
146:17

**Mark (13)**
21:3,4,24;22:1,10;
64:6;79:25;86:14;
106:4;109:18;118:24,
25;150:17

**marked (14)**
64:11;69:21,25;80:3;
86:17;95:19,21;
100:12;106:7;109:21;
118:24;119:2,6;151:1

**marks (1)**
49:13

**Mary (5)**
5:5;6:23;26:5;34:5;
52:17

**mass (1)**
43:18

**MassMutual (1)**
8:12

**master's (1)**
12:22

**math (1)**
137:6

**Matt (4)**
21:3,11;22:4,10

**matter (2)**
6:4;53:17

**matters (2)**
39:24,24

**Max (3)**
8:15,19;149:8

**maximum (4)**
78:21;100:20;
130:24,25

**Maxon (1)**
8:8

**may (5)**
8:20;26:20;33:17;
74:3;108:6

**maybe (29)**
13:2;14:18;15:16;
17:1;18:7;27:16;28:11;
34:20;37:19;39:5;41:1,
1;42:25;45:3;47:22;
49:6,8;63:1;67:17;
70:18;71:24;74:22,25;
89:5;93:5;107:24;
133:4,9,11

**MCB (1)**
143:17

**mean (15)**
18:12;24:13;35:10;
37:6;46:25,25;66:23;
70:21;88:1;91:16,19;
98:1;129:9;136:10;
146:19

**meaning (4)**

116:13;142:6;
143:13;149:24

**means (3)**
42:2;111:9;143:18

**meant (2)**
79:11;99:10

**Medicaid (1)**
112:19

**medical (8)**
46:19,19;54:23,24;
142:12;143:11,14;
144:21

**Medi-Cal (1)**
112:19

**Medicare (16)**
50:5,13,14;61:19,25;
82:21,21;88:22;101:4;
112:2,16;130:2;131:6;
132:6,7,11

**medication (3)**
10:24;62:14;68:20

**Medications (2)**
62:15,17

**meet (2)**
113:6;131:9

**meeting (2)**
63:17;79:5

**member (7)**
51:3,8,13;125:21;
126:15;127:8,15

**members (1)**
26:22

**memory (2)**
76:25;106:24

**mentally (1)**
40:3

**mention (1)**
91:20

**mentioned (3)**
51:5;83:19,22

**message (1)**
132:19

**met (2)**
32:8;111:16

**Meyer (2)**
83:4,14

**Michelle (12)**
6:3,7;8:23;42:23;
105:22;121:13;125:16;
134:16;143:9,22,23;
151:10

**might (10)**
26:12;28:9;32:14;
54:18;73:19;75:9;94:1;
108:14;124:6;145:1

**Mike (1)**
7:3

**mild (1)**
63:9

**miles (3)**
21:10,17,19

**military (1)**
45:16

**mind (1)**
  128:5
**mindful (1)**
  107:22
**mine (2)**
  110:4;133:8
**minimize (1)**
  67:17
**minute (3)**
  78:1;120:21;122:25
**minutes (5)**
  108:24,25;109:1,3,6
**miserable (1)**
  43:5
**missing (1)**
  97:14
**Missoula (1)**
  5:7
**misstates (3)**
  105:13,17;150:5
**misunderstanding (1)**
  124:7
**Mm-hmm (1)**
  124:2
**mom (4)**
  15:10;18:15;25:8;
  51:25
**moment (4)**
  58:2;77:25;95:24;
  150:14
**money (3)**
  88:17,18;130:25
**Montana (12)**
  5:7,7;6:5,17,22;
  12:10;13:4,5;21:5;
  28:7,25;29:18
**month (14)**
  43:23;92:25,25;
  136:14,20;137:7,8,13,
  19,20;138:7,9,13;140:7
**monthly (2)**
  143:19,19
**months (2)**
  44:5;127:4
**month-wise (1)**
  91:17
**more (12)**
  15:21;19:16;27:13;
  41:1;67:17,24;68:4,11;
  138:11,17;139:5;
  142:25
**most (2)**
  85:24;86:10
**mostly (1)**
  30:23
**mother (1)**
  24:3
**Mountain (1)**
  6:21
**move (5)**
  15:15;56:14;60:1;
  71:17;80:6
**moved (1)**

  30:14
**moves (1)**
  17:21
**moving (6)**
  133:10,11,14,15,21,
  22
**mowed (1)**
  26:20
**much (7)**
  26:2,25;51:6;68:8;
  69:7;89:4;92:25
**multiple (1)**
  145:11
**Municipal (3)**
  28:7;29:1,18
**Murphy (1)**
  6:20
**must (5)**
  77:4;80:17;133:19,
  23;142:14
**myself (2)**
  54:18;85:4

**N**

**name (19)**
  6:20,23;7:24;12:13;
  16:4,6;32:7,10;37:7;
  49:19;81:13,15;102:7,
  8,19,22;116:7;141:23;
  143:6
**named (2)**
  81:7;143:4
**names (1)**
  90:25
**name's (1)**
  9:5
**nature (1)**
  148:21
**near (1)**
  45:8
**neat (1)**
  62:3
**necessarily (1)**
  36:21
**necessary (1)**
  146:16
**need (31)**
  7:11,12,15;10:5;
  33:22,25;34:2;35:24,
  25;40:9;42:17,23;
  59:25;60:1,2;66:1,14;
  69:15;76:22;89:23;
  96:18;108:1,2,7;110:1;
  113:11;125:13;131:7;
  143:10,16,21
**needed (15)**
  13:21;38:20;40:11;
  49:16;71:18;87:19,24;
  88:3;96:17;97:19;
  103:17;119:19;121:14;
  131:25;143:10
**needing (1)**

  132:19
**needs (2)**
  36:11;56:23
**Neurologic (2)**
  60:24;68:21
**New (6)**
  76:14;80:1;100:15;
  121:8,25;124:11
**next (14)**
  14:25;37:20;44:19;
  78:23;80:6;106:10;
  113:16;114:18;119:6;
  125:9;126:18;139:10,
  14;150:20
**Nicole (1)**
  8:9
**noise (1)**
  76:9
**noncommercial (1)**
  20:16
**Nope (1)**
  128:5
**Northwest (3)**
  20:2;101:11;104:15
**Notary (1)**
  5:6
**Note (5)**
  95:12,19;112:2;
  125:9;134:19
**noted (1)**
  148:10
**notes (10)**
  114:25;115:4;
  116:22;117:4,10,13,22;
  122:4;134:14;151:25
**Nothing's (1)**
  133:15
**Notice (1)**
  61:20
**November (19)**
  18:12,14;44:15,22;
  49:1;83:24;91:25;
  115:22;117:1,16,21;
  132:18;133:6,8,25;
  134:7;135:4,23;143:20
**Number (10)**
  6:6;40:18;80:1;
  113:15;119:6;121:25;
  124:10;126:3;131:4;
  132:21
**numbers (1)**
  48:23
**nurse (22)**
  24:7;9;46:22;47:4,8,
  11,13;48:17,20;58:16;
  63:22;66:20;72:7,16;
  75:14,19,21;85:2;98:6,
  6;114:6;145:17
**nurses (4)**
  72:22;97:25;98:3,4
**nursing (7)**
  36:1;58:10;59:8;
  64:7;67:8;68:16;69:5

**Nutrition/Hydration (1)**
  68:22

**O**

**object (5)**
  54:1;55:2;146:3;
  147:15;149:11
**objection (26)**
  11:11,23;55:22;
  56:10,15,19;57:12,14;
  82:9;98:25;105:12,16;
  112:24;137:21;138:18;
  140:14;141:1;145:10;
  147:16;148:19,19;
  149:5,6,11;150:4,8
**objections (4)**
  54:14;122:15;123:8;
  148:3
**objection's (3)**
  55:16;123:5;148:10
**obnoxious (1)**
  146:9
**obviously (1)**
  22:16
**Occasionally (2)**
  70:9;114:7
**o'clock (1)**
  107:21
**October (16)**
  42:25;106:11;
  110:10;119:25;120:6;
  121:5,12,22;125:5,11;
  127:20,20;128:21;
  129:11;135:4,23
**odd (2)**
  30:11;51:22
**oddly (1)**
  46:8
**off (21)**
  7:15,18;15:9;40:8,
  23;42:8;52:21;53:4;
  60:19;63:7;77:3;97:24;
  109:9;122:3,3;123:20;
  124:14,23,25;152:3,16
**offer (1)**
  151:12
**offered (1)**
  135:11
**offhand (1)**
  37:22
**office (6)**
  16:23;77:13;89:10,
  11;116:12,13
**offices (1)**
  6:15
**often (2)**
  16:25;18:6
**oil (2)**
  30:10,10
**old (2)**
  12:13,18
**older (4)**

  26:14,16;38:22,24
**Once (6)**
  37:15;39:20;83:9;
  90:15;91:7;111:14
**one (38)**
  9:23;10:23;31:23;
  33:16;52:5,15;58:2,2,
  3;64:3;67:9,18;76:7,
  10;80:9;83:4,5,19,22,
  23;89:15;95:4,7,7,24;
  96:3;98:20;100:13;
  101:8;103:15;116:6;
  122:13,13;123:15;
  124:15;128:16;132:15;
  133:16
**one-word (2)**
  149:6;150:8
**online (1)**
  12:25
**only (13)**
  10:7;14:3;47:12;
  64:24;83:4,5;90:13;
  91:23;98:19,20;112:1;
  133:8;138:12
**on-site (1)**
  111:1
**onto (1)**
  141:19
**operating (1)**
  25:14
**opportunity (2)**
  59:4;96:14
**opposite (2)**
  120:24;121:4
**option (3)**
  47:23;134:22;136:12
**order (3)**
  96:17;113:6;143:17
**ordering (1)**
  67:9
**Orders (1)**
  67:8
**original (1)**
  110:4
**otherwise (5)**
  33:10,15;39:22;71:5;
  84:14
**ourselves (1)**
  98:2
**out (24)**
  47:4,8,11,13;48:17,
  20;52:25;66:23;71:16;
  72:1;87:6,8;91:21;
  94:6;114:6,9;115:24;
  117:18;122:18;123:3;
  128:3;135:5;142:11,19
**outlined (1)**
  112:4
**outside (3)**
  70:5;74:4;89:10
**over (6)**
  9:23;14:5;19:20;
  33:17;44:2;107:6

Michelle King    Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 51 of 56   Michelle King

United Teacher Associates Insurance Company, et al.                        December 10, 2024

**overbroad (1)**
11:11
**overnight (2)**
44:11;135:2
**Overview (12)**
60:25;62:15;68:18,
19,20,21,22,23,24,
25;69:1
**owed (1)**
151:14
**own (17)**
11:14;12:2;19:7;
23:11;24:17,20,22;
31:21;33:21;34:13;
35:20,23;39:10,13,15,
23;42:5
**owned (2)**
27:11,25

**P**

**packet (2)**
77:12;96:16
**page (18)**
61:1;67:18;68:12,13,
14;95:7;96:3;101:8;
121:14;122:9;123:3,
10,18,20,22,23,24;
124:1
**pages (6)**
59:3;64:24;66:12;
80:15;112:1;123:19
**paid (34)**
14:14;17:5,7;46:22;
49:23;50:4,15;61:24;
88:19,20,21,24;89:2,
16,17,20;92:22;94:3;
101:4;114:13;128:2;
129:14,21,22,23;130:1,
2;132:5,6,10;135:16;
136:1;139:20;140:6
**Pain (1)**
68:22
**pancreatic (1)**
43:18
**paperwork (1)**
146:15
**parents (3)**
24:17;27:15,18
**part (18)**
15:6,9,18;16:10,13;
17:25;19:12,14;24:5;
31:4;55:13;66:6;82:21,
21;104:6;114:7;120:3;
135:3
**particular (1)**
123:23
**parties (3)**
5:4,10,15
**partner (1)**
7:25
**parts (1)**
30:10

**party (2)**
29:4,8
**pass (2)**
18:11;98:3
**passed (3)**
49:1;97:24;134:11
**passing (1)**
40:3
**Patient (2)**
62:3;63:9
**patients (2)**
90:18,21
**patient's (1)**
102:2
**pauses (1)**
46:13
**pay (31)**
36:11;38:22;39:19;
51:3,12;73:2,5,7;89:4;
111:17;112:13;113:7;
114:9,20;130:8,10,18,
23;131:5,8,10,16;
132:10;135:1,3,11;
136:14;138:4,16,17;
143:17
**payable (2)**
16:3;78:25
**Payer (2)**
61:19,20
**paying (6)**
50:8,10;100:5;
111:16;130:3,4
**payment (9)**
50:14;132:20;134:3,
23;136:2,6,14;138:12;
151:13
**PAYS (2)**
134:25;138:13
**PDF'd (1)**
124:24
**pending (4)**
6:4;10:8;107:20;
121:15
**PEO (4)**
16:1,5,6;19:11
**people (11)**
40:10;43:10;72:21;
81:14;87:6;91:11,25;
92:1,11;101:3;150:1
**people's (1)**
14:10
**per (13)**
9:16;19:15,18;92:25;
100:20;124:9;125:24;
132:21;136:14;137:7,
7,8;138:5
**percent (2)**
16:14;28:23
**perfect (1)**
66:8
**perform (2)**
60:11,20
**period (13)**

65:11;71:20;78:20;
79:1,5,7;111:15;113:7;
130:22;131:10;134:24;
139:22;143:11
**person (5)**
28:22;40:12;45:9;
81:6;141:20
**personal (5)**
6:8;39:24;62:3;84:6;
96:20
**personally (1)**
99:16
**Peter's (14)**
49:21,24,24;50:3;
58:9;59:7;63:20;64:18;
66:20;84:4;94:17;
113:10,25;114:21
**phase (1)**
79:7
**Phoenix (1)**
12:25
**phone (9)**
38:10;40:8;74:8;
85:7;116:6;121:20;
127:13;129:5,7
**phones (1)**
25:10
**physician (1)**
83:2
**physicians (1)**
83:3
**pick (1)**
104:18
**picture (1)**
14:20
**piece (3)**
49:25;78:16;107:4
**pieces (1)**
145:5
**place (4)**
44:2;48:2;84:3;
132:21
**placed (1)**
125:17
**places (2)**
98:20,20
**plaintiff (6)**
6:9;7:3;56:4;147:22;
148:12,14
**plan (14)**
63:23;64:20;65:24;
66:19,21;67:4;69:6,10,
21;96:24,24;112:19;
116:20,21
**play (1)**
10:1
**please (22)**
25:23;29:6;62:11;
65:16;66:1,4,17;68:5;
69:15;76:16,19;97:3,
15;102:20;106:18;
112:2;119:9;122:25;
132:23;148:2;149:14,

21
**PLUS (3)**
121:23;125:12;127:3
**pm (5)**
108:24;125:12;
152:4,5,18
**POA (1)**
121:13
**pocket (2)**
94:7;114:9
**point (9)**
38:8,12;45:12;48:1;
95:17;129:6;134:6;
135:9;139:16
**policies (2)**
35:13;36:7
**policy (84)**
32:22;33:1,5,7,9,13,
16,17;34:14,16,23;
35:1,5,19;36:3,14,19,
21;37:7,8,13,14,15;
38:17,20,21;39:3,6;
50:21;51:6,17;52:5,8,
12;65:14;72:4;73:16;
77:15;87:12;89:18,21;
99:14,15,21;100:1,3,7;
111:4;112:3,3,5,6,9,13,
23;125:20,24;126:1,
13;127:7,14,20,22;
128:2,3;129:16,21,23,
25;130:5,7,10;131:5;
132:9;134:6;136:22;
138:4;139:19;140:5,
11,13,18,24;145:9
**policy's (1)**
130:7
**poor (1)**
92:12
**poorly (1)**
70:18
**portability (1)**
81:22
**portion (1)**
96:15
**position (1)**
103:23
**possible (2)**
10:21;28:2
**possibly (2)**
93:6;147:3
**power (1)**
82:1
**prefer (1)**
14:19
**prepare (5)**
11:8,12,21;12:3;
62:16
**prepared (1)**
65:8
**prescribed (1)**
62:16
**present (2)**
62:7;75:18

**pressure (1)**
14:10
**pretty (4)**
40:3;70:23;130:12,
13
**previous (1)**
14:5
**previously (1)**
51:2;66:17
**primary (1)**
83:2
**print (1)**
95:8
**printing (1)**
16:24
**prior (6)**
20:8;47:14;65:25;
66:19;117:18,21
**privacy (2)**
40:24;74:4
**private (1)**
147:5
**privilege (2)**
55:10;148:20
**privileged (3)**
56:1,8;148:11
**probably (12)**
14:8;20:11;30:6;
67:16;70:12;85:5;86:9;
107:23;116:14;129:8;
134:8;139:15
**problem (2)**
26:5;34:5
**Procedure (1)**
5:12
**PROCESS (1)**
135:5
**processing (2)**
96:18;97:19
**produce (2)**
123:14
**producer (2)**
22:18,24
**product (1)**
148:20
**Productions (1)**
6:21
**professional (1)**
20:19
**Profile (1)**
63:8
**program (1)**
50:2;103:8,23;118:9
**projects (2)**
30:24,25
**promotion (2)**
13:8,19
**Proof (3)**
113:5;116:18,18
**property (1)**
31:15
**PRORATED (2)**
134:25;135:24

**proud (1)**
72:18
**provide (13)**
54:24;63:24;70:19;
71:8;100:4;112:4;
113:21;115:3;125:19,
23;131:20;142:1,12
**provided (13)**
71:3,6;86:9;94:16;
97:22;113:8,12;126:2;
131:8,11,23;134:20;
139:25
**provider (13)**
49:20;84:4;96:22;
101:18,22;102:7;
103:17;106:4;111:20;
114:21;121:16;125:20;
126:14
**providers (1)**
96:19
**providing (15)**
70:16;77:21;84:5;
94:22;95:1;99:5,14;
100:2;102:23;105:9;
106:1;120:13;125:17;
130:1;144:2
**provision (2)**
126:1,13
**provisions (1)**
125:24
**Psychological (1)**
68:23
**Public (1)**
5:6
**pull (2)**
76:11;123:15
**pulled (1)**
76:13
**purchase (1)**
34:19
**purchased (2)**
36:10;52:12
**purchasing (1)**
37:14
**pursuant (2)**
81:20,21
**put (5)**
37:6;50:25;109:17,
18;147:16

**Q**

**qualification (1)**
11:16
**Qualified (1)**
111:19
**question's (3)**
10:8,22;11:11
**quick (1)**
101:11
**quickly (2)**
62:10;133:12
**quit (1)**

92:14
**quite (2)**
54:14;120:19

**R**

**radiation (1)**
47:22
**raises (1)**
45:12
**ramifications (1)**
149:1
**rate (1)**
45:11
**Re (2)**
110:19;116:10
**reach (2)**
87:8;125:25
**read (20)**
11:21;12:2;34:23;
52:5;59:1,3;60:8,13;
61:5,8,11,15;68:16;
69:2;97:7;101:24;
107:19;113:3;117:11;
131:4
**Read] (19)**
60:10;61:14;77:11;
111:15;112:12,15;
113:6;116:15;121:13,
23;125:14;127:1;
130:17;131:7;134:15,
15,18;143:2,8
**reading (4)**
5:16;60:6,7;107:25
**reads (1)**
9:25
**realize (2)**
37:6;124:25
**really (9)**
9:16;14:1;16:13;
22:19;37:5;42:16;51:6;
119:17;136:3
**reason (5)**
53:13;78:3;122:3;
123:22;124:24
**Reath (3)**
7:5;8:1,10
**recall (43)**
20:24;25:18;29:16;
40:25;44:17,22;50:10;
53:22;58:22;63:2,17,
19,22,22;66:22;74:11;
75:3;77:3;81:15,16;
84:11;87:7,17;88:14;
92:23;93:1,25;99:11;
104:3,20,24;112:8;
116:7;118:1,4;119:20;
125:6;141:6,23;
142:25;144:2;145:1;
146:10
**receive (1)**
78:17
**received (13)**

96:15;112:7;117:2,4;
119:8;130:20,22;
134:19;135:25;137:12,
19;139:8;141:17
**receives (1)**
11:17
**receiving (4)**
100:25;113:10,25;
114:4
**Recess (4)**
7:19;53:5;109:10;
152:4
**recognize (2)**
80:15;85:7
**recollection (5)**
32:11;38:9;47:15;
61:23;145:25
**record (28)**
7:15,18,22;8:14;
9:24;42:20;52:21;53:4,
8,10;58:1;71:5;89:6;
94:10;109:9,13,16;
123:6,11;124:11;
147:17;149:10;150:5;
152:1,3,7,10,17
**records (17)**
54:23,24;141:8,12;
142:1,3,4,7,12,16;
143:11,14,19;144:3,5,
8,22
**recs (2)**
16:3,21
**redid (1)**
123:20
**reduced (1)**
45:11
**refer (2)**
8:5;121:14
**referenced (1)**
66:19
**referencing (1)**
65:25
**REFERRED (1)**
121:9
**referring (2)**
62:25;98:5
**reflect (1)**
149:10
**regard (4)**
47:19;55:7;56:11;
122:9
**regarding (1)**
116:16
**regardless (1)**
139:2
**registered (3)**
20:16;24:7,9
**regular (1)**
93:7
**Reimbursable (4)**
112:14,16,18;131:6
**reimburse (1)**
140:1

**reimbursement (3)**
99:13,22;100:1
**related (2)**
56:12;94:16
**remaining (1)**
130:25
**remember (53)**
9:16;14:7;16:13;
22:15;29:22,23;41:2;
48:21,24;58:20;70:10;
75:6,8,11,24;76:3,6;
81:11,13;90:3;92:19;
94:2;106:3;111:11,12;
112:11;113:23;114:17;
115:6,23;116:4,5,7;
119:13,13,21,24;
120:10;121:20;125:8;
126:11,21,21;127:13,
17,19;129:15;135:20;
136:24;143:4,6;
144:18;145:6
**reminded (1)**
92:10
**reminder (1)**
25:22
**remotely (1)**
16:20
**Renal/Urinary (1)**
68:24
**repeat (7)**
29:6;42:24;65:16;
66:16;74:19;76:18;
97:15
**repeatedly (1)**
148:9
**repetitive (1)**
126:8
**rephrase (2)**
138:20;139:3
**Reporter (34)**
5:6;7:1,11,14;8:20;
9:24;10:13;11:4;25:19,
22;26:2;33:24;34:2;
42:16;46:7,10;52:17,
20;64:4,5,9;69:20,23;
86:13;95:18;108:5,6,7;
117:17;120:2;122:21,
23;150:19,21
**reporter's (1)**
6:23
**Reporting (2)**
6:16,24
**reports (1)**
85:22
**represent (4)**
8:2,11;110:3;120:20
**representative (3)**
6:8;77:13;96:21
**request (7)**
80:22;96:10;116:15,
15;126:3;147:18;148:9
**Requested (2)**
116:10;118:13

**requesting (3)**
78:4;100:18;116:19
**requests (1)**
148:23
**require (4)**
79:6;113:7;131:7,10
**required (5)**
87:22;90:10;130:14;
131:15;132:4
**requirement (2)**
140:12,24
**requires (1)**
140:18
**rescan (1)**
66:15
**rescroll (1)**
66:15
**RESEARCH (1)**
127:10
**reserved (2)**
5:17;152:19
**residing (1)**
5:7
**respective (3)**
5:4,10,15
**Respiratory (1)**
68:25
**response (1)**
86:3
**rest (3)**
17:2;123:19;144:9
**restate (1)**
141:9
**result (3)**
45:22;57:1;79:4
**retired (4)**
29:25;30:2,7,9
**retroactive (1)**
145:8
**retroactively (2)**
143:10,15
**revenues (1)**
27:1
**review (3)**
63:20;80:21;143:10
**reviewed (3)**
11:17;33:15;143:14
**reviewing (1)**
125:19
**rich (1)**
56:2
**rid (1)**
149:24
**rider (6)**
132:20;134:3;136:2,
6,14;138:12
**ridiculous (2)**
88:8;149:11
**right (87)**
8:18,18;10:3;22:21;
35:16;38:22;45:14,24;
47:24;53:10;57:25;
58:10,13,16,17;60:13,

19;61:11,15,17;64:18;
69:2;72:13,25;77:3,6;
79:21;80:25;81:23;
82:2;83:4,13,15,20,25;
87:12,23;94:4;98:23;
100:16;101:5,19;
103:9,12,18;104:15;
105:11,23;108:3;
109:15,16,24;110:17;
114:2,5,12;115:25;
116:8,10;121:6;
123:19;124:15;128:4,
7,21;129:13,25;130:5,
16;131:20,22,23;132:5,
6,7,8,9,11;134:11;
138:9,13;140:20;
144:7;145:22;151:10;
152:9,9
**rigs (1)**
30:10
**Risk (3)**
62:20;63:8,9
**RN (4)**
63:13;96:23;116:20;
143:13
**Robert (4)**
6:8;102:7;116:9,17
**roles (1)**
26:8
**roofing (1)**
19:25
**room (5)**
10:6;11:3;31:21;
40:22;74:7
**rude (1)**
146:8
**Rules (2)**
5:12;9:16

**S**

**safety (1)**
85:8
**sake (1)**
149:7
**salary (2)**
17:6,12
**salesman (1)**
23:4
**Salt (2)**
43:16;83:18
**Same (19)**
11:23,24;36:7;54:15;
55:22;56:10,19,19;
57:12,13;59:6;93:12;
107:2;111:25;118:12;
123:10;124:17,19;
127:6
**sand (1)**
39:14
**Sandra (2)**
7:4,25
**Sandy (7)**

9:5,5;107:5;122:10,
21,21,23
**SARA (4)**
121:23,25;125:3,6
**Sarah (3)**
125:8,12,22
**satisfaction (1)**
130:21
**saw (3)**
40:19;99:8;111:7
**saying (3)**
42:20;105:21;147:6
**scan (1)**
43:17
**scanned (1)**
122:6
**schedule (2)**
72:15;93:7
**school (3)**
13:13,22;18:2
**science (1)**
82:17
**scolded (1)**
54:13
**Scott (2)**
12:14,15
**screen (11)**
52:18;53:12,14;58:5;
64:1;76:8;95:5;96:1;
115:14;133:3;150:16
**script (2)**
10:1;104:11
**scroll (27)**
53:18;64:24;66:1,3;
67:6,25;68:2,4,8,11;
69:7;76:16,22;80:12;
95:8;96:3;97:3;101:10;
102:20;106:15,17,22;
115:17;119:9;124:20,
22;132:23
**scrollable (1)**
123:13
**scrolled (1)**
110:13
**scrolling (8)**
58:25;62:10;80:16;
107:13;109:25;110:1;
115:16;133:12
**se (2)**
9:16;124:9
**second (17)**
52:15;58:3;68:12,13;
76:7,10;95:4;100:13;
103:16;122:14;128:12;
131:6;132:15;133:1,
17;150:7,12
**Secondary (1)**
61:19
**section (3)**
69:5;112:2;113:16
**Security (1)**
112:15
**seeing (4)**

53:22;83:7,15;
136:24
**seeking (4)**
99:12,16,22;100:1
**select (2)**
96:23;98:8
**selected (3)**
98:14,15,17
**self (1)**
61:14
**sell (2)**
23:6;25:3
**selling (2)**
25:13;93:22
**sells (1)**
19:25
**send (12)**
64:6;114:6,21;
122:10;125:14;132:1;
144:6,7,9,10,21;145:4
**sending (2)**
66:23;143:22
**Sensation (2)**
61:3,4
**sense (3)**
10:9;61:14;124:4
**Senses (1)**
61:13
**sensitive (1)**
41:25
**sent (15)**
43:11;47:8;66:20;
75:15;77:12;81:17;
101:16;122:16;123:19;
144:5;145:17;147:1;
149:17,23;151:17
**sentence (1)**
78:23
**separate (1)**
11:14
**September (18)**
18:10,14;42:25;44:7;
84:19;87:1;92:24;
94:21;96:7;97:10;
102:12;103:11,16;
105:1,2;106:1;135:4,
22
**Service (10)**
34:9;96:24;115:1,5;
116:22;117:5,10,14,23;
121:24
**services (12)**
79:4;102:11,16;
111:18;112:13;113:10,
12,25;114:4;130:19;
131:6;132:10
**set (3)**
52:18;63:23;72:15
**SETUP (1)**
121:8
**shake (1)**
10:12
**share (6)**

52:17;53:12;76:8;
95:5;115:13;133:16
**SHARES (1)**
127:5
**sharing (2)**
52:18;150:16
**sharp (1)**
40:3
**sheet (2)**
89:8,9
**Sheetrock (1)**
19:25
**shop (3)**
31:16;70:8,11
**short (5)**
52:24;53:11;91:23;
109:16;152:10
**Show (6)**
54:11;58:1;101:7;
124:13;150:13,13
**showed (1)**
123:21
**shower (2)**
91:12;93:9
**shown (1)**
68:14
**shows (1)**
122:11
**siblings (6)**
20:25;71:8,23;72:4,
6;73:5
**sick (2)**
140:20,22
**side (3)**
42:19;124:22,24
**sign (2)**
53:24;103:3
**signature (8)**
54:2,7,11;61:17;
68:14;80:17;81:24;
152:19
**signed (5)**
63:13;81:23;103:5;
116:3;118:8
**signing (1)**
5:16
**Signs (1)**
69:1
**silly (1)**
10:22
**simple (1)**
137:6
**simply (1)**
56:6
**sitting (1)**
9:18
**situation (1)**
17:12
**six (2)**
20:11;81:3
**sixty (1)**
21:10
**Skilled (3)**

58:10;59:7;64:7
**sleep (1)**
139:15
**sleeps (1)**
85:24
**slightly (1)**
67:17
**slow (6)**
26:6;34:3;42:17;
46:12;66:6;106:18
**slowly (6)**
10:20;53:18;67:7;
80:12,20;95:8;96:4;
106:15
**small (4)**
30:24,25;67:20;
93:20
**smile (1)**
42:14
**Social (1)**
112:15
**sold (4)**
27:16,18;32:21;35:5
**somebody (14)**
35:25;63:23;66:23;
75:2;87:16;88:3,13;
91:8;93:9;103:21;
119:14;120:11;129:24;
141:16
**somehow (1)**
129:8
**someone (8)**
63:19;66:21;81:16;
87:25;88:9;115:7;
140:19;143:4
**sometime (7)**
34:20;44:8;47:17;
144:14;145:3;146:17,
21
**Sometimes (2)**
32:5;70:7
**somewhere (1)**
65:7
**sooner (1)**
140:22
**sores (1)**
49:14
**sorry (48)**
12:15,15;20:4,5;
26:18;29:7;33:24;34:1;
40:12;41:2;42:8,18;
45:4;46:5,7;47:3;
48:15;50:6;54:5;57:9;
66:24;69:9;71:13;74:6;
76:9;92:8;93:17;95:24;
104:24;105:14;106:24;
116:7,18;117:6,17,19;
118:23;120:1;121:8;
122:23;132:24;133:18;
137:15,24;140:2;
141:9;144:24;146:19
**sort (6)**
48:3;50:12;54:18;

Michelle King    Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 54 of 56    Michelle King

United Teacher Associates Insurance Company, et al.                                     December 10, 2024

73:10,12;94:10

**sound (2)**
22:21;88:8

**sounds (2)**
51:22;68:19

**span (1)**
44:2

**speak (1)**
10:20

**speaking (5)**
54:14;56:15;122:24;
126:21;148:3

**speaks (2)**
54:2,6

**specialist (1)**
6:20

**specific (1)**
145:13

**specifically (7)**
36:25;40:7;41:4;
70:22;98:7;142:23;
145:14

**speculation (1)**
138:22

**spelled (1)**
8:1

**spend (1)**
44:10

**Spiritual (1)**
68:25

**spoke (5)**
51:12;126:24;
134:15,16;143:8

**spot (2)**
107:7,7

**spouse (1)**
19:23

**spouses (1)**
22:9

**square (1)**
31:9

**St (14)**
49:21,24,24;50:3;
58:9;59:7;63:20;64:18;
66:20;84:4;94:17;
113:10,25;114:21

**stairs (1)**
32:4,4

**Star (1)**
6:21

**start (7)**
48:12;50:7;71:20;
77:9;121:24;140:8;
145:16

**started (15)**
15:4;41:20;44:7;
47:16;48:8,14,15,18;
50:19;73:19;74:13,17;
94:20;98:22;104:21

**Starting (4)**
83:11;84:7;92:23;
121:3

**starts (1)**

120:22

**State (6)**
5:6;13:4;82:13;
112:18;113:13;116:23

**stated (4)**
125:15;127:1,3;
134:20

**statement (1)**
97:23

**States (5)**
6:4;82:1;112:5;
125:20;127:4

**status (1)**
96:14

**stay (2)**
45:10;78:14

**stayed (1)**
44:18

**step (3)**
40:9;64:3;138:2

**Steps (2)**
114:18;119:6

**still (18)**
15:6;17:22;18:22;
19:8,12,15;50:19;
67:19;70:3;96:18;
97:14,17;103:17;
105:1,3;117:9;121:14;
122:24

**stipulated (3)**
5:3,9,14

**stop (12)**
9:19;17:19,22;59:1;
84:18;92:5;106:16;
109:25;115:17;128:11;
133:16;148:9

**stopped (6)**
18:8;27:4,8,15,21;
109:25

**straightforward (1)**
149:12

**Strike (3)**
27:17;56:14;103:1

**structures (2)**
30:23;31:14

**struggle (1)**
67:22

**stuff (5)**
14:9;16:19,22;42:13;
97:24

**subject (1)**
111:3

**submit (6)**
38:13;89:9;113:17;
114:19;126:3;129:13

**submitted (17)**
65:13,18;73:15;
74:21;80:24;87:11;
92:20;94:11;97:13;
103:11;114:15;115:8;
117:12,22,24;128:8;
146:15

**submitting (2)**

71:25;118:1

**substitute (6)**
122:18;123:3,15,18,
23,25

**substituted (1)**
123:18

**SUDDENLY (1)**
134:22

**suggest (1)**
38:11

**suggestion (1)**
54:15

**Sullivan (2)**
5:5;6:23

**summary (1)**
80:22

**supervisor (1)**
89:13

**suppose (2)**
58:15;67:7

**supposed (5)**
80:8;130:4,6,8;
145:24

**Sure (32)**
7:16;9:13;10:9;
20:12;28:23;29:7;39:4;
46:25;52:20;54:9;
65:17;66:18,22;70:17,
18;74:20;75:23;76:17;
77:3;82:7;90:9;91:18;
97:16;99:23;102:21;
117:7;120:4;137:16;
138:2;140:4;141:10;
149:22

**swear (2)**
7:1;8:20

**switched (1)**
63:5

**sworn (1)**
8:24

**symptom (1)**
67:11

**symptoms (1)**
67:10

---

## T

**talk (22)**
9:23;12:5,20;32:22;
33:1,4;36:18,23;37:9,
21;45:13;50:14;51:6;
72:3,6;81:18;112:9;
124:9;126:9,10,12;
130:15

**talked (7)**
9:14;51:2;87:16;
116:5;132:3;141:16,20

**talking (5)**
37:2;65:15;120:10;
124:23;125:6

**Tanya (6)**
89:14;103:1,4,5,20;
118:8

**taught (2)**
15:4;19:3

**tax (1)**
113:15

**teach (2)**
18:25;19:7

**Teacher (1)**
8:4

**Teachers (1)**
6:9

**teaching (4)**
13:22;15:3;20:21;
82:15

**technical (1)**
7:24

**telling (3)**
56:23;103:17;133:20

**tells (1)**
100:18

**ten (3)**
20:7,11;27:13

**Teresa (1)**
81:8

**Term (6)**
76:14;77:14;100:15;
102:2;111:19;116:17

**terminate (1)**
55:24

**terms (8)**
17:20;25:13;48:9;
70:4,16;78:10;93:19;
120:22

**terrible (2)**
43:5;66:24

**Terribly (1)**
48:11

**test (2)**
52:22;106:25

**testified (9)**
9:1;38:20;79:19;
99:8;105:13,17,19;
126:20;145:23

**testify (1)**
10:25

**testimony (4)**
65:25;66:20;105:20;
146:4

**testing (2)**
43:11,16

**THANKED (1)**
135:6

**Thanks (4)**
9:4;26:5;53:11;
152:9

**that'd (1)**
108:22

**Thereupon (1)**
8:22

**thinking (1)**
129:1

**thirty (1)**
130:20

**though (9)**

18:18;42:12;49:22;
72:12,23;83:23;98:7;
134:11;145:24

**thought (3)**
54:18;129:12;146:16

**thousand (3)**
136:19;138:13;140:7

**three (8)**
15:4;19:4;31:8;45:3;
57:23;64:24;84:6;93:5

**three-page (1)**
66:11

**throughout (3)**
8:5;63:7;81:14

**Timber (2)**
21:5,6

**timeline (2)**
17:20;120:22

**times (16)**
37:23;40:14,17,18,
21;41:1;46:24;47:5;
48:22,23;57:23;72:15;
84:6;91:14;130:23;
145:11

**timesheets (2)**
94:11;118:1

**tiny (1)**
21:18

**title (4)**
28:14;90:3;103:23;
112:14

**TITLED (1)**
134:23

**today (5)**
11:1;32:23;33:2;
93:9;135:5

**Today's (1)**
6:18

**told (17)**
17:9;33:6;51:20;
85:2;87:7,25;88:3,9,
11;93:24;105:10;
120:12;127:14;128:1;
129:8;131:15,19

**TOMORROW'S (1)**
135:6

**took (3)**
14:3;15:9;90:13

**top (9)**
58:7;61:1;67:4;
95:12;96:7;101:19;
110:7,8;115:15

**topic (2)**
41:24;93:19

**total (1)**
131:1

**totally (2)**
66:22;123:9

**toward (1)**
79:5

**towards (2)**
39:19;49:6,8

**transpired (1)**

74:24
transport (1)
59:25
Transwestern (1)
34:11
treatment (2)
47:19;48:3
TRIAL (1)
53:20
trickiness (1)
123:12
tried (2)
40:24;74:3
trigger (2)
140:10,23
trip (1)
80:20
true (1)
129:9
trust (2)
33:20;50:20
trusted (3)
39:9;52:2;79:19
truth (3)
8:25,25;9:1
truthfully (1)
11:1
try (13)
9:23;10:11,20;26:6;
34:3;38:25;42:2,17;
57:6;119:12;121:17;
129:20;133:17
trying (19)
14:20;41:22;46:11;
49:25;54:17;57:14;
62:12;67:24;76:10,24;
88:1;91:21;123:5;
124:1;128:6,7,9;
138:16;148:25
Tubbs (6)
58:16,19;63:13,16,
17;65:8
TUESDAY (1)
6:1
turned (1)
118:3
turning (1)
43:1
twenty-seven (1)
80:23
twice (1)
41:1
twist (1)
140:21
two (10)
13:7;14:3;21:1;
31:23,25;45:3;66:12;
93:5;127:10;130:23
two-page (1)
115:15
Tx (1)
61:18
types (3)

25:3;28:24;36:11

**U**

unable (1)
88:5
under (22)
10:23;65:14;73:16;
77:14;87:12;89:17,20;
99:21;100:1;112:2,14,
18;129:21,22;131:6;
136:1,22;137:11,17;
138:3;140:12;145:8
underneath (1)
60:15
Understood (7)
18:16;55:16;57:14;
76:3;79:10;126:2;
143:23
United (3)
6:4,9;8:4
University (2)
12:25;13:4
up (31)
17:24;29:24;32:3,4;
36:1;39:13;40:3;43:7;
52:18;63:23;68:15;
71:16;72:1;76:11,13;
80:20;104:18;107:11;
108:11;109:17,19;
111:15;115:15,17;
121:17;122:1;123:15;
125:4;132:23;133:8;
143:24
upset (8)
40:11,25;41:9;42:2;
75:4,7,9,12
upstairs (1)
32:1
Use (3)
62:23;85:7;124:1
used (1)
18:24
using (1)
138:7

**V**

VA (38)
43:3,15,16;44:18;
45:8,23;46:16,18,21;
47:9,11,13;49:23,23,
24;50:1,6,17;61:24;
63:19;88:13,17,22;
89:17;98:6,16,17;
101:3;102:15;114:6,
13;129:24;130:2;
132:6,7,11;143:11,24
Vaguely (1)
143:7
various (1)
87:5
Verification (1)

61:19
verified (1)
54:19
verify (1)
125:18
version (3)
122:4;123:14;124:14
veteran (2)
45:9,14
veterans (1)
45:23
veteran's (1)
82:22
video (2)
6:2,20
VIDEOGRAPHER (11)
6:2;7:17,21;11:4;
53:3,7;109:8,12;152:2,
6,15
Visit (5)
58:10;59:8;64:8;
67:8,10
Vital (3)
69:1;96:25;102:2
vitals (1)
49:12
voice (1)
132:19
volunteer (1)
18:4

**W**

W-9 (1)
113:14
wait (1)
25:23
walk (5)
14:16;22:14;32:4;
151:12,20
walker (2)
63:1,3
walking (1)
92:24
way (4)
14:22;25:13;92:15;
120:23
ways (1)
93:20
Weakness (2)
61:7,7
week (16)
16:11,14;17:1,8,15;
18:7;19:15;44:24;
48:19;49:8;67:10;
72:13;84:6;93:3,6,6
weekends (1)
49:8
weeks (2)
44:5;67:10
wellness (1)
13:8,20
weren't (4)

74:1,7;99:25;128:1
West (1)
6:16
What's (7)
12:8,13,21;39:6;
45:4;90:7;101:11
Wheelchair (2)
63:1,6
Wherein (1)
6:7
Where's (1)
89:11
whichever's (1)
14:18
whole (3)
8:25;59:4;124:21
Whoops (5)
58:2;77:25;80:8;
95:13;96:10
whose (1)
104:6
wish (1)
42:9
within (1)
26:9
without (6)
57:5,19;88:6;106:25;
115:21;149:2
witness (4)
7:1;8:21,24;42:21
witnesses (1)
56:3
WIXTED (3)
8:9,9,17
wonderful (1)
108:12
wood (4)
30:24,25;70:7,11
word (1)
136:10
worded (1)
70:18
words (10)
16:10;24:22;25:25;
33:21;42:5;50:13;87:3;
140:11,19,21
work (35)
16:11,20;17:9,16;
18:9,17,18;19:10,12;
20:1;22:12;23:8,19,19;
24:3;26:17,21,23;28:6;
29:17,20;30:13;32:18;
35:6;70:7;72:14;78:3;
86:22;91:1,3;95:13;
104:14;107:10;109:5;
148:20
worked (18)
13:25;15:1;16:1;
20:3,4,13;22:1,7,10;
23:16;24:10;26:12;
28:12,25;30:8;48:6;
82:6;103:21
working (22)

14:1,15;15:9;17:22,
24;18:2,8;27:4,16,21;
70:4;72:12;92:7,14;
94:20;98:22;104:21,
23;105:4,6;127:2,3
works (2)
38:18;101:14
workshop (2)
31:1;70:5
worries (1)
77:1
worry (1)
67:2
worse (1)
43:12
worst (1)
66:6
wound (1)
51:10
wounds (1)
49:13
wrenching (1)
92:13
writing (3)
115:20,21;129:7
written (1)
142:11
wrong (1)
128:4
wrote (1)
118:13

**X**

XVIII (1)
112:14

**Y**

year (6)
27:7;30:4;43:23;
143:21;144:20;149:17
years (10)
11:19;13:16;14:3;
15:4;19:4;20:7,11;
27:13;63:7;81:14
yellow (4)
43:1,5,9,10
Yep (4)
10:10,11;68:3;
108:15
You' (1)
125:22
young (2)
25:17;30:6
younger (1)
26:14

**Z**

zero (1)
85:16
Zoom (4)

Michelle King
Case 4:21-cv-00087-BMM    Document 119-3    Filed 01/03/25    Page 56 of 56    Michelle King
United Teacher Associates Insurance Company, et al.                                      December 10, 2024

7:8,9;25:16;46:5

## 1

**1 (4)**
64:8,11;131:4;135:4
**1,000 (1)**
139:6
**1,200 (1)**
31:11
**10 (5)**
6:1;108:24;109:1,2,6
**10.50 (2)**
89:5;92:22
**10/26/26 (1)**
126:19
**10:19 (2)**
53:3,5
**10:27 (1)**
53:7
**10th (1)**
6:18
**11 (1)**
121:12
**11/2015 (2)**
143:14,15
**11:42 (2)**
109:8,10
**11:48:59 (1)**
121:13
**11:50 (1)**
109:4
**11:54 (2)**
109:11,12
**11th (1)**
89:12
**12:45 (2)**
152:2,4
**12:59 (4)**
152:5,6,16,18
**13 (3)**
11:19;59:3;102:12
**13:42 (1)**
133:7
**14 (1)**
67:10
**14:50:52 (1)**
125:11
**14-year-old (1)**
12:19
**15 (5)**
19:16;38:9;72:14;
108:24;109:2
**16 (1)**
18:12
**17 (4)**
115:22;117:1,16,21
**17th (1)**
133:8
**17-year-old (1)**
12:19
**1971 (1)**
24:2

**1980 (1)**
22:21
**1995 (1)**
13:12
**1996 (1)**
81:23
**1999 (1)**
13:14

## 2

**2 (5)**
39:14;69:22,25;
107:21;110:25
**2:00 (1)**
108:24
**2:50 (1)**
125:12
**20 (11)**
16:14;17:15;19:15,
16;72:13,14;80:14;
93:3,4;103:14;108:25
**2000s (1)**
19:3
**2004 (1)**
13:2
**2006 (1)**
18:12
**2011 (4)**
15:16;17:21;30:14;
51:10
**2013 (7)**
37:19;38:4,5;51:9,
10,15,17
**2014 (2)**
38:9;143:11
**2015 (12)**
42:25;43:21;44:7,15,
22;83:23,24;84:19;
141:17,18,21;143:20
**2016 (83)**
17:23,24;18:9,14;
38:5,7;39:15,15;41:15,
19;43:15,21;44:9,20,
25;47:17;48:13,18;
49:1,2;50:19;58:12;
59:12;60:25;63:13;
65:9,11,18;67:8,9;
73:20,21,24;74:22,25;
75:9,11,15;77:2,5,14;
80:23;81:3;83:9,11;
84:7;85:15;86:15;87:1,
10;92:24;96:7;97:10;
102:12;103:12,16;
106:1,11;110:10,25;
115:22;117:2,16,21;
120:6,23,23;121:13,16,
22;124:21;125:5,11;
127:20,21;128:21;
129:11;133:7,25;
134:7,14;141:19;
143:12
**2017 (7)**

92:2,18,21;120:25;
124:22;146:17,22
**2018 (1)**
34:20
**2021 (4)**
18:10,14,18,20
**2023 (1)**
151:5
**2024 (2)**
6:1,18
**21 (1)**
67:9
**22 (1)**
65:2
**23 (1)**
19:19
**23rd (1)**
67:8
**24 (2)**
58:12;59:12
**24/7 (1)**
119:19
**24th (2)**
84:7;151:4
**25 (3)**
63:13;77:13;125:11
**25th (2)**
121:22;125:5
**26 (5)**
65:2;80:22;103:11;
124:21;127:21
**27 (3)**
65:1;77:2,5
**28 (1)**
112:15
**29 (2)**
133:25;134:7
**29th (2)**
132:18;133:6
**2nd (3)**
81:3;96:10;145:16

## 3

**3 (3)**
80:1,3;112:2
**3,000 (1)**
139:5
**3/24/2016 (1)**
60:25
**3/28/2016 (1)**
65:8
**3/7/2017 (1)**
143:3
**30 (3)**
137:7,19;138:8

## 4

**4 (6)**
86:14,17;110:10;
121:5,14;128:21
**4:21-cv-00087-BMM (1)**

6:7
**4015 (1)**
12:10
**406-421 (1)**
126:3
**422-1062 (1)**
126:4
**4th (1)**
106:11

## 5

**5 (4)**
95:19,21;120:19;
123:16

## 6

**6 (7)**
96:7;97:10;103:16;
106:5,7;134:14;135:5
**60-day (1)**
78:20
**6th (2)**
6:16;18:12

## 7

**7 (7)**
6:16;109:18,21;
119:6;120:25;124:22;
128:13

## 8

**8 (3)**
13:10;118:25;119:2
**80s (1)**
28:11

## 9

**9 (2)**
150:18;151:1
**9:06 (2)**
6:19;7:17
**9:23 (1)**
7:19
**9:28 (2)**
7:20,21
**90s (1)**
28:11